**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| ASSOCIATION FOR COMMUNITY AFFILIATED PLANS,<br>   1155 15th Street NW, Suite 600<br>   Washington, DC  20005<br><br>NATIONAL ALLIANCE ON MENTAL ILLNESS,<br>   3803 N. Fairfax Dr., Suite 100<br>   Arlington, VA 22203<br><br>MENTAL HEALTH AMERICA,<br>   500 Montgomery Street, Suite 820<br>   Alexandria VA  22314<br><br>AMERICAN PSYCHIATRIC ASSOCIATION.<br>   800 Maine Avenue, S.W., Suite 900,<br>   Washington, DC 20024<br><br>AIDS UNITED<br>   1101 14th St NW, Suite 300,<br>   Washington, DC 20005<br><br>THE NATIONAL PARTNERSHIP FOR WOMEN & FAMILIES,<br>   1875 Connecticut Avenue NW, Suite 650<br>   Washington, D.C.  20009<br><br>LITTLE LOBBYISTS, LLC<br>   PO Box 2052, Silver Spring MD 20915<br>                    *Plaintiffs*,<br><br>        v.<br><br>UNITED STATES DEPARTMENT OF TREASURY,<br>   1500 Pennsylvania Avenue, NW<br>   Washington, DC 20220<br><br>U.S. DEPARTMENT OF LABOR,<br>   200 Constitution Ave N.W.<br>   Washington, D.C. 20210 | Civil Action No. ___18-2133 |

U.S. DEPARTMENT OF HEALTH AND
HUMAN SERVICES,
 200 Independence Avenue, SW
 Washington, DC 20201

ALEX M. AZAR II, IN HIS OFFICIAL
CAPACITY AS SECRETARY OF HEALTH
AND HUMAN SERVICES,
 U.S. Department of Health and Human
 Services
 200 Independence Avenue, SW
 Washington, DC 20201

R. ALEXANDER ACOSTA, IN HIS
OFFICIAL CAPACITY AS SECRETARY OF
LABOR,
 U.S. Department of Labor
 200 Constitution Ave N.W.
 Washington, D.C. 20210

STEVEN MNUCHIN, IN HIS OFFICIAL
CAPACITY AS SECRETARY OF THE
TREASURY,
 United States Department of Treasury
 1500 Pennsylvania Avenue, NW
 Washington, DC 20220

UNITED STATES OF AMERICA
 U.S. Department of Justice
 950 Pennsylvania Avenue, NW
 Washington, DC 20530

*Defendants.*

# I.
## <u>INTRODUCTION</u>

1.        The Affordable Care Act ("ACA") sets forth standards that govern the terms on which health insurance plans may be offered on the individual market.  For example, the ACA requires these plans cover a set of "essential health benefits," and it prohibits insurers from denying coverage or charging higher rates based on a person's medical condition or history.  Narrow categories of insurance products are exempt from these standards.  One such narrow exemption is for "short-term, limited duration insurance," a phrase that refers to "a type of insurance that was primarily designed to fill temporary gaps in coverage that may occur when an individual is transitioning from one plan or coverage to another plan or coverage."  Final Rule, Short-Term, Limited Duration Insurance, 33 Fed. Reg. 38,212, 38,213 (Aug. 3, 2018).

2.        The Departments of Labor, Treasury, and Health and Human Services (collectively, "Departments") recently issued a final rule—the short-term, limited duration insurance rule ("STLDI Rule")—that seeks to convert this narrow exemption for "short-term, limited duration insurance" into a loophole that would permit the creation of a parallel individual insurance market consisting of plans that are not subject to the ACA's consumer protection standards.  This result cannot be reconciled with the text, structure, or purpose of the ACA.  The STLDI Rule is contrary to law, and is arbitrary and capricious—and therefore should be set aside under the Administrative Procedure Act.

2.        The STLDI Rule purports to define "short-term, limited-duration insurance"— which is exempt from the ACA's relevant provisions—to include health insurance policies that last up to 364 days, and that can be extended to up to 36 months (and potentially longer through the initial purchase of multiple plans).  The new rule reverses a recent, reasoned decision of the same Departments as well as longstanding practice regarding extensions of such plans.  If it is

permitted to take effect, the STLDI Rule will inflict serious harm on insurers and the health insurance marketplaces established by the ACA, making it much more expensive for anyone to purchase health insurance with all of the ACA's protections and covering all of the essential health benefits mandated by the ACA. Health care providers will not receive payment under STLDI policies for all of the care that is required to be covered by ACA-compliant individual health insurance plans. And it will be more expensive, and perhaps impossible, for some individuals with pre-existing conditions to obtain health care and health insurance coverage— undermining the purpose of, and congressional plan embodied in, the ACA.

3.     The Departments' justifications for this rule are directly contrary to the congressional determinations embodied in the text and structure of the ACA.  If the rule is permitted to stand, it will thwart rather than further Congress's objectives in enacting that law:

- Congress recognized that individuals often were sold insurance plans that did not provide necessary coverage, such as maternity or mental health benefits, or that imposed annual or lifetime limits on insurance payments.  Frequently, individuals were confused or deceived about the coverage they were purchasing. The ACA therefore requires that health insurance sold in the individual market cover "essential health benefits," adhere to the same mental health parity requirements as in the group market, and comply with limits on patients' out-of -pocket expenses.  But the Departments' rule permits the sale of insurance coverage of up to 3 years (and perhaps more) that does not comply with these requirements, leaving individuals without access to critical health care when they need it most and opening the door to consumer confusion about the scope of protection provided by any particular health plan.

- Congress recognized that individuals with pre-existing conditions often were unable to obtain affordable health insurance, or any insurance at all. The ACA therefore prohibits discrimination against individuals with pre-existing conditions or a history of illness.  It also bars insurers from setting health insurance premiums based on health history, gender, and (outside specified limits) age. But the Departments' rule permits sellers of STLDI to refuse to sell insurance to individuals with pre-existing conditions and allows premiums to be set based on health history, gender, and (without the ACA's limits) age.

- Congress recognized that the ACA's protection of individuals with pre-existing conditions and its prohibition of discriminatory premiums required a broad, single risk pool for the individual insurance market.  It therefore required the establishment of such a pool and enacted a number of measures for risk sharing among insurers.  But the Departments' rule is designed to greatly expand the separate STLDI market, and to do so by luring healthier individuals away from the ACA marketplaces (which include ACA-compliant insurance and qualified health plans), which will trigger an increase in premiums for those left in the ACA marketplaces.  As premiums increase, more individuals will leave the marketplaces, which will trigger further increases.  The inevitable result will be the segmentation of the individual market into one pool of healthier individuals (purchasing STLDI) and another pool of individuals with pre-existing conditions and/or high health costs (purchasing ACA marketplace plans)—the precise result that Congress rejected.

4.      The Departments themselves estimate that the rule will increase ACA marketplace premiums by 5%. And a study submitted by one of the plaintiffs found that the rule would cause premiums to rise by as much as 2.2-6.6% in the near term.[1] That study also found that as many as 1.01-1.95 million individuals would switch their coverage from ACA-compliant plans to STLDI plans.

5.      In a very different form, STLDI plans have existed in the insurance market for decades as a stopgap measure for individuals who are between comprehensive insurance plans. Even the insurers who offer such coverage do not consider it a replacement for ordinary health insurance.[2]  Unlike ACA marketplace plans, STLDI plans are exempt from the Health Insurance Portability and Accountability Act of 1996 (HIPAA) requirement that insurance plans be guaranteed renewable; thus, a STLDI provider may decline to continue covering an insured individual when the insurance term ends.  Also, unlike ACA marketplace plans, STLDI plans are exempt from the ACA's requirement that marketplace plans offer "essential health benefits" and abide by specified limits on patients' out-of-pocket expenses, among other consumer protections. Importantly, the essential health benefits required by the ACA include mental health and substance use disorder treatment that is subject to mental health parity requirements.  Finally, STLDI plans are exempt from the ACA's consumer protections that prohibit insurers from refusing coverage based on an individual's pre-existing health conditions and bar insurers from setting premiums based on an individual's health history, gender, or (outside specified parameters) age.  Thus, STLDI plans may omit essential health benefits and engage in business

---

[1] Comment of Association for Community Affiliated Plans, Apr. 20, 2018, at 5.

[2] Comment of American Cancer Society Cancer Action Network et. al, Apr. 23, 2018, at 3 (noting that sellers of STLDI plans "acknowledge that such plans are 'designed solely to provide temporary insurance during unexpected coverage gaps'") (citation omitted).

practices that are otherwise forbidden to ACA-compliant individual health insurance plans, making STDLI plans a poor substitute for ACA plans.

6.     Nevertheless, STLDI coverage is sometimes mistakenly purchased by consumers who believe it offers adequate coverage at a cheaper price, or who are contacted by an insurance agent who "tell[s] them that the plan complies with the ACA when it does not."[3]  This mistake can have devastating consequences.  A woman in Illinois, for example, went to the hospital with heavy vaginal bleeding resulting in a 5-day hospital stay and a hysterectomy, only to be denied coverage under her STLDI plan on the ground that her menstrual cycle constituted a pre-existing condition.[4]  Elsewhere, a man in Washington, D.C., purchased a STLDI plan with a stated maximum payout of $750,000; when he sought coverage for a $211,000 bill resulting from a hospitalization, however, he was paid only $11,780, in part due to a denial of coverage based on his *father's* medical history.[5]

7.     These consequences stem in large part from the reality that STLDI plans are not subject to ACA requirements—meaning that their customers fall victim to many of the ills that the ACA sought to remedy.  Prior to the ACA, the health insurance market for individual plans was subject to substantial premium volatility and discriminatory practices through which insurers cherry-picked healthy individuals and engaged in a variety of cost-control schemes to avoid paying claims.  The ACA substantially reduced these problems by requiring that individual and small group plans cover "essential health benefits," thereby guaranteeing a certain level of coverage to every individual without regard to age, gender, or pre-existing conditions. The ACA also forbids issuers from imposing cost-control practices such as rescissions of coverage, annual

---

[3] Comment of Families USA, Apr. 23, 2018, at 2 (internal quotation marks omitted).

[4] Comment of EverThrive Illinois, Apr. 23, 2018, at 2.

[5] Comment of Families USA at 2.

limits on coverage, and excessive cost-sharing requirements that effectively rendered individuals' coverage meaningless.

8.      In addition to guaranteeing that the insurance an individual purchases and receives meets basic coverage requirements, including maternity, mental health, and substance use disorder treatment, the ACA requires that insurers treat all enrollees in each of the individual and small group markets, healthy or sick, as part of a unified insurance pool.  And the ACA's risk adjustment provisions stabilize the marketplaces by helping to equalize risk among insurers participating in the marketplaces.  Through these  mechanisms, the ACA enables access to affordable insurance for people with pre-existing conditions by the pooling of high- and low-cost enrollees' premiums, preventing market segmentation and disruption of the individual health insurance marketplaces established by the ACA.

9.      STLDI plans are exempted from these requirements because those plans are intended to provide only temporary insurance protection while individuals transition from one plan to another; for example, a newly hired employee who must complete a probationary period before becoming eligible for insurance through his or her employer might seek coverage through a STLDI plan.  In such circumstances, where the risk of needing substantial health services over the next few months is low (and when comprehensive insurance is around the corner), an individual's risk of poor health outcomes and sizeable surprise bills due to inadequate coverage may not be high.  But STLDI plans are not appropriate over a longer period of time—as their name indicates—because individuals cannot predict if and when a latent health issue (or new catastrophic problem) will manifest and require more comprehensive treatment.  Similarly, although a cap on health insurance benefit payments generally will not affect a consumer who is on the short-term plan for only a few months, such limits may substantially harm individuals

who maintain the capped coverage for an extended period.  What is more, an individual with a short coverage gap—that  is, a period or no more than three months in which the individual goes without insurance, or maintains only a sub-standard STLDI plan—is eligible to enroll in an ACA-compliant plan under a special enrollment period at the end of that term, if he or she learns that a new health issue requires more comprehensive coverage.  That individual loses the eligibility to do so after three months.  If STLDI plans could be marketed for periods longer than three months, then, many individuals could lose their eligibility for insurance that would cover all of their medical needs.

10.     To balance these considerations, the Departments published a final rule on October 31, 2016, interpreting "short term" as including only plans that are up to three months in length and "limited duration" as requiring that these plans' total term, including extensions, be 12 months or fewer.[6]  By doing so, the Departments ensured that STLDI coverage would not contravene the core purpose of the ACA by creating an "alternative" to comprehensive coverage that would undercut ACA protections and segment the market.

11.     Shortly after this rule was finalized, President Trump took office.  One of President Trump's stated policy goals, as promised during his presidential campaign, is to repeal and replace the ACA.[7]  President Trump signed an Executive Order on his first day in office to initiate action toward this goal—including through administrative actions.[8]

---

[6] *Excepted Benefits; Lifetime and Annual Limits; and Short-Term, Limited-Duration Insurance*, 81 Fed. Reg. 75,316 (Oct. 31, 2016).

[7] *See, e.g.*, Donald Trump (@realDonaldTrump), Twitter (Oct. 21, 2016, 8:22 AM), https://twitter.com/realdonaldtrump/status/790936603590033408?lang=en.

[8] *Minimizing the Economic Burden of the Patient Protection and Affordable Care Act Pending Repeal*, 82 Fed. Reg. 8351 (Jan. 20, 2017) (Exec. Order No. 13765).

12.     Like any law, the ACA can be repealed by act of Congress.  But Congress has repeatedly rejected attempts to repeal the ACA.  Now, with the issuance of the STLDI Rule, the Departments seek to do by executive fiat what could not be accomplished through the required constitutional process.

13.     Specifically, the rule interprets "short-term" as permitting plans with a contract term of up to 364 days—1 day less than a qualified health plan under the ACA.  The rule also interprets "limited duration" as including plans that can be renewed for up to 36 months, and specifically permits the purchase of multiple 36-month contracts at the original point of sale. The Departments' decision thus allows insurers to sell "short-term, limited-duration" plans that are a single day shorter than comprehensive insurance and have no legally set limit to their duration.  The only practical difference between these plans and comprehensive insurance, then, is that they need not comply with the ACA's consumer protection requirements and can cherry pick healthier consumers— the precise practice prohibited by the ACA.  The ACA leveled the playing field for insurers.  This rule will disrupt the protections and requirements that created this level playing field and will have the effect of forcing insurers who participate in the ACA marketplace to raise premiums when STLDI plans siphon off younger and healthier individuals. As numerous commenters warned the Departments during the notice-and-comment process, the foreseeable effect of the STLDI Rule will be increased confusion for consumers (including the risk of fraud by brokers and other intermediaries), decreased coverage (overall and for services needed by covered individuals), and a higher financial burden for the government and taxpayers

alike.[9]  Nonetheless, the Departments have finalized the STLDI Rule, and given it an effective date of October 2, 2018.

14.     This rule is not merely harmful policy—it is unlawful.  *First*, the Departments' interpretation of "short-term" as including plans whose duration is 99.7% as long as marketplace plans is contrary to the plain meaning of the phrase "short-term" and to the structure of the ACA.  *Second*, the Departments' interpretation of "limited-duration" as permitting renewals beyond 12 months, and potentially for many years, is contrary to the text and purpose of the governing statute, and contradicts a longstanding agency interpretation without any adequate justification.  *Third*, the Departments' reasoning in support of the rule is arbitrary and capricious, including (a) their departure from a very recent and directly contrary rule adopted by those same Departments; (b) their choice of an approach that is certain to injure consumers, health care providers, and marketplace insurers by reducing meaningful insurance coverage; (c) their adoption of a rationale that is directly contrary to the policy determinations embodied in the text and structure of the ACA—and is designed to, and would, undermine Congress's own plan for the health insurance market; and (d) the risk of significant harm to the 2019 individual marketplace by having the STLDI Rule go into effect on October 2, 2018.  *Fourth*, the Departments failed to provide notice of central provisions of their rule, thereby depriving the public of a meaningful opportunity to comment on the rule, in violation of the Departments' obligations for notice-and-comment rulemaking under the Administrative Procedure Act.

15.     Plaintiffs are seven organizations that participated in the 2018 rulemaking proceeding and/or believe strongly that the STLDI rule is incompatible with their shared purpose of ensuring access to adequate, affordable health care for all Americans.  Each plaintiff and its

---

[9] *See, e.g.*, Comment of BlueCross BlueShield Association, Apr. 23, 2018; Comment of Consumers Union, Apr. 20, 2018.

members and/or the individuals and groups that it represents will suffer significant harm from the STLDI rule.

- The Association for Community Affiliated Plans ("ACAP") is an association of nonprofit and community-based insurers that provide qualified health coverage to individuals through the ACA marketplaces.  The insurance policies permitted by the rule will compete with the insurance offered by ACAP's members, and ACAP members will be harmed by the loss of customers to insurers selling STDLI policies. STLDI policies will be less expensive for some consumers because premiums can be set based on health history, age (beyond the ACA-specified limits), and gender (resulting in lower premiums for healthy, young men); the policies can exclude some of the essential health benefits that ACA marketplace insurance provides; and the policies can impose annual dollar limits on benefits.

- The National Alliance on Mental Illness ("NAMI") represents individuals affected by mental illness.  These individuals will face higher health insurance costs as a result of the increase in premiums for ACA marketplace plans; they will not be able to purchase STDLI plans because such plans typically are not available to individuals with pre-existing conditions and do not provide the coverage that such individuals need.

- Mental Health America ("MHA") is a community-based nonprofit dedicated to addressing the needs of those living with mental illness and to promoting the overall mental health of all Americans. Because most STDLI plans are not required to cover mental health and substance use disorder services, or contain limitations (such as exclusions of drug benefits or dollar caps on benefit

12

payments) that restrict treatment options, MHA believes that expanded use of STLDI policies will result in an increasing number of individuals with mental health conditions losing access to coverage and care for these conditions. This change would overwhelm the MHA affiliates network, which relies on limited non-profit resources to assist such individuals, and would put unsustainable pressure on local and state government funded services. Consequently, more people would be unable to access timely and appropriate medical treatment, would experience multiple crises (such as interrupted education, employment, housing), and would be diverted into the criminal justice system

- The American Psychiatric Association is the largest association of psychiatrists in the world.  The medical services provided by its members are excluded from many STDLI plans and doctors will therefore be put in the position of discontinuing treatment (which may be ethically and legally impermissible) or providing treatment without compensation.

- AIDS United represents individuals with HIV and health care providers who treat those individuals; because of their pre-existing condition, STLDI plans are not available for these individuals, who will therefore continue to purchase health insurance through the ACA marketplaces.  They therefore will be burdened by the premium increases for that insurance, which are a direct result of the STLDI rule; and, to the extent an individual can no longer afford insurance, the health care providers that AIDS United represents will face an increase in uncompensated care, which imposes a direct financial burden on these organizations.

- The National Partnership for Women & Families ("NPWF") represents the interests of women by promoting fairness in the workplace; reproductive health and rights; access to quality, affordable health care; and policies that help women and men meet the dual demands of work and family.  The STLDI Rule promotes plans that engage in pricing discrimination against women, exclude coverage for essential women's health services, and deny coverage based on pre-existing conditions, which would leave the women that NPWF represents without adequate coverage and access to care.

- The Little Lobbyists, a group of families with children with serious health conditions, will see the health insurance premiums of its families increase significantly as healthy, younger individuals leave the ACA marketplaces and instead purchase STDLI plans.

16.     For all of these reasons, the STLDI Rule should be set aside as arbitrary and capricious and contrary to law.

## II.
## JURISDICTION & VENUE

17.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 2201(a).  Jurisdiction is also proper under the judicial review provisions of the Administrative Procedure Act, 5 U.S.C. §§ 702, 704.

18.     Venue is proper in this district pursuant to 28 U.S.C. §§ 1391(b) and (e)(1). Defendants are United States agencies or officers sued in their official capacities; Defendants reside in this District; and a substantial part of the events giving rise to this action occurred in this District.

**III.**
**PARTIES**

19.     Plaintiff Association for Community Affiliated Plans (ACAP) is a membership trade association of 62 not-for-profit and community-based Safety Net Health Plans located in 29 states.  ACAP member plans provide health care coverage to more than 21 million individuals, including over 700,000 enrollees in the individual ACA insurance marketplaces.

20.     ACAP is a 501(c)(6) nonprofit organization incorporated in Delaware with its principal place of business in Washington, D.C.  It was founded in 2000.

21.     In ACAP's comment submitted in the 2016 rulemaking, ACAP explained that "ACAP's member plans do not generally offer short-term, limited-duration products," which can cherry-pick healthy insurance purchasers and undercut ACAP members' ability to balance their risk pools.[10]

22.     As ACAP further explained in its comment during the 2018 rulemaking, the STLDI Rule finalized by the Departments "will have a deleterious impact on the individual market single risk pool—thus impacting the business stability for SNHPs offering individual market products."[11]  To quantify this effect, ACAP commissioned a study from the Wakely Consulting Group which estimated that as a result of the STLDI Rule in just the first year up to "826,000 consumers are expected to leave the ACA-compliant market" (and thus cease being potential customers of ACAP members), and that 1.01 to 1.95 million will leave in the following 4 or 5 years.[12]  This study, which was included as an appendix to ACAP's comment in the 2018

---

[10] Comment of Association for Community Affiliated Plans, Aug. 9, 2016, at 1.

[11] Comment of Association for Community Affiliated Plans, Apr. 20, 2018, at 3.

[12] *Id.* at 5.

rulemaking, also estimated that as a result of the STLDI Rule, premiums in the ACA-compliant market will increase by 2.2 to 6.6 percent.[13]

23.     ACAP members will be injured directly by the STLDI Rule's authorization of competing insurance products that will be priced lower than ACAP members' policies—because companies offering STDLI policies can set premiums based on an individual's health history, gender, and age (without the age rating limitations that apply to ACA marketplace policies), exclude coverage of some of the essential health benefits that ACA marketplaces must cover, and set annual dollar limits on policy benefits.  ACAP members will therefore lose customers to competing companies offering STDLI policies—as the Wakely study documents.

24.     For example, Community Health Choice Inc. (Community) is a ACAP member in Harris County, Texas.  It was created by the Harris County Hospital District as a separate not-for-profit organization to serve low-income, underserved residents of the Houston area by becoming licensed as an HMO and contracting with the State of Texas for its Medicaid Managed Care program.  It has been serving low-income residents who qualify for Medicaid since 1997, and entered the local federally-facilitated health insurance marketplace in 2014.  Community currently offers seven plans on the Texas ACA marketplace—two Bronze, three Silver, and two Gold plans.

25.     Community currently serves approximately 290,000 Medicaid or CHIP insurance recipients, along with roughly 110,000 people who purchased its insurance through the individual health insurance marketplace.  Community estimates that 30,000-40,000 of the people who purchased its insurance through the marketplace have limited or no subsidies covering the cost of health insurance.

---

[13] *Id.*

26.     Because Community serves a low-income population, many of its members were previously uninsured, have pre-existing conditions, and cannot afford large deductibles.  These Community members are not good candidates for STLDI plans.  However, STLDI plans are often marketed to the low-income, low-information population that Community serves, making STLDI plans a direct competitor to Community's products.  Moreover, agents and brokers currently assist Community with roughly 40% of its members.  Because agents and brokers often receive higher commissions for STLDI plan enrollment, Community expects that many of the members it would otherwise have obtained will instead be directed to STLDI plans, even though STLDI plans are often not an appropriate insurance solution for those individuals.

27.     As a result of the proliferation of STLDI plans that will occur if the STLDI Rule goes into effect, Community expects that many of the 30,000-40,000 members who do not have subsidies could be lured to purchase a cheaper but less effective STLDI alternative plan.  In addition, Community believes that 10,000 or more of its highly subsidized members may be confused by a low-cost plan and subscribe to STLDI without realizing that they are signing up for a higher deductible, fewer benefits, and no premium tax credits.  Community has observed that its members often do not understand the difference in risk and care associated with different marketplace insurance products, much less the difference in risks with newly-marketed, caveat-filled STLDI plans.

28.     Conservatively, Community expects to lose at least 10,000 members as an immediate result of the STLDI Rule, which would reduce its revenue by $50-100 million, depending on the ages and premiums of those who leave.  Over the next three to five years, Community expects that a large exodus of its members (particularly the healthy individuals that STLDI plans target) will add an additional 5-10% morbidity adjustment to its rates each year,

resulting in a premium increase of 20-50% for those who remain members.  Those individuals

will be harmed by higher premiums and may choose to leave Community as a result, further

decreasing Community's revenue.

29.     In addition, the STLDI Rule will make it more difficult for Community to

compete for the approximately two million Texans who are currently uninsured and could be

potential Community customers, meaning Community will lose out on revenue that it would

obtain but for the STLDI Rule.  Adding the members that it would have obtained but for the

STLDI Rule would also improve the risk pool and decrease premiums for all Community

insurance members, increasing Community's revenue and its ability to attract even more

members in the future.

30.     Furthermore, Community is an affiliate of the Harris Health System, which is the

healthcare provider of last resort in the Houston area.  As a result, Community expends resources

to assist individuals who lack health insurance (or whose insurance has limited coverage) and

need uncompensated care.  Because the STLDI Rule expands the population of individuals

whose insurance will deny coverage for essential health benefits, Community expects to suffer

further financial injury (and to see further injury to the population it serves and its fellow safety

net providers) as a direct result of this rule.

31.     Plaintiff National Alliance on Mental Illness (NAMI) is the nation's largest

grassroots mental health organization dedicated to building better lives for the millions of

Americans affected by mental illness.  NAMI's members are individuals who live with mental

health conditions and their families, with members in all 50 states. NAMI is an alliance that

includes 48 independent state organizations and local NAMI affiliate organizations in over 500

communities.

32.     NAMI is a 501(c)(3) nonprofit membership organization with its principal place of business at 3803 N. Fairfax Dr., Arlington, VA 22203.

33.     Access to coverage and care is essential for people with mental illness—NAMI's members—to successfully manage their condition and get on a path of recovery.  The STDLI Rule will limit access to coverage and care for people with mental health conditions, with consequential and devastating impacts for NAMI's members. *First*, individuals without known mental health conditions who enroll in these plans—which are not required to, and typically do not, provide coverage for mental illness—could be left exposed to significant risk if they develop a serious mental health condition once enrolled.  Because mental illnesses typically develop early in life and research shows that early intervention results in better outcomes, lack of parity mental health coverage in plans that appeal to healthy young adults has the potential to cause exceptional harm.  *Second*, because STLDI plans are not required to cover people with pre-existing conditions, NAMI's members likely will continue to purchase insurance through the ACA marketplaces.  Since STLDI plans will likely siphon younger and healthier individuals out of the individual market risk pool, NAMI's members will likely have to pay far higher costs for the comprehensive coverage they obtain through the insurance marketplaces.  *Third*, any NAMI member permitted to purchase an STLDI plan will likely be charged significantly more as a result of their pre-existing mental health conditions or may have coverage for their pre-existing condition excluded from their insurance plan.

34.     Plaintiff Mental Health America (MHA) is the nation's leading community-based nonprofit dedicated to addressing the needs of those living with mental illness and to promoting the overall mental health of all Americans.

35.     MHA is a 501(c)(3) nonprofit organization incorporated in New York and with its principal place of business in Alexandria, Virginia.  It was founded in 1909.

36.     MHA's Affiliate Network comprises over 200 local and state mental health organizations in 42 states, providing access to fair and effective mental health support services and working to influence public policy on mental health issues.  Many MHA affiliates provide direct mental health support services, run rehabilitative and recovery programs, conduct outreach and public education, and function as information and referral hubs.

37.     MHA's primary interest is in ensuring that individuals with mental health issues receive adequate care. Because many individuals with mental health concerns are unable to afford adequate treatment without the assistance of insurance, MHA believes that increased use of STLDI policies that exclude or limit mental health coverage would result in numerous individuals losing, or never obtaining, essential mental health services. Such an outcome would harm these individuals, and would place additional financial burdens on MHA and MHA affiliates that assist these persons.

38.     Much of MHA's work is on behalf of individuals with chronic behavioral health concerns, including chronic mental health issues and substance abuse disorders.  As explained in MHA's comment during the 2018 rulemaking, STLDI plans are not a realistic option for such individuals because these plans "do not have to cover mental health and substance abuse treatment services" and individuals with a history of such issues are, in any event, unlikely to "be able to meet medical underwriting standards" to obtain an STLDI plan.[14]  Moreover, STLDI plans can cherry-pick individuals who do not require mental health and substance abuse treatment services, which will drive up insurance premiums for the individuals that MHA assists

_____

[14] Comment of Mental Health America, April 9, 2018, at 2.

(and on whose behalf MHA advocates) and make "it more challenging for people that use these plans to access comprehensive services for mental health and substance use disorders when they need them."[15]

39.     Plaintiff American Psychiatric Association (APA) is the oldest medical association in the United States. APA's more than 37,800 physician members specialize in psychiatry and are dedicated to serving the best interests of patients with mental health and/or substance use disorders.  APA is the largest association of psychiatrists in the world, whose mission includes improving the treatment, rehabilitation, and care of persons with mental and substance use disorders; advancing the standards of psychiatric services, including diagnosis and treatment; promoting the best interests of patients and those actually or potentially making use of mental health services; and advocating for the interests of its members.  APA and its members have been long-term advocates for mental health parity and improving access to quality care for patients with mental health and substance use disorders.

40.     APA is a Section 501(c)(6) organization with its principal place of business in Washington, D.C.

41.     APA's members work in many practice settings, including private practices, hospitals, emergency rooms, community mental health clinics, and outpatient clinics and accept insurance from patients who participate in ACA marketplace plans.  The STLDI Rule, which effectively permits plans to discriminate based on pre-existing conditions and can exclude coverage for mental health and substance use disorders, threatens injury to APA's members in a number of ways.  To begin with, an individual who purchases an STLDI plan may subsequently develop a mental health or substance use disorder— most serious mental illness is diagnosed in

---

[15] *Id.*

the late teens or early twenties and starts as a more common mental illness such as depression, attention deficit hyperactivity disorder ("ADHD"), or anxiety.  Psychiatrists treating younger patients whose illness blossoms into a more serious mental illness will likely find that treatment for these illnesses is not covered by STLDI policies.  There will be little ability to transition these patients when their insurance does not cover the necessary medications and treatments.  The psychiatrist is then significantly constrained in his or her ability to provide usual and customary care to patients and to meet their duty of care.  That harms patients, and also means that APA's members will not be able to provide their services to them.

42.     In addition, the lower cost of STDLI plans will attract healthy enrollees, deterring them from purchasing ACA marketplace plans, thereby driving up the cost of ACA insurance for patients with mental illness and substance use disorders.  This negatively impacts APA members in a number of different ways.  *First*, as ACA insurance premiums rise, many mental health/substance use disorder patients who have gained private-sector coverage through the Act will be unable to afford ACA marketplace coverage.  As they will not be able to purchase less expensive STLDI because of its ban on pre-existing conditions, mental health and substance use disorder patients will be left without realistic insurance options. Nevertheless, medical ethics and some malpractice laws preclude psychiatrists from abandoning an established patient, requiring the physician to continue to provide bridge treatment to the patient while helping to secure alternative care arrangements (which will not exist).  As such, APA anticipates that its members will be left treating patients without compensation or face significantly increased malpractice and ethical risk— which can negatively impact their license to practice medicine.  *Second*, when the ACA plan costs rise because the risk pool is disproportionately filled with unhealthy people, the plans will seek to increase revenue by charging patients more and to save costs by reducing

payments to providers. Plans also may limit service by constructing unreasonable access barriers such as time-consuming prior authorizations, "fail first" step therapies, and audits that require physicians to spend significant uncompensated time to ensure treatment for their patients. Thus, APA members will lose patients and face increased overhead expenditures as a result of the STLDI Rule.

43.     Plaintiff AIDS United's mission is to end the HIV/AIDS epidemic in the United States. AIDS United's Public Policy Council (PPC) of 47 HIV/AIDS service organizations, national and regional coalitions is the largest and longest-running community-based HIV/AIDS domestic policy coalition in the country. For the last 35 years, the PPC has led initiatives to shape and inform federal policies that impact people living with and affected by HIV. AIDS United additionally represents more than 200 grantee and sub-grantee AIDS Service Organizations serving people living with HIV throughout the United States.

44.     AIDS United is a 501(c)(3) nonprofit organization with its principal place of business in Washington, D.C.

45.     STLDI policies generally are not available to individuals with pre-existing conditions such as HIV. This proposition was tested when, as part of a study, applications for coverage were submitted to 38 STLDI plans on behalf of an applicant with HIV. Coverage was denied by all 38 plans.[16] Individuals with HIV therefore must purchase insurance on the ACA marketplaces. The STLDI Rule will increase the cost of that insurance, and therefore adversely affect individuals with HIV. Moreover, to the extent such individuals are not able to afford insurance, health care providers—including those represented by AIDS United—will not be able

---

[16] Dawson, Lindsey and Jennifer Kates, "Short-Term Limited Duration Plans and HIV," Issue Brief, Kaiser Family Foundation, http://files.kff.org/attachment/Short-Term-Limited-Duration-Plans-and-HIV  p.3 (June 2018).

to obtain compensation for their services.  That increased amount of uncompensated care will impose real financial harm on these entities.

46.     Plaintiff the National Partnership for Women & Families ("NPWF") promotes fairness in the workplace, reproductive health and rights, access to quality, affordable health care, and policies that help women and men meet the dual demands of work and family.

47.     NPWF is a 501(c)(3) nonprofit organization incorporated and with its principal place of business in Washington, D.C.  It was founded in 1971.

48.     NPWF has engaged in advocacy on health care issues—with a particular focus on issues related to discrimination against women—since its founding.  Its advocacy has been critical to passage of anti-discrimination laws such as the Family and Medical Leave Act, the Pregnancy Discrimination Act, the Lilly Ledbetter Fair Pay Act, and the Affordable Care Act, among others.

49.     Consistent with its beliefs that discrimination against women is impermissible and that health care should be affordable for all, NPWF submitted a comment during the 2018 rulemaking which explained the devastating consequences that the STLDI Rule would have for "individuals who rely on comprehensive coverage" in general, and women in particular.[17]

50.     Specifically, NPWF noted that STLDI plans discriminate against individuals based on health status by refusing coverage based on pre-existing conditions, and discriminate against women by excluding coverage for many key women's health services, including contraception and routine maternity care.[18]  By increasing the number of women who are denied coverage of services, such as maternity care, and increasing the premiums for those who purchase ACA-compliant coverage, STLDI plans harm NPWF's core constituency.  Faced with

---

[17] Comment of National Partnership for Women & Families, Apr. 23, 2018, at 1.

[18] *Id.* at 2–3.

higher premiums or limited insurance coverage through STLDI plans, women's health and economic security will be in jeopardy.

51.     As a result of these (and other) characteristics, NPWF strongly opposes the use of STLDI plans as replacements for comprehensive insurance.  Thus, the STLDI Rule is directly contrary to NPWF's work on behalf of women's health, as well as NPWF's core mission and advocacy efforts.  Combating the Rule's effects will require redirection of NPWF resources that could otherwise be used to accomplish NPWF's other goals of improving the health and wellbeing of women and families.

52.     Plaintiff Little Lobbyists is a membership corporation composed of families with children with complex medical needs and disabilities requiring specialized and ongoing health care.  These families face significant challenges in caring for their children and experience first-hand the impact of laws and regulations relating to health care.  Little Lobbyists' offices are in Maryland.

53.     Because the children in Little Lobbyists' families have pre-existing conditions, these families almost certainly would not be able to purchase STDLI plans, and even if they could, those plans are not likely to provide the full coverage of essential health benefits that these children need.  Little Lobbyist families must therefore continue to obtain health insurance through the ACA marketplaces, and their premium costs will increase significantly as younger, healthy individuals switch from ACA marketplace plans to STDLI plans.  Although some of these families are eligible for premium tax credits, and therefore will be insulated to some extent from the effect of these increases, many families are not eligible for tax credits and will bear the full burden of the premium cost increases.

54.     Defendant Department of Labor is an agency of the United States government and has responsibility for implementing and enforcing portions of HIPAA and the ACA.  It is an "agency" under 5 U.S.C. § 551(1).

55.     Defendant R. Alexander Acosta is the Secretary of Labor and is sued in his official capacity.

56.     Defendant Department of the Treasury is an agency of the United States government and has responsibility for implementing and enforcing portions of HIPAA and the ACA.  It is an "agency" under 5 U.S.C. § 551(1).

57.     Defendant Steven T. Mnuchin is the Secretary of the Treasury and is sued in his official capacity.

58.     Defendant Department of Health and Human Services is an agency of the United States government and has responsibility for implementing and enforcing portions of HIPAA and the ACA.  It is an "agency" under 5 U.S.C. § 551(1).

59.     Defendant Alex M. Azar is the Secretary of Health and Human Services and is sued in his official capacity.

60.     Defendant the United States of America is sued as allowed by 5 U.S.C. § 702.

## IV.
## FACTUAL ALLEGATIONS

### A.     The Governing Law

61.     Prior to 1997, STLDI plans served as a temporary health insurance coverage option for individuals who would otherwise have experienced a lapse in comprehensive coverage.

62.     In 1997, Congress enacted HIPAA, an insurance reform statute that, as relevant here, established federal standards for "individual health insurance coverage" and mandated that

such coverage provide for, among other things, guaranteed renewability. Under this requirement, an insurer must offer continued insurance to a current insured individual whose plan is expiring, even if that individual had utilized the insurance or suffered adverse health consequences during the plan term. But Congress in HIPAA exempted STLDI plans from that requirement. The Departments then had to define what constituted a STLDI plan.

63. Accordingly, the Departments adopted an interim final rule in 1997. That interim rule defined "short-term limited duration coverage" to mean "health insurance coverage provided under a contract with an issuer that has an expiration date specified in the contract (taking into account any extensions that may be elected by the policyholder without the issuer's consent) that is within 12 months of the date the contract becomes effective."[19] The final rule adopted in 2004 contained the same language.[20]

64. As several commenters noted during the 2018 rulemaking, the Departments' decision in 1997 to interpret "short-term" as permitting a 364-day contract was likely arbitrary and capricious.[21] Indeed, nothing in the 1997 preamble to the interim final rule defended this element of the Departments' definition, suggesting that the Departments did not give close consideration to this provision. Because HIPAA did not impose substantial requirements on the content of comprehensive insurance plans, however, the federal classification of a plan as STLDI—rather than continuing or long-term insurance—made no significant practical difference. Accordingly, the Departments' definition went unchallenged.

---

[19] *Interim Rules for Health Insurance Portability for Group Health Plans*, 62 Fed. Reg. 16,894, 16,958 (Apr. 8, 1997).

[20] *Final Regulations for Health Coverage Portability for Group Health Plans and Group Health Insurance Issuers Under HIPAA Titles I & IV*, 69 Fed. Reg. 78,720 (Dec. 30, 2004).

[21] *See, e.g.*, Comment of Timothy Stoltzfus Jost, Apr. 20, 2018.

65.     In 2010, Congress enacted the ACA, which—among other things—
comprehensively regulated the health insurance marketplace.  As part of the ACA, Congress
required that a health insurance marketplace (sometimes referred to as an exchange) be created in
each state, where individuals could purchase ACA-compliant health insurance plans.[22] Prior to
the ACA's enactment, many individuals faced substantial discrimination in (or were effectively
priced out of) the insurance market.[23]   In some states, insurance companies could discriminate in
premiums or coverage against individuals based on pre-existing conditions, claims history,
health status, age, gender, occupation, and other factors.  That risk segmentation both made
health insurance unavailable to many Americans as a practical matter (because individuals with
the risk of higher health costs faced huge health insurance premiums) and led to wide and
unsustainable fluctuations in costs for individuals.[24]

66.     To address these problems, the ACA imposes a number of requirements,
including that insurers consider all enrollees in the individual market to be "members of a single
risk pool."[25]  This requirement spread risk across all enrollees, ensuring that risk pools include
both the healthy and the sick, thus satisfying the ACA's core mission of making insurance
affordable for all.  To further that goal, Congress also established a program known as "risk
adjustment" to spread risk across insurers in the individual insurance market.[26]  And Congress
provided refundable tax credits to individuals whose household incomes were between 100 and

---

[22] 42 U.S.C. § 18031.

[23] H.R. Rep. No. 111-299, tit. 3, pt. 1.

[24] *See, e.g.*, Cong. Research Serv., *Private Health Insurance Provisions in Senate-Passed H.R. 3590, The Patient Protection and Affordable Care Act* 5 (Jan. 29, 2010).

[25] 42 U.S.C. § 18032(c).

[26] *Id.* § 18063.

400 percent of the federal poverty line, encouraging enrollment of people for whom the cost of comprehensive insurance was a barrier.[27]

67.     The ACA also added reforms to Part A of Title 27 of the Public Health Service Act ("PHSA").[28]  At least three of those reforms are central to the ACA's scheme.

68.     First, Congress required each insurer offering coverage in the individual and group markets in a State to "accept every employer and individual in the State that applies for such coverage"—prohibiting the prior practice of refusing coverage to individuals with a history of health problems or a chronic disease condition, and instead adopting "guaranteed issue."[29]  An insurer in the individual or group market therefore may not limit or deny coverage based on the covered parties' pre-existing conditions.[30]

69.     Second, Congress enacted a "community rating" provision to limit premium discrimination in the individual and small group markets.  The community rating provision forbids variations in premiums except those based on enumerated factors, while also limiting the rate variation permitted under those factors.[31]  Thus, tobacco use is a permissible factor, "except that such rate shall not vary by more than 1.5 to 1"; so is age, "except that such rate shall not vary by more than 3 to 1 for adults"; and geography may be considered only in the context of rating areas established by the State.[32]  Factors such as health status, claims history, race, gender, sexual orientation, geography (except for rating areas established by the State), occupation, and

---

[27] *Id.* § 18081.

[28] *Id.* §§ 300gg–300gg-28.

[29] *Id.* § 300gg-1(a).

[30] *Id.* § 300gg-3.

[31] 42 U.S.C. § 300gg.

[32] *Id.*

many others may not be considered by insurers in setting rates.[33]  These provisions ensure that discriminatory pricing practices no longer unduly affect certain members of the individual insurance market, as had been quite common prior to the ACA's enactment.  For example, "gender rating," or charging higher premiums to women, had been employed by 92% of the best-selling plans on the individual market and cost women over a billion dollars.[34]

70.     Third, Congress required that all individual and small group plans provide a "comprehensive" benefits package known as "essential health benefits."[35]  This package includes ambulatory patient services, emergency services, hospitalization, maternity and newborn care, mental health services, substance use services, prescription drugs, rehabilitative and habilitative services and devices, laboratory services, preventive and wellness services and chronic disease management, and pediatric services (including oral and vision care).[36]  The ACA also extended mental health parity to the individual insurance market, ensuring coverage of mental health and substance use disorder treatment comparable to that of physical health care.  It also bans lifetime and annual dollar limits on insurance benefits and includes other financial protections for enrollees, such as limitations on cost-sharing requirements.[37]

### B.     The 2016 STLDI Definition

71.     In enacting the ACA's reforms, Congress had to specify the category of insurance plans to which the new requirements applied.  It did so by cross-referencing HIPAA's definition

---

[33] *See id.*

[34]  Comment of American Cancer Society Cancer Action Network et. al, Apr. 23, 2018, at 4.

[35] 42 U.S.C. § 300gg-6(a).

[36] 42 U.S.C. § 18022(b).

[37] See 42 U.S.C. § 18022(a), (c) (limitations on cost-sharing); *id*. § 18022(d) (minimum actuarial value).

of "individual health insurance coverage" and defining plans that complied with the ACA's requirements as "qualified health plans."[38]

72.     The Departments realized that they would need to revisit their prior rulemakings under the Public Health Service Act and HIPAA to reconcile their implementation of those statutes with Congress's new comprehensive reforms of the insurance market in the ACA.  This effort included a reconsideration of the 1997 definition of "short-term, limited-duration," which had served one purpose under HIPAA but now had very different implications for the individual insurance market under the ACA.  The Departments began considering this issue in 2014, the first year for which ACA marketplace plans were available, after it became apparent that some insurers would use short-term plans to circumvent the ACA marketplace reforms.  That process culminated in the 2016 final regulation, in which the Departments concluded that, to qualify as an STLDI plan, "coverage must be less than three months in duration, including any period for which the policy may be renewed."[39]

73.     The Departments provided detailed, reasoned explanations for this definition in the 2016 rulemaking.  The Departments explained that, prior to their rulemaking, STLDI plans were being purchased by some individuals "as their primary form of health coverage," even though these plans did not provide "the protections of the Affordable Care Act" and thus "may not provide meaningful health coverage."[40]  Moreover, the pricing of STLDI plans based on the insured's health history would allow these plans to target "healthier individuals," thereby

---

[38] Qualified health plans must comply with additional requirements as well; we use that term here for convenience.

[39] 81 Fed. Reg. at 75,318.

[40] *Id.* at 75,317-18.

"adversely impacting the risk pool for Affordable Care Act-compliant coverage."[41]  Thus, the

Departments determined that a narrow interpretation of STLDI was necessary to "improve the

Affordable Care Act's single risk pool" and keep premiums for all participants in the individual

health market at an appropriate and affordable level.[42]

74.     The Departments considered and rejected comments suggesting that STLDI plans

with longer terms should be permitted because some individuals transitioning between

permanent coverage plans might desire longer temporary coverage—for example, persons

seeking employment whose job search went longer than 3 months might want coverage for the

entire duration of their search.[43]  The Departments explained that STLDI plans were not

necessary to fill this gap because, "for longer gaps in coverage, guaranteed availability of

coverage and special enrollment period requirements in the individual health insurance market"

would ensure that individuals could purchase ACA-compliant insurance.[44]  In effect, Congress

itself had already determined that ACA-compliant insurance would fill the gap in coverage for

individuals of more than 3 months; consequently, it was inappropriate for STLDI plans to

compete with ACA-compliant plans for those customers.

75.     The Departments' prior rule went into effect on January 1, 2017.  But in

recognition of the fact that "State regulators may have approved short-term, limited-duration

insurance products for sale in 2017" that met the previous definition, the Department of Health

and Human Services decided to avoid disrupting the insurance market by announcing that it

would "not take enforcement action against an issuer with respect to the issuer's sale of a short-

---

[41] *Id.* at 75,318.

[42] *Id.*

[43] *Id.*

[44] *Id.*

term, limited-duration product before April 1, 2017 on the ground that the coverage period is

three months or more, provided that the coverage ends on or before December 31, 2017 and

otherwise complies with the definition of short-term, limited-duration insurance in effect under

the regulations."[45]

### C.    The STLDI Rule

76.    The next year, the new President sought repeal of the ACA.  A number of bills to

achieve this goal were considered by and voted on in the House and Senate. But Congress

rejected these bills and elected to maintain the ACA.[46]

77.    As enacted, the ACA required most individuals either to maintain minimum

essential coverage or to pay a penalty with their tax return if they failed to do so.[47]  Congress

subsequently reduced that failure-to-maintain-coverage penalty to zero in months beginning after

December 31, 2018.

78.    In doing so, however, Congress pointedly declined to repeal or modify the ACA's

essential protections for individuals with pre-existing conditions and its prohibition against

discrimination in setting health insurance  premiums.[48]  Senate Majority Leader Mitch

McConnell (R-KY) stated, "Everybody I know in the Senate, everybody is in favor of

---

[45] *Id.*

[46] *See* American Health Care Act of 2017, H.R. 1628 (2017); Better Care Reconciliation Act of 2017, S. Amend. 270 (July 25, 2017); Obamacare Repeal Reconciliation Act of 2017, S. Amend. 271 (July 25, 2017); Healthcare Freedom Act of 2017, S. Amend. 667 (July 26, 2017).

[47] 26 U.S.C. § 5000A.

[48] Budget Fiscal Year 2018, 131 Stat. 2054, 2092 (Dec. 22, 2017).

maintaining coverage for pre-existing conditions."[49]  One survey found that 92% of respondents purchased insurance for protection against high medical bills, which explains why they might prefer to purchase comprehensive coverage that provides such protection instead of skimpy insurance that, although cheaper, provides inadequate coverage in case of a catastrophe.[50] Another survey found that 90 percent of people say it is important that the ACA's pre-existing protections remain law.[51]

79.     Soon after the ACA repeal effort failed, President Trump signed Executive Order 13813 on October 12, 2017, directing his Administration to expand access to STLDI plans.[52] The Executive Order directed this expansion on the ground that STLDI plans are exempt from the "insurance mandates and regulations included in title I of the [ACA]," and sought to make STLDI plans an "alternative" to ACA-compliant health care for consumers in the individual insurance marketplaces.[53]  The proposed STLDI rule, issued on February 21, 2018, was the Departments' response to the President's directive.[54]

---

[49] Anna Edney & Steven T. Dennis, *McConnell Backs Obamacare Coverage of Pre-Existing Illness*, Bloomberg, June 12, 2018, https://www.bloomberg.com/news/articles/2018-06-12/mcconnell-backs-obamacare-s-coverage-of-pre-existing-conditions.

[50] Comment of Equality North Carolina, Apr. 23, 2018, at 2.

[51] Ashley Kirzinger et. al, *Kaiser Health Tracking Poll – Late Summer 2018: The Election, Pre-Existing Conditions, and Surprises on Medical Bills*, Kaiser Family Foundation, September 5, 2018 at Fig. 12, https://www.kff.org/health-reform/poll-finding/kaiser-health-tracking-poll-late-summer-2018-the-election-pre-existing-conditions-and-surprises-on-medical-bills.

[52] Exec. Order No. 13813, Presidential Executive Order Promoting Healthcare Choice and Competition Across the United States (Oct. 12, 2017), https://www.whitehouse.gov/presidential-actions/presidential-executive-order-promoting-healthcare-choice-competition-across-united-states.

[53] *Id.*

[54] *Short-Term, Limited-Duration Insurance*, 83 Fed. Reg. 7437 (Feb. 21, 2018).

80.     The Departments received approximately 12,000 comments on their proposed rule.[55]  One analysis found that "more than 98%—or 335 of 340—of the healthcare groups that commented on the proposal to loosen restrictions on short-term health plans criticized it, in many cases warning that the rule could gravely hurt sick patients," while "[n]ot a single group representing patients, physicians, nurses or hospitals voiced support" for the proposal.[56]

81.     Notwithstanding these and many other objections, the Departments "finalized the proposed rule with some modifications" on August 3, 2018.[57]

82.     To justify the new STLDI Rule, the Departments claimed that the individual insurance markets had not been working properly under the ACA.  Enrollment in the individual insurance marketplaces among unsubsidized individuals had decreased, the Departments asserted, and "[s]ome of this decline is likely a response to increased premiums" (although the Departments cited no evidence in support of that conclusion, and in fact cited evidence that the decrease in the individual marketplaces is attributable to the facts that "the labor market has improved" and that "some unsubsidized enrollees [have] become subsidized" as a result of insurance premium increases).[58]

83.     The Departments also claimed that an increasing number of ACA marketplaces consumers had access to only one insurer, raising premiums and decreasing choice, and that the reduction in enrollment and increase in premiums had not abated following adoption of the 2016

---

[55] *Short-Term, Limited-Duration Insurance*, 83 Fed. Reg. 38,212 (Aug. 3, 2018).  Though the complete set of comments is not publicly available, 9,205 of them have been published at https://www.regulations.gov/docket?D=CMS-2018-0015.

[56] Noam N. Levey, *Trump's New Insurance Rules are Panned by Nearly Every Healthcare Group that Submitted Formal Comments*, L.A. Times, May 30, 2018.

[57] 83 Fed. Reg. at 38,214.

[58] *Id.* & n.22.

rule.[59]  The Departments likewise noted that several responses to a 2017 request by the

Department of Health and Human Services for suggestions on how to change existing

regulations and guidance to "promote consumer choice, enhance affordability of coverage for

individual consumers, and affirm the traditional regulatory authority of the states in regulating

the business of health insurance" proposed revisiting the 2016 rule.[60]  In light of these factors, as

well as "Executive Order 13813 directing the Departments to consider proposing regulations or

revising guidance to expand the availability of short-term, limited-duration insurance," the

Departments finalized the proposed rule.[61]

84.    The Departments explained that "[u]nder this final rule, short-term, limited-

duration insurance means health coverage provided pursuant to a contract with an issuer that has

an expiration date specified in the contract that is less than 12 months after the original effective

date of the contract and, taking into account renewals or extensions, has a duration of no longer

than 36 months in total."[62]  The Departments also clarified that "[n]othing in this final rule

precludes the purchase of separate insurance contracts that run consecutively, so long as each

individual contract is separate and can last no longer than 36 months."[63]

85.    The Departments stated that the final rule would "empower[] consumers to

purchase the benefits they want and reduce overinsurance," as STLDI insurance, which is

exempt from the ACA, "lacks distortionary price controls and regulation that can greatly separate

---

[59] *Id.* at 38214.

[60] *Id.* at 38213.

[61] *Id.* at 38214.

[62] *Id.* at 38214-15.

[63] *Id.* at 38220.

price from value and lead some people to overinsure and others to underinsure."[64]  The

Departments further speculated that lengthening the term and duration of STLDI plans could

lead to some currently uninsured individuals purchasing insurance, allowing them to "potentially

experience improved health outcomes and have greater financial protection from catastrophic

health care expenses."[65]

86.     The Departments provided no reasoned explanation and identified no changed

circumstances (whether factual or legal) justifying this deviation from their contrary conclusions

in the previous rulemaking, which took place less than 2 years earlier.  Instead, the Departments

added a severability provision to the final rule so that the remaining provisions of the regulation

would go into effect even if a court concluded that the "36-month maximum duration provision"

was unlawful.[66]  As the Departments noted, the proposed rule had not included a severability

provision and "no comments [] directly addressed [either] severability" or the question whether

the remaining provisions of the STLDI Rule would be beneficial even absent the 36-month

provision.[67]

87.     As the Departments themselves acknowledged, the result of their rule will be that

"relatively young, relatively healthy individuals in the middle-class and upper middle-class" will

be "more likely to purchase short-term, limited-duration insurance," so "the proportion of

healthier individuals in the individual market Exchanges will decrease."[68]  This conclusion is

widely shared, including by the American Academy of Actuaries: "Because of medical

---

[64] *Id.* at 38228.

[65]  *Id.* at 38229.

[66] *Id.* at 38217.

[67] *Id.*

[68] *Id.* at 28235.

underwriting at issue, STLD is expected to attract healthier individuals with a lower premium and could put upward pressure on ACA rates as healthier enrollees leave the ACA pool."[69] According to the Departments' own estimates, which a number of commenters noted were unduly optimistic, "premiums for unsubsidized enrollees in the Exchanges will increase by 5 percent" as a result of this change.[70]  One model, which accounted for several under-counting errors in the Departments' estimates, concluded that ACA enrollment will decrease by 8.2-15.0% and that premiums will increase by 2.2-6.6% in the near term.[71]  When combined with the recent repeal of the individual mandate penalty, increases in the premiums on the ACA-compliant marketplace will average over 18% in States that do not otherwise regulate access to STLDI plans.[72] Indeed, one insurer (CareFirst in Virginia) has added 10% to its proposed premiums for 2019 due to the anticipated availability of STLDI plans and association health plans.[73] One reason why enrollment in STLDI plans may be even higher than has been projected is that two of the largest health insurers in the nation that are not currently in the marketplaces (United Health

---

[69] Comment of American Academy of Actuaries, Apr. 6, 2018, at 5.

[70] 83 Fed. Reg. at 28235.

[71]  Wakely Consulting Group, *Effects of Short-Term Limited Duration Plans on the ACA-Compliant Individual Market,* http://www.communityplans.net/wp-content/uploads/2018/04/Wakely-Short-Term-Limited-Duration-Plans-Report.pdf

[72] Linda J. Blumberg et al., *Updated Estimates of the Potential Impact of Short-Term, Limited Duration Policies*, Urban Institute, Aug. 2018: https://www.urban.org/sites/default/files/updated_estimates_of_the_potential_impact_of_stld_policies_final.pdf.

[73] Sabrina Corletter, *The Effects of Federal Policy: What Early Premium Rate Filings Can Tell Us About the Future of the Affordable Care Act*, CHIRblog, May 21, 2018, http://chirblog.org/what-early-rate-filings-tell-us-about-future-of-aca/.

Care and Aetna) have expressed interest in offering such plans.[74] Insurance agents and brokers report getting higher commissions for STLDI plans than marketplace plans.[75]

88.     As commenters informed the Departments during the notice-and-comment process, the financial consequences of the STLDI Rule for the ACA marketplace enrollees by themselves will be both substantial and harmful.  For example, the AARP estimates that the STLDI Rule will raise the premiums of a 60-year-old with ACA coverage by $1,000–$4,000 in 2019 alone, with higher increases to follow as the adverse selection process continues.[76]

89.     Moreover, these consequences will fall disproportionately on those who are unable to satisfy the medical underwriting provisions of STLDI plans and thus cannot avail themselves of the cheaper options that the Departments favor.  There are millions of such people across America.  One study suggested that individuals with chronic conditions comprise "nearly half of the adult population in the United States."[77]  Another study concluded that 27% of non-elderly Americans would be uninsurable if they were subject to medical underwriting.  Such individuals, when seeking to buy coverage through the individual market, will thus pay higher premiums and potentially have fewer choices due to the expansion of STLDI plans.[78]

---

[74] Carolyn Y. Johnson, *Trump Proposal Could Mean Healthy People Save On Insurance While Others Get Priced Out*, Wash. Post, Apr. 23, 2018, https://www.washingtonpost.com/news/wonk/wp/2018/04/23/trump-proposal-could-mean-healthy-people-save-on-insurance-while-sick-middle-class-people-get-priced-out.

[75] Kevin Lucia et al., *U.S. Health Reform—Monitoring and Impact, Views From the Market: Insurance Brokers' Perspectives on Changes to Individual Health Insurance*, Urban Institute, Aug. 2018, https://www.urban.org/sites/default/files/publication/98899/2001949-views-from-the-market-insurance_brokers-perspectives-on-changes-to-individual-health-insurance_1.pdf.

[76]  Comment of Blue Shield of California, April 23, 2018, at 2.

[77]  Comment of American Cancer Society Cancer Action Network et. al, April 23, 2018, at 5.

[78] Comment of American Cancer Society Cancer Action Network, April 20, 2018, at 1-2.

90.     For many Americans, this increase in premiums will make the comprehensive

coverage they need to treat their medical conditions unattainable, or force them to seek care only

intermittently.  This can have devastating consequences; for example, cancer patients who cannot

afford to continue their expensive chemotherapy on the prescribed schedule have a substantially

decreased chance of survival.[79]  People with mental health conditions will be less likely get

needed care.[80]

91.     Individuals who enroll in STLDI plans and subsequently need health care are also

at risk.  Such plans can, unlike marketplace plans, "rescind" or retroactively cancel coverage.

For example, one plan denied payment for a $900,000 bill for a triple bypass surgery claiming,

after reviewing the patient's medical records, that he failed to disclose alcoholism and

degenerative disc disease – conditions for which he was never diagnosed.[81]

92.     Moreover, STDLI plans typically exclude coverage for health care that healthy

individuals may find that they need after they purchase such a plan. For example, one review of

STLDI plans found that none covers treatment of attempted suicide, the second leading cause of

death for young adults.[82]  In addition, 43% do not cover mental health services, 62% do not

cover services for substance use treatment (both alcohol and other drugs), and 71% do not cover

---

[79] *Id.* at 7.

[80] Kathleen C. Thomas et al., *Impact of ACA Health Reforms for People With Mental Health Conditions*, Psychiatric Services, Nov. 15, 2017, https://ps.psychiatryonline.org/doi/10.1176/appi.ps.201700044.

[81] Reed Abelson, *Without Obamacare Mandate, 'You Open the Floodgates' for Skimpy Health Plans*, New York Times, Nov. 30, 2017, https://www.nytimes.com/2017/11/30/health/health-insurance-obamacare-mandate.html.

[82] *Short-Term Plans Do Not Cover Life-Saving Mental Health and Substance Use Treatment*, FamiliesUSA.org Factsheet, June 18, 2018, https://www.nami.org/getattachment/About-NAMI/NAMI-News/2018/NAMI-And-Partners-Release-New-Report-on-Health-Pla/ACA_Mental-Health_Factsheet.pdf

outpatient prescription drugs—critical to behavioral health care.  The STLDI plans that do cover

some substance use disorder and mental health services often have severe limits: for instance, a

maximum of $3,000 worth of coverage for an enrollee suffering from a dual diagnosis.[83]

93.     The same study found that no STLDI plans cover maternity care, a costly and

essential service for nearly 6 million pregnant women each year.[84]  Maternity and newborn care

can pose a significant cost for women; on average, insurance companies pay over $18,000 for

uncomplicated pregnancies and childbirth.[85]

94.     The Departments responded to these comments expressing concern with the

STLDI Rule's effect on the insurance market by suggesting that States could resolve these

problems by essentially adopting the now-superseded 2016 STLDI rules as a matter of *state* law.

But the fact that a State may be able to mitigate the harm caused by the STLDI Rule does not

justify or render lawful the Departments' decision to promulgate this rule in the first place.

95.     As a middle ground, several commenters suggested that the Departments consider

a shorter initial term for STLDI plans such as 9 months, which—although inferior to the 3-month

term adopted in the Departments' prior rulemaking—would at least reduce somewhat the risk of

market segmentation caused by the Departments' new rule.  The Departments dismissed this

proposal in a single line, on the ground that, although the purported problems with a 3-month

---

[83] Karen Pollitz et. al, "Understanding Short-Term Limited Duration Health Insurance," Issue Brief, Kaiser Family Foundation, https://www.kff.org/health-reform/issue-brief/understanding-short-term-limited-duration-health-insurance/ (Apr. 2018).

[84] *Id.*; *Moving Backward: Efforts to Undo Pre-Existing Condition Protections Put Millions of Women and Girls at Risk*, Center for American Progress Fact Sheet, 2018, http://www.nationalpartnership.org/research-library/health-care/aca-pre-ex-protections-women-girls.pdf.

[85] *The Cost of Having A Baby in the United States*, Truven Health Analytics Marketscan Study, January 2013, http://transform.childbirthconnection.org/wp-content/uploads/2013/01/Cost-of-Having-a-Baby-Executive-Summary.pdf.

period "would be somewhat mitigated if the maximum initial contract term was somewhat longer than less than 3 months, for example, less than 9 months, the Departments believe that mitigating these circumstances even further, by establishing a federal maximum initial contract term of less than 12 months, is preferable."[86]  This preference was not explained.

96.     In addition, several commenters, including the non-partisan National Association of Insurance Commissioners, sought a delay of the final rule's effective date to allow time for States to enact protective regulations as well as to eliminate uncertainty the STLDI Rule caused in the insurance market for 2018 and 2019.[87]  Nonetheless, the Departments decided to make the STLDI Rule effective as of October 2, 2018, 60 days after its publication in the Federal Register—a departure from the past practice in which major changes to insurance rules have effective dates that minimize impact on decisions already made for the current or subsequent year.

**V.**
**CAUSES OF ACTION**

A.     **FIRST CAUSE OF ACTION (Administrative Procedure Act—Contrary to Law—"Short Term")**

97.     Plaintiffs reallege and incorporate by reference the allegations set forth in all preceding paragraphs of the complaint.

98.     Under the Administrative Procedure Act, courts must "hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

---

[86] 83 Fed. Reg. at 38,218.

[87] Comment of National Association of Insurance Commissioners, Apr. 23, 2018,

99.     The Departments' interpretation of "short-term" as encompassing plans with a

term of 364 days is not in accordance with the text, purpose, or structure of the Affordable Care

Act.

100.    First, interpreting this provision as encompassing such lengthy plans does not

comport with the plain meaning of the term "short-term," which means "occurring over or

involving a relatively short period of time."[88]  A plan that lasts for 364 days is more than 99.7%

the length of a standard, annual insurance plan; it cannot be called "relatively short" in any

meaningful sense of the term.

101.    Second, the ACA's text and structure show that Congress did not intend to permit

plans substantially similar in length to ACA marketplace plans to be sold as STLDI plans.  Most

obviously, the ACA's requirements for newly sold, year-long individual market health insurance

plans are incompatible with the STLDI Rule, which allows insurers to offer (and individuals to

purchase) plans that fail to provide essential health benefits and fail to adhere to other ACA

requirements (*e.g.*, offer mental health parity, exclude annual and lifetime limits, include a

maximum out-of-pocket limit, meet minimum medical loss ratio and network adequacy

requirements).  In addition, the ACA's guaranteed-issue and risk-adjustment provisions are

premised on the presence of diverse individuals—healthy and sick, young and old, male and

female—in the single risk pool, thereby ensuring that premiums are kept at affordable levels.

Permitting insurers to charge less and pull from the single risk pool individuals qualifying for

medically underwritten plans, while offering these individuals coverage that evades the ACA's

---

[88] *Short-term*, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/short-term.

requirements for marketplace plans is thus incompatible with the ACA's reforms of the insurance market.

102.    The STLDI Rule's definition of STLDI plans is thus contrary to law.

103.    The rule is unlawful and should be set aside.  5 U.S.C. § 706(2)(A).

**B.    SECOND CAUSE OF ACTION (Administrative Procedure Act—Contrary to Law—"Limited Duration")**

104.    Plaintiffs reallege and incorporate by reference the allegations set forth in all preceding paragraphs of the complaint.

105.    Under the Administrative Procedure Act, courts must "hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

106.    The Departments' interpretation of "limited-duration" as encompassing plans that can be renewed for a total of 36 months is not consistent with the text or structure of the Affordable Care Act.

107.    First, the word "limited" is a relative term, meaning "[r]estricted in size, amount, or extent."[89]  A contract that may be automatically renewed is, by definition, not restricted to its original term; thus, the STLDI Rule departs from the plain meaning of the ACA.  This conclusion is bolstered by the fact that the States that have legislated on the topic of STLDI plans refer to such coverage as non-renewable, or renewable only for a very short period.[90]

---

[89] *Limited, Oxford English Dictionary*, https://en.oxforddictionaries.com/definition/limited.

[90] Idaho S.B. 1552 (1994); Minn. S.F. No. 1912 (1994); N.H. S.Bn. 30 (1995); Ore. S.B. 152 (1995); Ind. S.E.A. 576 (1995); Me. P.L., c. 342 (1995); Mo. S.B. 27 (1995); Tenn. H.B. 1213 (1995); Tenn. H.B. 2484 (1996); Conn. H.B. 5486 (1996); Fla. S.B. 910 (1996); Va. H.B. 1026 (1996); Mich. S.B. 1007 (1997); Nev. Admin. Code § 689A.434 (Nov. 14, 1997); 28 Tex. Admin. Code § 3.3002 (Dec. 19, 1997); Colo. H.B. 1053 (1998), Cal. A.B. 424 (2002); Ga. H.B.

Accordingly, Congress presumptively intended in 1997 and 2010 that limited-duration coverage be renewable for a minimal duration, if at all, under federal law. *See NLRB v. Amax Coal Co.*, 453 U.S. 322, 329 (1981) (explaining that "[w]here Congress uses terms that have accumulated settled meaning under either equity or the common law, a court must infer, unless the statute otherwise dictates, that Congress means to incorporate the established meaning of these terms").

108.    Second, the ACA's text and structure confirms that Congress did not intend to permit renewable plans to be sold as STLDI plans.  Most obviously, the ACA's requirements that insurers offer robust qualified health plans are incompatible with the STLDI Rule, which allows insurers to offer (and individuals to purchase) insurance with significant coverage gaps as their main, long-term insurance policy.  In addition, the ACA's guaranteed-issue, single risk pool, and risk-adjustment provisions are premised on the presence of diverse individuals— healthy and sick, young and old, male and female—in the risk pool, thereby ensuring that premiums are kept at affordable levels.  But allowing the continuation of STLDI plans for many years increases the likelihood that individuals will use such plans as a long-term source of insurance, segregated from the risk pools of ACA-compliant health plans. The Rule is therefore incompatible with the ACA's reforms of the insurance market.

109.    Third, interpreting "limited-duration" as including plans that automatically renew upon expiration, as the STLDI Rule does, departs from the text and purpose of HIPAA.  In that statute, Congress expressly guaranteed the renewability of individual health insurance coverage and specifically provided that STLDI plans would not be guaranteed renewable.  By doing so, Congress expressed its clear intent that STLDI coverage be non-renewable.

---

1100 (2002); Utah S.B. 122 (2002); S.D. Admin. R. 20:06:39:32 (adopted 2003); Wis. S.B. 27 (2009); Okla. S.B. 878 (2011); Kan. H.B. 2107 (2013).

110.    The STLDI Rule's definition of STLDI plans is thus contrary to law.

111.    The rule is unlawful and should be set aside.  5 U.S.C. § 706(2)(A).

**C.      THIRD CAUSE OF ACTION (Arbitrary and Capricious)**

112.    Plaintiffs reallege and incorporate by reference the allegations set forth in all preceding paragraphs of the complaint.

113.    Under the Administrative Procedure Act, courts must "hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

114.    The STLDI Rule is arbitrary and capricious for multiple reasons, including but not limited to those stated in the following paragraphs.

115.    First, the Departments provide no reasoned explanation for rejecting their prior, well-reasoned interpretation of "limited-duration" as including only plans whose total term, including any extensions, is 12 months or fewer, which was adopted after notice and comment in 1997.  Thus, without reasoned justification, the STLDI Rule departs from over two decades of settled law regarding the meaning of "limited duration" that faithfully reflected congressional intent.  The Departments have provided no detailed justification for disregarding either the facts underlying their longstanding interpretation or State governments' substantial reliance interests on that interpretation, in an area where the States are the primary regulatory authority.

116.    Second, the Departments provide no reasoned explanation for rejecting their well-reasoned interpretation of "short-term" as including only plans with an initial term of 3 months or fewer, which was adopted after notice and comment just 2 years ago, in 2016.  The three-month limitation is anchored in other parts of the law; for example, the ACA limits waiting

periods for employer coverage to 90 days.  The Departments' disregard of the facts underlying the prior interpretation and the reliance interests of State governments is arbitrary and capricious.

117.    Third, the STLDI Rule is arbitrary and capricious in light of the significant adverse effects it will have on the health insurance market and the certainty that it will harm individuals in need of health insurance, as demonstrated by the comments received by the Departments. The rule thus is tainted by a skewed analysis that touts illusory benefits, ignores significant costs, and is insufficiently quantified.

118.    Fourth, without reasoned justification, the Departments have chosen to have the STLDI Rule go into effect on October 2, 2018, notwithstanding the fact that the annual open enrollment for individual insurance purchasers will start shortly thereafter.  The rule thus will create *immediate* confusion and disruption in the health insurance marketplace without adequate justification.  Indeed, the Departments concede that state laws must be enacted to forbid the deceptive and harmful practices allowed under the new rule, but failed to respond to comments explaining that a delay of the effective date is necessary to permit States currently in legislative recess to enact such reforms.  This also puts insurers offering qualified health plans at financial risk as they could not fully anticipate an October 2 effective date of the August 3 final rule prior to the June 20 deadline for qualified health plans for 2019.

119.    Fifth, the STLDI Rule relies on factors Congress could not have intended the Departments to consider.  These include that the key purported benefit of the rule is that it permits individuals to rely on coverage that is "unlikely to include all the requirements applicable to individual market plans."[91] In fact, Congress expressed in the ACA its intent that *all* individuals in this market obtain annual coverage that complies with those requirements. The

---

[91] 83 Fed. Reg. at 38,231.

Departments also pointed to the fact that the STLDI Rule promotes insurance where "the policies are priced so that the premium paid by an individual reflects the risks associated with insuring the particular individual or individuals covered by that policy," but that result is flatly contrary to the community rating reforms of the ACA.[92]

120.     Sixth, the Departments failed to adequately consider alternatives to their regulatory action, including (but not limited to) adoption of a 6-month or 9-month initial term.

121.     Seventh, the Departments failed to consider whether permitting the sale of consecutive STLDI plans at a single time would have adverse effects on the insurance market in light of their decision to permit the sale of 3-year STLDI plans.

122.     Eighth, the Departments' addition of a severability provision in the final STLDI Rule is arbitrary and capricious, as the Departments failed to consider whether any of the rule's remaining provisions would operate as the Departments intended once the continuation provision is severed.

123.     For these reasons, the STLDI Rule is unlawful and should be set aside as arbitrary and capricious under 5 U.S.C. § 706(2)(A).

**D.      FOURTH CAUSE OF ACTION (Failure to Engage in Notice-and-Comment Rulemaking)**

85.     Plaintiffs reallege and incorporate by reference the allegations set forth in all preceding paragraphs of the complaint.

86.     The Administrative Procedure Act provides that "[g]eneral notice of proposed rule making shall be published in the Federal Register," including "either the terms or substance of the proposed rule or a description of the subjects and issues involved."  5 U.S.C. § 553(b).

---

[92] 83 Fed. Reg. at 38,234.

87.     The Departments failed to provide the public with reasonable notice of important aspects of their rule in their notice of proposed rulemaking.  In particular, the Departments failed to disclose that they intended to permit STLDI plans to be renewable at all, let alone for a period of up to 36 months.  Further, the Departments failed to disclose their intent to treat this renewability provision as severable from the remainder of the rule.

88.     This failure deprived the plaintiffs, and the public at large, of a meaningful opportunity to comment on the STLDI Rule.

89.     The Departments promulgated the STLDI Rule in disregard of their obligations to engage in notice-and-comment rulemaking under the APA.  Accordingly, the Rule should be vacated and set aside.

## VI.
## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court:

a.  Preliminarily enjoin the Departments and all their officers, employees, and agents, and anyone acting in concert with them, from implementing, applying, or taking any action whatsoever under the STLDI Rule;

b.  Declare that the STLDI Rule is arbitrary, capricious, or otherwise contrary to law within the meaning of 5 U.S.C. § 706(2)(A);

c.  Declare that the STLDI Rule does not provide a legal basis for classifying as a "short-term, limited-duration" plan one whose initial term is greater than three months or whose total term including renewals exceeds one year;

d.  Vacate and set aside the STLDI Rule;

e.  Enjoin the Departments and all their officers, employees, and agents, and anyone acting in concert with them, from implementing, applying, or taking any action whatsoever under the STLDI Rule;

f.  Award Plaintiffs' costs, expenses, and reasonable attorney's fees; and

g.  Award such other relief as the Court deems just and proper.

Respectfully submitted,

/s/ Andrew J. Pincus

Andrew J. Pincus (D.C. Bar No. 370762)
Charles Rothfeld (D.C. Bar No. 367705)
Ankur Mandhania* (CA Bar No.302373)
Surya Kundu**
MAYER BROWN LLP
1999 K Street NW
Washington, DC 20006-1101
Telephone: (202) 263-3000
Facsimile: (202) 263-3300

Dated: September 14, 2018

_____

*Member of the California Bar only.  Not Admitted in the District of Columbia.  Practicing under the supervision of firm principals.

**Member of the District of Columbia Bar; application for admission to this Court's Bar pending.