**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| ASSOCIATION FOR COMMUNITY AFFILIATED PLANS, *et al.*,<br><br>      Plaintiffs,<br><br>  v.<br><br>UNITED STATES DEPARTMENT OF TREASURY, *et al.*,<br><br>      Defendants. | Civil Action No. 18-2133 (RJL) |

<u>**DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO
PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION**</u>

## TABLE OF CONTENTS

INTRODUCTION ............................................................................................................1

BACKGROUND ............................................................................................................4

    I.      Statutory and Regulatory Background ...............................................................4

           A.      Establishment of the Exemption for "Short-Term Limited Duration Insurance" Under HIPAA. ...........................................................4

           B.      The ACA's Retention of the STLDI Exemption. .........................................5

           C.      The 2016 STLDI Rule. .................................................................................7

           D.      The 2018 STLDI Rule .................................................................................9

    II.     This Litigation ................................................................................................12

STANDARD OF REVIEW ...........................................................................................13

ARGUMENT ...............................................................................................................13

    I.      Plaintiffs Have Not Established a Substantial Likelihood of Standing. ................13

           A.      Plaintiffs Fail to Establish Standing on Behalf of their Insurer-Members. ....................................................................................14

           B.      Plaintiffs Fail to Establish Standing on Behalf of their Provider Members. ....................................................................................20

           C.      Plaintiffs Fail to Establish Standing on Behalf of their Consumer Members. ..................................................................................22

    II.     Plaintiffs Have Not Established Irreparable Injury. ..............................................24

    III.    Plaintiffs Are Not Likely to Succeed on the Merits of their Claims. .....................26

           A.      The STLDI Rule Is Comfortably within the Departments' Authority. ...........................................................................27

           B.      The STLDI Rule Is Not Contrary to Law. ..................................................30

                1.   The STLDI Rule Is Consistent with the Statutory Text. ....................30

                2.   Congress Did Not Clearly Preclude the STLDI Rule. ........................32

C.    The STLDI Rule Is Not Arbitrary and Capricious......................................38

    1.   The Departments Acted Reasonably in Promulgating the STLDI Rule..........................................................................................38

    2.   The Departments Provided a Well-Reasoned Basis for Their Departure from the 2016 STLDI Rule. .................................................39

    3.   The Purported Harms that Plaintiffs Claim Will Result from the STLDI Rule Do Not Render It Unlawful.....................................41

IV.   The Public Interest and Balance of Equities Weigh in Favor of the Government.......................................................................................42

CONCLUSION ...............................................................................................................44

# TABLE OF AUTHORITIES

## CASES                                                         PAGES

*Adirondack Med. Ctr. v. Sebelius*,
  891 F. Supp. 2d 36 (D.D.C. 2012), *aff'd*, 740 F.3d 692 (D.C. Cir. 2014) ............................... 38

*Am. Fed'n of Gov't Emps. AFL-CIO, Local 3669 v. Shinseki*,
  709 F.3d 29 (D.C. Cir. 2013) ................................................................................................ 26

*Am. Freedom Law Ctr. v. Obama*,
  821 F.3d 44 (D.C. Cir. 2016), *cert. denied*, 137 S. Ct. 1069 (2017) ................................ *passim*

*Am. Safety Ins. Co. v. Page's Thieves Mkt., Inc.*,
  No. 2:15-CV-3266-PMD, 2016 WL 4430839 (D.S.C. Aug. 22, 2016) .................................... 30

*Apotex, Inc. v. FDA*,
  Civ. No. 06-0627, 2006 WL 1030151 (D.D.C. Apr. 19, 2006),
  *aff'd and remanded*, 449 F.3d 1249 (D.C. Cir. 2006) .............................................................. 26

*Ariz. Christian Sch. Tuition Org. v. Winn*,
  563 U.S. 125 (2011) .............................................................................................................. 14

*Arpaio v. Obama*,
  797 F.3d 11 (D.C. Cir. 2015) ................................................................................................ 17

*Burlington Truck Lines, Inc. v. United States*,
  371 U.S. 156 (1962) .............................................................................................................. 38

*Cent. United Life Ins. Co. v. Burwell*,
  827 F.3d 70 (D.C. Cir. 2016) ................................................................................................ 39

*Chamber of Commerce of U.S. v. EPA*,
  642 F.3d 192 (D.C. Cir. 2011) .............................................................................................. 14

*Chaplaincy of Full Gospel Churches v. England*,
  454 F.3d 290 (D.C. Cir. 2006) .............................................................................................. 24

*Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*,
  467 U.S. 837 (1984) .......................................................................................................... 26, 27

*City of Arlington v. FCC*,
  569 U.S. 290 (2013) .......................................................................................................... 26, 27

*Clapper v. Amnesty Int'l USA*,
  568 U.S. 398 (2013) ...................................................................................................... 14, 20, 21

*Cmty. Health Sys., Inc. v. Burwell*,
   113 F. Supp. 3d 197 (D.D.C. 2015) ......................................................... 26

*Coal. for Common Sense in Gov't Procurement v. United States*,
   576 F. Supp. 2d 162 (D.D.C. 2008) ......................................................... 25

*Coal. for Mercury-Free Drugs v. Sebelius*,
   671 F.3d 1275 (D.C. Cir. 2012).............................................................. 23

*ConverDyn v. Moniz*,
   68 F. Supp. 3d 34 (D.C. Cir. 2014) ......................................................... 25

*Davis v. PBGC*,
   571 F.3d 1288 (D.C. Cir. 2009)............................................................... 13

*DEK Energy Co. v. FERC*,
   248 F.3d 1192 (D.C. Cir. 2001)........................................................ 15, 19

*Delta Air Lines, Inc. v. Export-Import Bank*,
   85 F. Supp. 3d 250 (D.D.C. 2015) ........................................................... 18

*Drummond Coal Co. v. Hodel*,
   796 F.2d 503 (D.C. Cir. 1986)................................................................. 31

*Electronic Privacy Info. Ctr. v. U.S. Dep't of Educ.*,
   48 F. Supp. 3d 1 (D.D.C. 2014) ............................................................... 22

*Food & Water Watch, Inc. v. Vilsack*,
   808 F.3d 905 (D.C. Cir. 2015)................................................................. 14

*Gordon v. U.S. Capitol Police*,
   778 F.3d 158 (D.C. Cir. 2015)................................................................. 27

*Griffin v. Oceanic Contractors, Inc.*,
   458 U.S. 564 (1982)................................................................................ 37

*Grocery Mfrs. Ass'n v. EPA*,
   693 F.3d 169 (D.C. Cir. 2012)................................................................. 15

*Indus. & Fin. Markets Ass'n v. U.S. Commodity Futures Trading Comm'n*,
   67 F. Supp. 3d 373 (D.D.C. 2014) ........................................................... 14

*Judulang v. Holder*,
   565 U.S. 42 (2011).......................................................................... 27, 38

*King v. Burwell*,
   135 S. Ct. 2480 (2015) .................................................................................................. 27

*La. Energy & Power Auth. v. FERC*,
   141 F.3d 364 (D.C. Cir. 1998) ...................................................................................... 17

*LG Electronics, U.S.A., Inc. v. Dep't of Energy*,
   679 F. Supp. 2d 18 (D.D.C. 2010) ........................................................................... 25, 26

*Lorillard v. Pons*,
   434 U.S. 575 (1978) ...................................................................................................... 27

*Lujan v. Defs. of Wildlife*,
   504 U.S. 555 (1992) ...................................................................................................... 14

*Mayo Found. for Med. Educ. & Research v. United States*,
   562 U.S. 44 (2011) .................................................................................................. 27, 33

*Mazurek v. Armstrong*,
   520 U.S. 968 (1997) ...................................................................................................... 13

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*,
   456 U.S. 353  (1982) ..................................................................................................... 28

*Munaf v. Geren*,
   553 U.S. 674 (2008) ...................................................................................................... 13

*Mylan Pharms., Inc. v. Shalala*,
   81 F. Supp. 2d 30 (D.D.C. 2000) .................................................................................. 26

*Nat'l Ass'n of Home Builders v. EPA*,
   786 F.3d 34 (D.C. Cir. 2015) ........................................................................................ 14

*Nat'l Fed'n of Indep. Bus. v. Sebelius*,
   567 U.S. 519 (2012) .................................................................................................... 1, 5

*New World Radio, Inc. v. FCC*,
   294 F.3d 164 (D.C. Cir. 2002) ......................................................................... 17, 18, 19

*Orton Motor, Inc. v. HHS*,
   884 F.3d 1205 (D.C. Cir. 2018) .................................................................................... 28

*Privacy Info. Ctr. v. Presidential Advisory Comm'n on Election Integrity*,
   878 F.3d 371 (D.C. Cir. 2017) ...................................................................................... 13

*Pub. Citizen, Inc. v. Nat'l Highway Traffic Safety Admin.*,
  489 F.3d 1279 (D.C. Cir. 2007) .......................................................... 20

*Rodriguez v. United States*,
  480 U.S. 522 (1987) .......................................................... 35

*Sandoz, Inc. v. FDA*,
  439 F. Supp. 2d 26, 32 (D.D.C. 2006),
  *aff'd*, No. 06-5204, 2006 WL 2591087 (D.C. Cir. Aug. 30, 2006) .................... 24, 26

*Sherley v. Sebelius*,
  610 F.3d 69 (D.C. Cir. 2010) .......................................................... 17, 19

*Smoking Everywhere, Inc. v. FDA*,
  680 F. Supp. 2d 62 (D.D.C. 2010), *aff'd sub nom. Sottera, Inc. v. FDA*,
  627 F.3d 891 (D.C. Cir. 2010) .......................................................... 25

*Summers v. Earth Island Inst.*,
  555 U.S. 488 (2009) .......................................................... 13, 17

*United Transp. Union v. ICC*,
  891 F.2d 908 (D.C. Cir. 1989) .......................................................... 17

*Visiting Nurse Ass'n Gregoria Auffant, Inc. v. Thompson*,
  447 F.3d 68 (1st Cir. 2006) .......................................................... 38

*Whitmore v. Arkansas*,
  495 U.S. 149 (1990) .......................................................... 14

*Williams v. Lew*,
  819 F.3d 466 (D.C. Cir. 2016) .......................................................... 15

*Winter v. Nat. Res. Def. Council, Inc.*,
  555 U.S. 7 (2008) .......................................................... 13, 17

*Wis. Gas Co. v. Fed. Energy Regulatory Comm'n v. FERC*,
  758 F.2d 669 (D.C. Cir. 1985) .......................................................... 24

## STATUTES

26 U.S.C. § 36B .......................................................... 5, 6

26 U.S.C. § 5000A .......................................................... 6, 36, 37

42 U.S.C. § 300gg-22 .......................................................... 7

42 U.S.C. § 300gg-41 .......................................................... 4

42 U.S.C. § 300gg-91(b)(5) ....................................................................... 4, 5, 7, 37

42 U.S.C. § 300gg-92 .......................................................................................... 28

42 U.S.C. § 18011 ............................................................................................ 6, 36

42 U.S.C. § 18013 ................................................................................................. 6

42 U.S.C. § 18022 ................................................................................................. 7

42 U.S.C. § 18031 ................................................................................................. 5

42 U.S.C. § 18032(c) ........................................................................................... 33

42 U.S.C. § 18118(c) ............................................................................................. 6

42 U.S.C. §§ 300gg, 300gg-1 ............................................................................... 5

42 U.S.C. §§ 300gg-21(b)-(c), 300gg-63(b) ........................................................ 6

42 U.S.C. §§ 300gg-23, 18041 ............................................................................. 7

42 U.S.C. §§ 300gg-41(a), 300gg-42(a) ............................................................. 34

42 U.S.C. §§ 18031(c)(1)(F), 18041, 300gg, 300gg-15, 300gg-18, 300gg-19 ............. 8

Health Insurance Portability and Accountability Act ("HIPAA"),
    Pub. L. No. 104-191, 110 Stat 1936 (1996) ........................................... 4, 28

Budget Fiscal Year, 2018,
    Pub. L. No. 115-97 § 11081, Stat 2054 (2017) .......................................... 6

## ADMINISTREATIVE AND EXECUTIVE MATERIALS

28 Tex. Admin. Code § 3.3002(18) ................................................................. 16, 32

State enforcement,
    45 C.F.R. § 150.201 (2013) ........................................................................... 7

Definitions,
    45 C.F.R. § 156.20 (2015) ............................................................................. 7

Interim Rules for Health Insurance Portability for Group Health Plans (the "1997 Rule"),
    62 Fed. Reg. 16,894 (Apr. 8, 1997) ............................................................. 5

Final Regulations for Health Coverage Portability for Group Health Plans and Group Health
    Insurance Issues Under HIPAA Titles I & IV,
        69 Fed. Reg. 78,720 (Dec. 30, 2004) ........................................................ 5

Excepted Benefits; Lifetime and Annual Limits; and Short-Term, Limited-Duration Insurance
(the "2016 Rule"),
81 Fed. Reg. 75,316 (Oct. 31, 2016) .......................................................................... 9

Exec. Order No. 13765,
Minimizing the Economic Burden of the Patient Protection and Aordable Care Act Pending
Repeal,  82 Fed. Reg. 8351 (Jan. 20, 2017) .............................................................. 10

Reducing Regulatory Burdens Imposed by the Patient Protection and Affordable Care Act &
Improving Healthcare Choices To Empower Patients,
82 Fed. Reg. 26,885 (June 12, 2017) ....................................................................... 12

Short-Term, Limited-Duration Insurance,
83 Fed. Reg. 7437 (Feb. 21, 2018) .......................................................................... 12

Short-Term, Limited-Duration Insurance,
83 Fed. Reg. 38,212 (Aug. 3, 2018) ................................................................. 12, 54

## OTHER AUTHORITIES

2017 Vt. House Bill No. 892 (Act 131) ......................................................................... 25

# INTRODUCTION

The insurance market reforms of the Patient Protection and Affordable Care Act (the "ACA") were enacted to increase access to health insurance and drive down its costs. *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 538 (2012) ("*NFIB*"). Until recently, however, premiums had sky-rocketed and many insurers had abandoned the individual market, leaving many regions with just one health insurance option. Millions of Americans were faced with the choice of purchasing one-size-fits-all plans that did not meet their needs or their budgets, or not purchasing insurance at all. Moreover, regulatory measures adopted in 2016 exacerbated these conditions by restricting alternative insurance options for consumers who need short-term coverage because, for example, they lost their jobs or were priced out of more comprehensive coverage.

To facilitate relief for such consumers, the Departments of Labor, Treasury and Health and Human Services (the "Departments") sought to restore "short-term, limited duration insurance" ("STLDI") as a realistic coverage option. In addition to providing short-term coverage, STLDI policies can be more cost-effective because Congress has long exempted them from the definition of individual health insurance coverage under federal law—first in 1996 in the Health Insurance Portability and Accountability Act ("HIPAA") and again in 2010 in the ACA. The final rule, issued in August 2018, scales back the regulatory changes adopted in 2016 and largely reverts to the framework in effect in 2010, when Congress enacted the ACA, by restoring the permissible term of an STLDI policy from less than ninety days (first instituted in 2016) to any period of less than one year. The rule is distinguishable from the framework in effect in 2010 only in that it permits the renewal of an STLDI plan for a period of up to 36 months and requires all STLDI plans to include a detailed disclosure notifying consumers that such plans are not required to provide certain benefits and need not comply with the requirements of the ACA.

Importantly, the rule allows states to determine any further state-appropriate regulation of STLDI plans, consistent with the long-standing congressional recognition that states are the primary regulators of insurance and insurance markets are quintessentially local in nature. And, by freeing states to permit more flexible (and frequently more affordable) insurance options for

those who need short-term health insurance, the rule also complements the ACA's goals of increasing affordability, availability, and continuity of health insurance coverage.

Plaintiffs disagree with these policy changes and seek the extraordinary relief of a preliminary injunction to enjoin the application of the rule.  Their Motion suffers from myriad legal and factual defects, however, and it should be denied.

*First*, Plaintiffs have not established standing to bring their claims.  Their assertion of an injury on behalf of issuers of ACA-compliant health plans fails because, notwithstanding the highly variable market conditions for STLDI plans across different states and regions, Plaintiffs fail to provide any non-speculative, non-conclusory evidence that any specific insurance company will suffer a certainly impending harm.  Nor do Plaintiffs show that any injury, if it occurs, will be attributable to the rule, as opposed to Congress's recent decision to reduce the tax penalty to $0 for people who opt out of the ACA's coverage mandate.  As to those Plaintiffs purporting to assert the interests of consumers, they do not identify any single consumer who will experience an increase in his or her out-of-pocket expense as a result of the rule; indeed, 87 percent of consumers who purchase individual health coverage through ACA-facilitated markets are insulated from the effect of premium increases because they receive subsidies that are pegged to premiums.  Moreover, any price increases in 2019 for the hypothetical, unsubsidized consumer are no longer redressable given that issuers have already set their rates.  And, whether any hypothetical, unsubsidized consumer can be expected to encounter cost increases in 2020 or beyond will turn on numerous unknowable facts about the future behavior of state legislators and regulators, STLDI issuers, ACA-compliant plan issuers, and consumers in different regions across the nation.  Indeed, the D.C. Circuit recently rejected a nearly identical theory of standing, holding that consumers of ACA-compliant health insurance lacked standing to challenge an ACA-related policy because their assumption that the policy would cause rate increases for ACA-compliant coverage was speculative.  *Am. Freedom Law Ctr. v. Obama*, 821 F.3d 44, 49 (D.C. Cir. 2016), *cert. denied*, 137 S. Ct. 1069 (2017).  As for those plaintiffs who seek to assert the interests of providers, their claim that providers would encounter an increased risk of uncompensated care—because their patients

will either be priced out of the market for ACA-compliant plans or mistakenly purchase STLDI products that do not provide the coverage they need—is similarly conjectural and cannot support standing.

*Second*, Plaintiffs have not demonstrated that they will suffer irreparable harm absent preliminary injunctive relief. Indeed, courts in this District have regularly found that the type of garden-variety economic harm asserted by Plaintiffs here is insufficient to justify the extraordinary remedy of a preliminary injunction. Moreover, the sole insurer that Plaintiffs identify as susceptible to being injured by the rule has already increased its premiums for the 2019 plan year to account for the rule's implementation, demonstrating that any immediate risk arising from the rule is not irreparable as to insurance companies and not redressable as to any consumers or providers that may be impacted by increased rates in 2019.

*Third*, Plaintiffs have no likelihood of success on the merits of their claims. Their theory that the rule exceeds the Departments' authority cannot be squared with the fact that the rule largely restores the regulatory approach to STLDI plans under HIPAA, an approach that existed when Congress enacted the ACA in 2010. As for Plaintiffs' claim that the rule is contrary to law, it is refuted by Congress's decision to exempt STLDI coverage from federal regulation—first in HIPAA and again in the ACA. Congress consistently has treated STLDI plans as distinct from individual health insurance coverage and it has never suggested that the Departments must restrict such coverage in favor of ACA-compliant insurance. Plaintiffs' claim that the rule is arbitrary and capricious likewise must be rejected because the Departments considered the possible adverse effects of the rule on the market for ACA-compliant insurance and reasonably determined that those effects are outweighed by the need to increase coverage options for individuals whose needs were not being met under the prior regulatory scheme.

*Finally*, Plaintiffs have not demonstrated that the balance of harms or the public interest weigh in favor of an injunction. Plaintiffs' characterization of the Rule as a "drastic change" that will "upend the individual market for health insurance and harm millions of people" is belied by the many analyses indicating that the rule will have only a minor impact on the overall risk pool

in the market for individual health insurance coverage, while providing important relief to individuals who face coverage gaps or cannot afford to purchase ACA-compliant coverage. Further, preliminary injunctive relief will not lower premiums for 2019, which have already been set; it will merely provide a windfall to those insurance companies that have set their 2019 premiums for ACA-compliant coverage based on the assumption that the STLDI rule would be in effect.  For all of these reasons, Plaintiffs' Motion should be denied.

**BACKGROUND**

I.      **Statutory and Regulatory Background**

     A.      **Establishment of the Exemption for "Short-Term Limited Duration Insurance" Under HIPAA.**

In 1996, Congress enacted HIPAA, Pub. L. No. 104-191, 110 Stat 1936.  Effective in 1997, HIPAA established, among other things, federal standards for "individual health insurance coverage" at section 2741, *et seq.*, of the Public Health Service Act ("PHS Act"), *codified at* 42 U.S.C. § 300gg-41, *et seq.*  Congress defined "individual health insurance coverage" to mean "health insurance coverage offered to individuals in the individual market, but [that] does not include short-term limited duration insurance."  PHS Act § 2791(b)(5), *codified* at 42 U.S.C. § 300gg-91(b)(5).

While HIPAA clearly exempted STLDI plans from its individual market reforms, it did not define the term "short-term limited duration insurance."  Thus, on April 8, 1997, the Departments jointly published an interim final rule (the "1997 Rule") to define the term to mean "health insurance coverage provided pursuant to a contract with an issuer that has an expiration date specified in the contract (considering any extensions that may be elected by the policyholder without the issuer's consent) that is within 12 months of the date such contract becomes effective." 62 Fed. Reg. 16,894, 16,928 (Apr. 8, 1997).  In 2004, the Departments issued a final rule with this same definition without opposition or comment.  *See* 69 Fed. Reg. 78,720, 78,748 (Dec. 30, 2004).

**B.      The ACA's Retention of the STLDI Exemption.**

In 2010, Congress enacted the ACA with the aim of "increas[ing] the number of Americans covered by health insurance and decreas[ing] the cost of health care." *NFIB*, 567 U.S. at 538.  The Act established a series of new insurance market reforms, including "guaranteed issue" and "community rating" requirements in the individual and small group markets.  "Guaranteed issue" requires insurers to offer coverage to all individuals regardless of health status and to accept every individual who applies for such coverage, and "community rating" prohibits insurers from charging higher premiums based on a person's medical history or gender.  *See* 42 U.S.C. §§ 300gg, 300gg-1.  The Act also imposed a number of other requirements for plans in the individual and small group health insurance markets, such as mandatory provision of "essential health benefits," cost sharing limits, medical loss ratio rules, and restrictions on annual and lifetime dollar limits on essential health benefits.  *Id.* §§ 300gg-6, 300gg-11, 300gg-18, 18022(b).  Notably, the Act did not amend HIPAA's definition of the term "individual health insurance coverage," thereby similarly exempting STLDI plans from the federal individual market requirements.  *See id.* § 300gg-91(b)(5).

To facilitate a market for health insurance products that conform to the ACA's regulatory reforms, Congress established "Health Benefit Exchanges" or state-based virtual marketplaces where consumers can purchase ACA-compliant qualified health plans or "QHPs."  42 U.S.C. § 18031.  To help low-income individuals obtain such coverage, the law provides subsidies in the form of premium tax credits, which are available only to eligible consumers who purchase health insurance through an Exchange.  *See generally id.* §§ 18021-18044; 26 U.S.C. § 36B.  The amount of the subsidy is pegged to the premium charged by a benchmark plan available on the Exchange, as well as to a consumer's household income.  *See* 26 U.S.C. § 36B.  If premiums for the benchmark plan increase, the premium tax credits increase by a corresponding amount, thus insulating the taxpayer from the effect of the premium increase.  Wu Decl. ¶ 6.  As of 2018, roughly 87 percent of consumers purchasing health insurance through an Exchange received subsidies.  *Id.*

QHPs sold on an Exchange qualify as one of several forms of "minimum essential coverage" identified by the Act. The Act requires applicable individuals to obtain such coverage or pay a tax penalty, unless the individual qualifies for one of several enumerated exemptions. 26 U.S.C. § 5000A(a)-(b). Among these are exemptions for individuals who cannot afford ACA-compliant coverage or who suffer hardship with respect to obtaining such coverage. *Id.* § 5000A(e)(1), (5). In December 2017, Congress enacted the Tax Cuts and Jobs Act of 2017 ("TCJA"), which reduced the amount of the tax penalty to $0 for all individuals beginning in 2019. *See* Budget Fiscal Year, 2018, Pub. L. No. 115-97 § 11081, 131 Stat 2054 (2017).

Although the ACA sought to facilitate the market for ACA-compliant insurance products through the interdependent provisions discussed above, Congress exempted some forms of health coverage from some or all of the ACA's individual market reforms or allowed flexibility in applying the reforms to such coverage. These include:

- Insurance policies in effect prior to the ACA's enactment (also known as "grandfathered health plans"), *see* 42 U.S.C. § 18011;

- Student health insurance plans, *see* 42 U.S.C. § 18118(c);

- Self-insured group health plans, or arrangements in which an employer collects premiums from its employees and takes on the responsibility of paying medical claims, either directly or through a third party, *see* 42 U.S.C. § 18013;

- Health care sharing ministries, or organizations that facilitate sharing of health care costs among individual members with common ethical or religious beliefs, *see* 26 U.S.C. § 5000A(d)(2);

- "Excepted benefits," or policies that protect against certain types of accidents or provide stand-alone, limited benefits, such as dental or vision benefits, benefits for certain types of disease, and long-term care, *see* 42 U.S.C. §§ 300gg-21(b)-(c), 300gg-63(b);

- Catastrophic plans, or individual health plans that do not meet the minimum actuarial value required of QHPs,[1] provide only limited benefits until an individual has incurred cost-sharing equal to the applicable annual limit on cost-sharing, and

---

[1] "Actuarial value" refers to the portion of premium that a plan spends on claims costs. *See* 42 U.S.C. § 18022(d); 45 C.F.R. § 156.20.

may only be sold to individuals under thirty years of age and others who qualify for a hardship exemption from the individual mandate, *see* 42 U.S.C. § 18022(e).

In addition, as noted above, by declining to change HIPAA's definition of "individual health insurance coverage," Congress also excluded STLDI plans from the ACA's individual market reforms. 42 U.S.C. § 300gg-91(b)(5). In providing flexibility for additional forms of health coverage vehicles to co-exist with ACA-compliant coverage, and in creating exemptions from the tax penalty for unaffordability and hardship, Congress recognized that coverage that is compliant with the regulatory framework enacted by the ACA will not be appropriate in every circumstance.

Finally, although the ACA greatly expanded the role of the federal government in the regulation of health insurance, Congress indicated that states should remain the primary regulators of health insurance. For example, Congress provided states with the flexibility to implement the Act in state-specific ways and gave states the authority to enforce many of the Act's individual market reforms. *See* PHS Act § 2723, *codified at* 42 U.S.C. § 300gg-22; *see also* 42 U.S.C. §§ 300gg-23, 18041; 45 C.F.R. § 150.201. The Department of Health and Human Services ("HHS"), which oversees implementation of many of the ACA's reforms, is also directed to consult with the National Association of Insurance Commissioners ("NAIC") in developing standards to implement the Act in due recognition of state regulators' expertise in formulating insurance policy. *See, e.g.*, ACA §§ 1311, 1321, 1001 (adding sections 2715 and 2719 of the PHS Act), 1202 (amending and adding section 2701 of the PHS Act), and 10101 (adding section 2718 of the PHS Act), *codified at* 42 U.S.C. §§ 18031(c)(1)(F), 18041, 300gg, 300gg-15, 300gg-18, 300gg-19.

**C.     The 2016 STLDI Rule**

After the Exchanges became operative in 2014, premiums for health plans sold in the individual market rose drastically. Between 2013 and 2014, premiums rose an average of roughly 38 percent. Between 2014 and 2015, premiums rose another 23 percent.[2] During this time, higher-

---

[2] *See, e.g.*, Forbes, Overwhelming Evidence that Obamacare Caused Premiums to Increase Substantially (July 28, 2016), https://www.forbes.com/sites/theapothecary/2016/07/28/overwhelming-evidence-that-obamacare-caused-premiums-to-increase-substantially/#61242bf715be (last visited Oct. 9, 2018).

than-expected health care costs drove many issuers to exit the individual health insurance markets, leaving consumers with fewer and less affordable insurance choices.[3]

On October 31, 2016, the Departments adopted a final rule (the "2016 Rule") to reduce the maximum term and duration of an STLDI plan from "less than [twelve] months" (under the 1997 and 2004 Rules) to "less than 3 months."  81 Fed. Reg. 75,316, 75,317-18 (Oct. 31, 2016).  The Departments explained that they believed the change was warranted because "[i]n some instances, individuals are purchasing [STLDI] coverage as their primary form of health coverage and . . . some issuers are providing renewals of the coverage that extend the duration beyond 12 months[,]" which could "adversely impact[] the risk pool for Affordable Care Act-compliant coverage."  *Id.* at 75,317-18.  The 2016 Rule also required such plans to provide a written notice to consumers that the coverage provided would not qualify as "minimum essential coverage" and could subject the consumer to a tax penalty.  *Id.* at 75,318.

Although a number of commenters supported the 2016 Rule, several commenters opposed it.  *Id.* at 75,318.  Of note, the NAIC, representing insurance commissioners across the nation, observed that "[s]hort term, limited duration insurance has long been defined as a policy of less than 12 months both by the states and the federal government" and opined that "[f]ederal interference" with this scheme was likely to "harm some consumers, limit consumer options, and have little positive impact on the risk pools in the long run."  NAIC Comment, 2016 Proposed Rule (Aug. 9, 2016), at 1-2.[4]  The NAIC observed that if "an individual misses open enrollment and seeks STLDI coverage, [a plan of less than three months] "would not provide coverage until the next policy year," resulting in a higher risk of coverage gaps and possible exclusion from coverage altogether if the consumer developed a health condition during the less than three-month

---

[3] *See, e.g.*, The Brookings Institution & The Rockefeller Institute, A Study of Affordable Care Act Competition in Texas (Feb. 2017), https://www.brookings.edu/wp-content/uploads/2017/02/texas-aca-competitiveness-2-6-for-print.pdf (last visited Oct. 13, 2018).

[4] https://www.naic.org/documents/government_relations_160809_hhs_reg_short_term_dur_plans.pdf (last visited Oct. 14, 2018).

8

period.  *Id.* at 1.  The NAIC also explained that there "are instances when consumers simply cannot afford, even with the subsidies, an insurance plan with minimum essential coverage" and that the options of those consumers "should not be limited to either paying for coverage they cannot afford or exposing themselves to the risk of losing their coverage after three months if they become sick." *Id*. at 2.  Finally, the NAIC cautioned that "if the concern is that healthy individuals will stay out of the general pool by buying short-term, limited duration coverage[,] there is nothing in this proposal that would stop that.  If consumers are healthy they can continue buying a new policy every three months.  Only those who become unhealthy will be unable to afford care, and that is not good for the risk pools in the long run." *Id.* at 1-2. The NAIC urged the Departments to "focus . . . on educating consumers and ensuring that they are aware of the limitations of these and other excepted benefit plans[,]" rather than shortening the term of an STLDI policy.  *Id.* at 2.

The Departments promulgated the 2016 Rule, effective January 1, 2017, notwithstanding the views of opposing commenters.  *See* 81 Fed. Reg. at 75,318.

### D.      The 2018 STLDI Rule

After the Departments promulgated the 2016 Rule, market conditions in the Exchanges continued to deteriorate.  The nationwide average Exchange enrollment among unsubsidized consumers in the individual market declined by 1.3 million, or 20 percent, between 2016 and 2017. 83 Fed. Reg. at 38,214; *see also* Comment, Galen Institute (Apr. 23, 2018) ("[B]etween a third and a half of people ages 45 to 59 and a quarter of those 60+ went without needed health care in the last year due to its costs.").  During the same period, average Exchange enrollment among all consumers in the individual market decreased by ten percent and premiums increased by 21 percent.  Short-Term, Limited-Duration Insurance, 83 Fed. Reg. 83,212, 38,214 (Aug. 3, 2018). Individual market premiums rose another 37 percent between 2017 and 2018.  *Id.* at 38,232. Further, in 2018, about 52 percent of counties in the United States, containing 26 percent of enrollees, had access to just one individual market issuer in the Exchange.  *Id.*

On January 20, 2017, the President issued an Executive Order directing all agencies with authority and responsibilities under the ACA, to the extent permitted by law, to "provide relief

from . . . regulatory burden[s] on individuals, families, health care providers, health insurers, patients," and other stakeholders.  Executive Order 13765, Minimizing the Economic Burden of the Patient Protection and Affordable Care Act Pending Repeal, 82 Fed. Reg. 8351 (Jan. 20, 2017).  The Executive Order further directs such agencies to "provide greater flexibility to States . . . in implementing health care programs" in order to "encourage the development of a free and open market . . . for the offering of health care services and health insurance, with the goal of achieving and preserving maximum options for patients and consumers." *Id.*

On June 12, 2017, HHS published a request for information in the Federal Register notifying stakeholders that it was "actively working to reduce regulatory burdens and improve health insurance options under Title I of the [ACA]," and seeking input from interested parties to inform those efforts.  Reducing Regulatory Burdens Imposed by the ACA, 82 Fed. Reg. 26,885.  In response, HHS received feedback that the "shortening of the permitted length of short-term, limited-duration insurance policies [under the 2016 Rule] had deprived individuals of affordable coverage options," especially for "financially-stressed individuals [who] may be faced with a choice between short-term, limited-duration insurance coverage and going without any coverage at all."  83 Fed. Reg. at 38,213-14.

On February 21, 2018, the Departments issued a proposal to, in part, restore the definition of the maximum contract term of an STLDI policy to the one that existed when the ACA was enacted—*i.e.*, the definition in the Departments' 1997 and 2004 Rules.  The Departments also proposed an expanded notice requirement and asked for comments on the conditions under which STLDI policies could continue for 12 months or longer.  Short-Term, Limited-Duration Insurance, Proposed Rule, 83 Fed. Reg. 7437 (Feb. 21, 2018).

The Departments received approximately 12,000 comments in response to the proposed rule.  A number of commenters, including the NAIC and several states, strongly supported the proposal.  For example, the Iowa Insurance Commissioner noted that Iowa had seen the departure of approximately 26,000 consumers from its Exchange in 2018 "in large part due to the skyrocketing premium rates[,]" and that, "[g]iven the collapse of our market, we believe that short-

term limited duration insurance can provide an option for consumers to ensure coverage." Comment, Iowa Commissioner of Insurance at 1 (Apr. 23, 2018).[5]   The Iowa Insurance Commissioner also urged that states be allowed to "address the unique conditions and needs of their respective insurance markets" and noted that "Iowa intends to issue regulations for the short-term limited-duration plans to require that any carrier who wants to offer those plans in our marketplace provides fulsome coverage."  *Id.* at 2; *see also* Comment, Commissioner of Securities & Insurance, Montana at 1 (Apr. 23, 2018) (supporting the proposal and requesting that additional issues, "such as rating, renewability or duration of the policies . . . be left to the states").[6]  Similarly, the National Association of Insurance and Financial Advisors ("NAIFA") commented that "this measure could ensure that consumers can maintain critical and temporary health insurance coverage in instances where a consumer lost his or her individual market or group policy and needs sufficient time to obtain a more comprehensive insurance policy."   NAIFA Comment (Apr. 18, 2018), at 2[7]; *see also* Comment, Galen Institute (Apr. 23, 2018) (noting that "[d]uring the most recent recession, [the] average [period of unemployment] at one point reached . . . more than three times the 90-day limitation" permitted under the 2016 Rule).[8]   The NAIC also noted that "[r]eturning the Federal definition to 'less than 12 months,' as proposed, is consistent not only with longstanding federal law but also how this term has been long defined by most states."   NAIC Comment (Apr. 23, 2018), at 1.[9]

On August 3, 2018, the Departments finalized the proposed rule with some modifications. Under the final rule (the "STLDI Rule"), "short-term, limited-duration insurance" means "health coverage provided pursuant to a contract with an issuer that has an expiration date specified in the

---

[5]  https://www.regulations.gov/document?D=CMS-2018-0015-8866 (last visited Oct. 15, 2018).

[6]  https://www.regulations.gov/document?D=CMS-2018-0015-9005 (last visited Oct. 15, 2018).

[7]  https://www.regulations.gov/document?D=CMS-2017-0078-0233 (last visited Oct. 15, 2018).

[8]  https://www.regulations.gov/document?D=CMS-2018-0015-8877 (last visited Oct. 15, 2018).

[9]  https://www.regulations.gov/document?D=CMS-2018-0015-9018 (last visited Oct. 15, 2018).

contract that is less than 12 months after the original effective date of the contract and, taking into account renewals or extensions, has a duration of no longer than 36 months in total." 83 Fed. Reg. at 38,214-15.  The STLDI Rule thereby aligns the maximum initial contract term of an STLDI policy with the definition that existed under the 1997 Rule, while permitting such a contract to be extended or renewed for a period of up to 36 months.  The STLDI Rule also retains the proposed requirement that issuers of STLDI display a prominent notice in the contract and any application materials advising consumers of the potential limits of such coverage.  Moreover, the language of the notice in the final rule was revised and expanded to read as follows:

> This coverage is not required to comply with certain federal market requirements for health insurance, principally those contained in the Affordable Care Act. Be sure to check your policy carefully to make sure you are aware of any exclusions or limitations regarding coverage of preexisting conditions or health benefits (such as hospitalization, emergency services, maternity care, preventive care, prescription drugs, and mental health and substance use disorder services). Your policy might also have lifetime and/or annual dollar limits on health benefits. If this coverage expires or you lose eligibility for this coverage, you might have to wait until an open enrollment period to get other health insurance coverage.

*Id.* at 38,215.[10]

## II.     This Litigation

On September 14, 2018, Plaintiffs filed this lawsuit challenging the STLDI Rule under the Administrative Procedure Act ("APA") on the basis that the STLDI Rule allegedly exceeds the Departments' authority, is contrary to law, and is arbitrary and capricious.  Plaintiffs contend that the STLDI Rule converts the exemption for STLDI plans "into a loophole that would permit the creation of a parallel individual insurance market consisting of plans that are not subject to the ACA's consumer protection standards" and will cause market-segmentation that will cause ACA-compliant coverage to become more expensive.  Compl. ¶ 2.  This motion for a preliminary injunction followed.

---

[10] Plans that commence before January 1, 2019, must also include a warning that STLDI coverage may expose the consumer to a tax penalty.  83 Fed. Reg. at 38,223.

## STANDARD OF REVIEW

A preliminary injunction "is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion."  *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (emphasis omitted) (citation omitted).  The party moving for preliminary injunctive relief must demonstrate that (1) it has a substantial likelihood of success on the merits of its claims, (2) it will suffer irreparable injury unless the injunction issues, (3) the threatened injury outweighs damage to the opposing party, and (4) the injunction would not harm the public interest.  *See Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22-23 (2008).[11]  And where, as here, there are serious questions as to the Court's jurisdiction, it is "more *unlikely*" that the plaintiff can establish a "'likelihood of success on the merits.'"  *Munaf v. Geren*, 553 U.S. 674, 690 (2008).

## ARGUMENT

### I.  Plaintiffs Have Not Established a Substantial Likelihood of Standing.

At the outset, the Court should deny Plaintiffs' motion because they have not demonstrated Article III standing.  A plaintiff "bears the burden of showing that he has standing for each type of relief sought."  *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009).  To meet that burden in the context of a preliminary injunction motion, a "plaintiff cannot 'rest on mere allegations, but must set forth by affidavit or other evidence specific facts' that, if 'taken to be true,' demonstrate a substantial likelihood of standing.'"  *Elec. Privacy Info. Ctr. v. Presidential Advisory Comm'n on Election Integrity*, 878 F.3d 371, 377 (D.C. Cir. 2017) (citation omitted).  That is, the plaintiff must "show a 'substantial likelihood' of standing" under the heightened standard for evaluating a

---

[11]  In *Winter*, the Supreme Court held that a party must always demonstrate a likelihood of irreparable harm before a preliminary injunction may issue.  555 U.S. at 22.  By so holding, the Court appears to have rejected the test previously used in the D.C. Circuit under which the requisite degree of likelihood of success and the degree of harm to the party seeking the injunction were balanced along a sliding scale.  *See Davis v. PBGC*, 571 F.3d 1288, 1295-96 (D.C. Cir. 2009) (explaining that "this Circuit's traditional sliding-scale approach to preliminary injunctions may be difficult to square with" *Winter*) (Kavanaugh, J. concurring).

motion for summary judgment. *Id.* (citing *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 912-13 (D.C. Cir. 2015)).

The "irreducible constitutional minimum" of standing requires a plaintiff to demonstrate an injury-in-fact that is: (1) concrete and particularized, and actual or imminent, not conjectural or hypothetical, (2) fairly traceable to the challenged conduct of the defendant, and (3) likely to be redressed by a favorable judicial decision. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992). "In requiring a particular injury, the Court mean[s] 'that the injury must affect the plaintiff in a personal and individual way.'" *Ariz. Christian Sch. Tuition Org. v. Winn*, 563 U.S. 125, 134 (2011) (citation omitted). The Supreme Court has also "repeatedly reiterated that 'threatened injury must be *certainly impending* to constitute injury in fact,' and that 'allegations of *possible* future injury' are not sufficient." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990)).

An organizational plaintiff may assert associational standing on behalf of its members by showing that at least one of its members satisfies the injury-in-fact, causation, and redressability requirements. *Nat'l Ass'n of Home Builders v. EPA*, 786 F.3d 34, 40 (D.C. Cir. 2015). To do so, "it is not enough [for the organization] to aver that unidentified members have been injured." *Chamber of Commerce of U.S. v. EPA*, 642 F.3d 192, 199-200 (D.C. Cir. 2011). Rather, the plaintiff "bear[s] the burden of specifically identifying at least one 'member who had or would suffer harm' from each challenged agency action." *Sec. Indus. & Fin. Markets Ass'n v. U.S. Commodity Futures Trading Comm'n*, 67 F. Supp. 3d 373, 400 (D.D.C. 2014) (citation omitted).

### A.    Plaintiffs Fail to Establish Standing on Behalf of Their Insurer-Members.

Plaintiffs first assert associational standing on behalf of the insurer members of Plaintiff Association of Community Affiliated Plans. They identify only one such member—Community Health Choice, Inc. ("CHC"). *See* Pls.' Mem. of Law in Supp. of Mot. for Prelim. Inj. ("Mot.") at 33-35, ECF No. 10-1. CHC is a Houston-based Health Maintenance Organization serving approximately 400,000 low-income residents in the Houston area, approximately one-quarter of whom purchase coverage through the Texas Exchange. *Id.* at 33-34; Decl. of Kenneth Janda

("Janda Decl.") ¶ 6, ECF No. 10-6.  CHC believes that the STLDI Rule could cause it to lose as many as 10,000 Exchange members and impede its ability to compete for uninsured Texans.  *Id.* ¶ 11.  CHC's concerns in this respect, however, are largely unsupported, and they do not establish that any harm to CHC is certainly impending.

It is well-established that standing may not be premised on "an extended chain of contingencies[,]" *Williams v. Lew*, 819 F.3d 466, 473 (D.C. Cir. 2016), especially those that "depend[] on the acts of third parties not before the court." *Grocery Mfrs. Ass'n v. EPA*, 693 F.3d 169, 176 (D.C. Cir. 2012).  Thus, "[w]hen 'the existence of one or more of the essential elements of standing depends on the unfettered choices made by independent actors not before the courts and whose exercise of broad and legitimate discretion the courts cannot presume either to control or to predict,' it becomes 'substantially more difficult' to establish" standing." *Am. Freedom Law Ctr. v. Obama*, 821 F.3d 44, 48-49 (D.C. Cir. 2016) (citations omitted), *cert. denied*, 137 S. Ct. 1069 (2017).

Here, whether CHC in fact will suffer a loss of market share to the STLDI market depends on a number of state-specific, market-specific, and product-specific factors reflecting a broad array of choices to be made by independent actors that are not before the Court.  These include, among other things, how stringently the State of Texas regulates STLDI plans, whether STLDI insurers obtain approval from state regulators to sell their plans in the Houston area, whether the mix of benefits offered by those plans is attractive to CHC's enrollees, whether CHC's enrollees could pass any underwriting requirements to enable them to purchase STLDI plans, and how the premiums charged by STLDI plans compare to CHC's premiums after accounting for any subsidies that CHC's members receive.  Because Plaintiffs provide no evidence on any of these factors, their claim that CHC would be harmed by the STLDI Rule is mere speculation.  *See DEK Energy Co. v. FERC*, 248 F.3d 1192, 1194-95 (D.C. Cir. 2001) (concluding that the fact that government action increased competitors' "*ability* to sell profitably in [plaintiff's] areas" and "the *probability* of such entry" was not sufficient because a plaintiff must demonstrate that a challenged agency action will "almost surely cause [the plaintiff] to lose business").  As just one example of such state-specific

15

variation, Texas does not permit extensions or renewals of an STLDI plan beyond one year.  *See* 28 Tex. Admin. Code § 3.3002(18).  Consequently, at a minimum, CHC will not be harmed by, and does not have standing to challenge, the STLDI Rule's 36-month renewability provision.

In fact, the limited evidence that does exist undercuts CHC's projections of injury.  CHC claims to serve a predominantly low-income population that would be rendered ineligible to receive subsidies if they switched to STLDI coverage.  Janda Decl. ¶ 12.  These enrollees, however, generally would be insulated from the effects of any price increases that may be caused by the STLDI Rule.  Wu Decl. ¶ 6.[12]  Moreover, CHC itself asserts that STLDI products "are not reasonable alternatives for the vast majority of [its] members" because "many have pre-existing conditions, and few can afford large deductibles."  Janda Decl. ¶ 8.  If so, the "vast majority" of CHC's enrollees are unlikely to switch to an STLDI plan.[13]

Plaintiffs also suggest that they need not meet their evidentiary burden on this point because "[e]ven the government estimates that enrollment in ACA-compliant plans will decrease by 200,000 people in 2019, and that enrollment will be down by 1.3 million by 2028."  Mot. at 34 (citing 83 Fed. Reg. at 38,236).  The government's analysis, however, assessed the likely impact of the STLDI Rule *nationwide* and provides no information at all regarding the particular Plaintiffs in this litigation or their members.  *See* 83 Fed. Reg. at 38,236.  Other analyses, including the

---

[12] In Texas, approximately 86 percent of residents enrolling in insurance coverage through the Exchange received subsidies in 2018.  *See* https://www.healthinsurance.org/texas-state-health-insurance-exchange/ (last visited Oct. 15, 2018).  Despite claiming to serve a "low-income population" in Texas, CHC states that roughly one-third of its enrollees receive "limited or no subsidies."  Compl. ¶ 25.  CHC does not, however, quantify what it means by "limited" or specify what proportion of its enrollees receives no subsidies.  In general, any amount of subsidies, even if limited in amount, would help insulate an enrollee against any price increases that may be caused by the STLDI Rule.  Wu Decl. ¶ 6.

[13] Although CHC allegedly is concerned that its enrollees could nevertheless be "lured" away by unscrupulous marketers of STLDI plans, that concern is speculative and also dependent on the supposed misconduct of third parties.  The STLDI Rule requires STLDI plans to notify consumers of important limitations on coverage.  To the extent individuals fail to read the disclosures, fail to obtain the assistance necessary to comprehend them, or choose to purchase insurance that does not meet their coverage needs, the answer to that problem is more education, not rigid restrictions on the length and duration of STLDI coverage.

Wakely Report commissioned by the Plaintiffs, did the same.  *See generally* Congressional Budget Office, *Federal Subsidies for Health Insurance Coverage for People Under Age 65: 2018 to 2028*, 12 (May 23, 2018) ("CBO Report"); Murray Decl. Ex. B, ECF No. 10-10 (the "Wakely Report"). These projections therefore did not find that plans in any specific state or region, much less a specific issuer in any region, would be impacted by the STLDI Rule.  *Cf. Summers*, 555 U.S. at 495 (explaining that a claim of injury to the "national forests" as a whole did not show that a visitor to any specific forest, or portion of that forest, would be injured).  Moreover, all of these analyses cautioned that they were merely projections and that the actual, local impact was uncertain and would depend on a number of factors—including state-by-state regulation of STLDI plans.  *See* 83 Fed. Reg. at 38,239; CBO Report at 12; Wakely Report at 8.  These types of uncertain projections may be appropriate to guide policymaking, but they are not adequate to establish an Article III injury.  *Cf. United Transp. Union v. ICC*, 891 F.2d 908, 915-16 (D.C. Cir. 1989) (holding that legislative projections about the effects of a particular policy did not demonstrate Article III standing because "there is no constitutional requirement that such [projections] . . . be correct, or even likely, for Congress to legislate in reliance on them," whereas a "court's . . . inquiry is much more rigorous").

Plaintiffs' reliance on the doctrine of "competitor standing" is similarly misplaced.  Under this doctrine, the D.C. Circuit has recognized that "economic actors 'suffer an injury in fact when agencies lift regulatory restrictions on their competitors or otherwise allow increased competition' against them."  *Sherley v. Sebelius*, 610 F.3d 69, 72 (D.C. Cir. 2010) (citing *La. Energy & Power Auth. v. FERC*, 141 F.3d 364, 367 (D.C. Cir. 1998)); *New World Radio, Inc. v. FCC*, 294 F.3d 164, 172 (D.C. Cir. 2002).  However, as the D.C. Circuit has emphasized, the doctrine is a narrow one: "Because of the generally contingent nature of predictions of future third-party action," a court should be "sparing in crediting claims of anticipated injury by market actors and other parties alike."  *Arpaio v. Obama*, 797 F.3d 11, 23 (D.C. Cir. 2015).  A plaintiff seeking to invoke competitor standing must therefore demonstrate that the government has lifted a "regulatory restriction *on a 'direct and current competitor'*" or taken regulatory action that predictably

"enlarges the pool of competitors . . . *in the same market*." *Id.* (emphasis added, citation omitted); *accord New World Radio, Inc.*, 294 F.3d at 170.  Importantly, the doctrine does not apply to "an agency action that is, at most, the first step in the direction of future competition." *New World Radio*, 294 F.3d at 172; *see, e.g.*, *Delta Air Lines, Inc. v. Export-Import Bank*, 85 F. Supp. 3d 250, 266 (D.D.C. 2015) (no competitor standing where "numerous factual questions remain unresolved and undeveloped, many of which are necessary for determining if and how Plaintiffs might suffer an injury-in-fact from the [agency action]").

Plaintiffs have not shown competitor standing because, most importantly, STLDI plans and ACA-compliant plans are in different product markets.  The STLDI Rule does not lift regulatory restrictions on CHC's competitors on the Texas Exchange for ACA-compliant plans or open *that* market to new participants.  Rather, the STLDI Rule applies to products sold in the market for off-Exchange short-term coverage of limited duration.  Those products cannot be purchased or sold on the ACA-created Exchanges, and the millions of Americans who receive subsidies to obtain coverage cannot use those subsidies to purchase them.  Moreover, STLDI policies can last for only limited periods of time and cannot involve an initial term of greater than 364 days.  And, as Plaintiffs point out, they are not required to carry protections for pre-existing conditions, coverage of essential health benefits, or guarantees of availability and renewability, and they do not count toward any "minimum essential coverage" requirements, as CHC's coverage does.[14]  They therefore do not directly compete with QHPs, and even Plaintiffs themselves argue that they are not reasonable substitutes for ACA-compliant plans.  Thus, to the extent enrollees of ACA-compliant plans do consider switching to STLDI plans, the STLDI Rule is "at most, the first step

---

[14] Accordingly, a Kaiser Family Foundation poll concluded that 84 percent of consumers do not see STLDI plans as an attractive alternative to ACA-compliant coverage.  Kaiser Family Foundation, *Survey of the Non-Group Market Finds Most Say the Individual Mandate Was Not a Major Reason They Got Coverage in 2018, And Most Plan to Continue Buying Insurance Despite Recent Repeal of the Mandate Penalty*, (Apr. 3, 2018), https://www.kff.org/health-reform/press-release/poll-most-non-group-enrollees-plan-to-buy-insurance-despite-repeal-of-individual-mandate-penalty/ (last visited Oct. 12, 2018)

in the direction of future competition." *New World Radio*, 294 F.3d at 172; *see also DEK Energy Co.*, 248 F.3d at 1196 (finding competitive injury unduly speculative where any increase in competition would "depend on . . . market conditions [in the plaintiff's market] and in alternative markets"). That is, Plaintiffs cannot satisfy "the basic requirement common to all [competitor standing] cases," namely that the challenged government regulation has caused "an actual or imminent increase in competition, which increase . . . will almost certainly cause an injury in fact." *Sherley*, 610 F.3d at 73.

In any event, Plaintiffs also have not shown that any potential decision by CHC enrollees to switch to STLDI coverage would be caused by the STLDI Rule or redressable by a ruling in Plaintiffs' favor. Indeed, the analyses on which they rely, Mot. at 33-34, measured the *combined* effect of the reduction of the tax penalty to $0 and the STLDI Rule, and found that the impact of the STLDI Rule, standing alone, was minimal. *See* 83 Fed. Reg. at 38,235-39; Wakely Report at 1. This is not surprising because, as the Departments found, the type of enrollee most likely to switch from an ACA-compliant plan to an STLDI plan is a healthier one who, with a tax penalty of $0, may well go without insurance altogether. *See id.* at 38,235. A favorable ruling would do nothing to ensure that these individuals purchase ACA-compliant plans, much less CHC's products. Nor would a favorable ruling prevent a cost-conscious consumer from purchasing STLDI coverage as an alternative to CHC's plan. *See, e.g.*, Kaiser Family Foundation – Health Reform, *Understanding Short-Term Limited Duration Health Insurance* at 3 (Apr. 23 2018) (noting that even under the 2016 Regulation, consumers were purchasing "four-packs" of 3-month STLDI plans as an alternative to year-round ACA-compliant coverage).[15] For all of these reasons, Plaintiffs fail to demonstrate that the STLDI Rule will cause CHC (or any other issuer) competitive harm, or that such a harm, if it occurs, is redressable here.

---

[15] https://www.kff.org/health-reform/issue-brief/understanding-short-term-limited-duration-health-insurance/ (last visited Oct. 15, 2018).

**B.      Plaintiffs Fail to Establish Standing on Behalf of their Provider Members.**

Plaintiffs also assert standing on behalf of their provider members, relying on the declarations of three psychiatrists who voice concerns that if their patients switch to STLDI coverage, their services may go uncompensated.  Mot. at 36-38.  The doctors also claim that if QHP issuers face a sicker risk pool as a result of the STLDI Rule, plans that do cover their services may begin "institut[ing] cost reduction practices" such as auditing and prior authorization requirements, which allegedly will then "increase the amount of uncompensated time the psychiatrist must spend on each patient to ensure their care is covered[.]"  *Id.* at 36.  These types of speculative, inchoate harms cannot satisfy Article III's demanding standards.

"The Supreme Court has repeatedly held that disputes about future events where the possibility of harm to any given individual is remote and speculative are properly left to the policymaking Branches, not the Article III courts."  *Pub. Citizen, Inc. v. Nat'l Highway Traffic Safety Admin.*, 489 F.3d 1279, 1295 (D.C. Cir. 2007).  Accordingly, it is not enough that there is an "objectively reasonable likelihood" of future injury.  *Clapper*, 568 U.S. at 410.  Nor can a plaintiff establish "certainly impending" injury when the asserted injury is based on a "speculative chain of possibilities," *id.*, or on "speculation about the decisions of independent actors," *id.* at 414.  Plaintiffs' claims of provider injury are based precisely on such speculations.

As a factual matter, there appears to be little likelihood that the fears of Dr. David Fassler or Dr. Harry Brandt will be realized any time soon.  In the State of Vermont where Dr. Fassler works, Fassler Decl. ¶ 1, ECF No. 10-3, and in the State of Maryland, where Dr. Brandt works, Brand Decl. ¶ 1, the state legislatures have recently enacted laws limiting STLDI policies to three months.[16]  As to Dr. Kolodner's patients in the District of Columbia (but not those in Maryland, for the reasons set forth above), his concerns will not be realized unless at least all five of the following circumstances occur: (1) one or more of his patients enrolls in an STLDI plan (which generally will occur only if the patient is not eligible to receive a subsidy sufficient to reduce the

---

[16] *See* Vt. HB 892 (Act 131); Healthinsurance.org, *Short-Term Health Insurance in Maryland*, https://www.healthinsurance.org/maryland-short-term-health-insurance/.

cost of ACA-compliant coverage below the cost of STLDI coverage); (2) the plan that the patient chooses does not cover the services that Dr. Kolodner provides[17];  (3) the patient continues to seek services from Dr. Kolodner but is unable to pay for those services; (4) Dr. Kolodner is compelled by state law to continue to provide services; and (5) any partial amount the patient is able to pay is less than the contract rate that otherwise would have been paid by an insurance company. Plaintiffs provide no reason, other than sheer speculation, to believe that any of these circumstances—much less all of them together—will occur.

Equally speculative is Dr. Kolodner's fear that he could be harmed if QHP issuers begin instituting cost reduction practices as a result of the STLDI Rule.  Kolodner Decl. ¶ 14.  It is contingent on another chain of speculative events: (1) the specific health care plans that provide coverage to his patients lose members overall as a result of the STLDI Rule; (2) those plans react to any loss of customers by instituting cost-cutting practices, instead of other actions such as reducing administrative costs or raising premiums; and (3) those specific cost-cutting practices require Dr. Kolodner to do more work.  Again, Plaintiffs have provided no evidence to believe any of these contingencies is even likely, much less "certainly impending." *Clapper*, 568 U.S. at 410.

Plaintiffs also assert that provider members of Plaintiff AIDS United will be harmed because, if patients encounter increased premiums for ACA-compliant coverage, "many individuals will be unable to pay those premiums," Mot. at 37, requiring such providers to continue treating them for free.  But Plaintiffs offer no evidence that the patients they serve generally will be unable to afford to maintain health insurance coverage, much less that any specific patient served by a specific provider member will face this problem, particularly given that 87 percent of the Exchange enrollees receive subsidies and are therefore insulated from the effects of any

---

[17]  Although Plaintiffs contend that STLDI policies are not required to cover mental health and substance abuse benefits, a number of STLDI policies do in fact cover such benefits.  *See* Kaiser Family Foundation, Issue Brief, Understanding Short-Term, Limited Duration Health Insurance, at 5-6 (Apr. 2018), http://files.kff.org/attachment/Issue-Brief-Understanding-Short-Term-Limited-Duration-Health-Insurance.

premium increases.  Wu Decl. ¶ 6.  Nor do Plaintiffs show that any unsubsidized patients will be unable to pay at the same rate as any contract rate if and when this occurs.  And these same defects also render Plaintiff Mental Health America's claim of standing highly speculative.  *See* Mot. at 38 (speculating without any concrete evidence that "individuals with mental illness are priced out of increasingly expensive ACA-compliant Marketplace plans and their conditions are therefore left untreated").

### C.   Plaintiffs Fail to Establish Standing on Behalf of their Consumer Members.

Finally, Plaintiffs assert standing on behalf of consumer members who they claim will encounter higher premiums for ACA-compliant coverage due to the departure of healthier enrollees to STLDI plans.  Mot. at 38-39.  This theory is deficient as well.

As a threshold matter, Plaintiffs fail to identify even a single consumer member who is likely to encounter higher premiums as a result of the STLDI Rule, much less one who is not insulated from premium increases due to subsidies, a failure that is fatal to their claim of standing. *Electronic Privacy Info. Ctr. v. U.S. Dep't of Educ.*, 48 F. Supp. 3d 1, 22 (D.D.C. 2014) (concluding that association plaintiff lacked standing because it failed to identify an individual member that would be injured).  Moreover, even assuming Plaintiffs could identify such an unsubsidized member, the premiums for the 2019 benefit year are already set and a favorable court ruling is not likely to result in their revision.  *See* Wu Decl. ¶ 16.  Accordingly, any certainly impending harm for the hypothetical unsubsidized consumer, if it exists, is not redressable here.

With respect to any rate increases that might occur in 2020 or beyond, such harm is inherently speculative.  As noted above, whether any particular consumer in fact encounters higher costs for health insurance—and whether that increase is attributable to the STLDI Rule, the reduction of the tax penalty to $0, or something else—will depend on a slew of state-specific, market-specific, and consumer-specific factors, such as (1) the degree of market penetration of STLDI plans in the geographical location where the consumer resides; (2) any state law requirements that may apply—either now or in the future—to STLDI plans in that state; (3) the mix of benefits and rates offered by those STLDI plans and how they compare to the benefits and

rates of individual market ACA-compliant plans in the state; (4) whether the consumer in the relevant market would nevertheless choose to have no insurance at all given the $0 tax penalty (beginning in 2019); (5) whether and to what degree the specific plan in which the consumer is enrolled is impacted by these factors; and (6) whether the consumer is eligible for subsidies to offset any premium increases that occur for ACA-compliant insurance.

All of these factors—regarding which there is no evidence before the Court—make it impossible to determine with any degree of certainty that any specific consumer will encounter an increase in costs for ACA-compliant premiums in 2020 and, if such costs do increase, whether and to what extent they are attributable to the STLDI Rule.  For this very reason, the D.C. Circuit recently held that consumers of ACA-compliant coverage did not have standing to challenge an HHS policy that was alleged, as here, to increase adverse selection and cause higher premiums. *See generally Am. Freedom Law Ctr.*, 821 F.3d at 49.  The D.C. Circuit found that the assumption "that [HHS's] Transitional Policy will cause [plaintiffs] to pay more for their health insurance in the future . . . is speculative" because although the insurer's rate filings indicated it had increased premiums due to the administrative policy at issue, "the increase was an average across all of [the insurer's] plans" and did not demonstrate that premiums for any particular plan would increase. *Id*.  The D.C. Circuit further noted that "many factors determine the cost of health care," and that changes "in any of these factors could cause costs to increase or decrease[.]"  *Id.* at 51.  Those observations are similarly controlling here.

Finally, the D.C. Circuit has held that consumers do not suffer Article III harm simply because a product they desire is more expensive; instead, the consumer must show that as a result of the government policy, the product is "not readily available at a reasonable price."  *Coal. for Mercury-Free Drugs v. Sebelius*, 671 F.3d 1275, 1281 (D.C. Cir. 2012).  Thus, even if Plaintiffs had met their evidentiary burden to establish that one of their members faces a "certainly impending" increase in insurance costs as a result of the STLDI Rule, they would also need to show, not only that these members will pay more for the coverage they prefer, but that the price

increase will be so significant as to render ACA-compliant coverage "not readily available at a reasonable price."  Plaintiffs have not done so.

## II.    **Plaintiffs Have Not Established Irreparable Injury.**

Even if Plaintiffs' fears of competitive harm, increased premiums, and uncompensated care were sufficiently imminent for purposes of standing, Plaintiffs have not shown that such injuries— if they occur at all—are irreparable.

In this Circuit, a litigant seeking a preliminary injunction must satisfy "a high standard for irreparable injury."  *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006) (internal citations and quotation marks omitted).  It is "well settled that economic loss does not, in and of itself" satisfy this standard.  *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985) (per curiam). Rather, to "'successfully shoehorn potential economic loss into the irreparable harm requirement, a plaintiff must establish that the economic harm is so severe as to 'cause extreme hardship to the business' or threaten its very existence."  *Sandoz, Inc. v. FDA*, 439 F. Supp. 2d 26, 32 (D.D.C. 2006) (citation omitted), *aff'd*, No. 06-5204, 2006 WL 2591087 (D.C. Cir. Aug. 30, 2006); *see also Wis. Gas. Co.*, 758 F.2d at 674 ("monetary loss may constitute irreparable harm only where the loss threatens the very existence of the movant's business").  Further, the asserted injury "must be both certain and great; it must be actual and not theoretical," and "the movant must show that the alleged harm will directly result from the action which the movant seeks to enjoin." *Wis. Gas Co.,* 758 F.2d at 674.

Plaintiffs fail to satisfy this "high" standard.  As discussed above, because premiums have already been set for 2019, any harm to consumers in 2019 is not redressable.  And as to providers, Plaintiffs have not demonstrated that any provider faces any certainly impending harm, let alone any harm that cannot be redressed through their own rate increases.  That leaves only Plaintiffs' suggestion that insurer-member CHC will be irreparably harmed if the STLDI Rule is allowed to go into effect because it cannot sue the government for damages.  However, CHC already priced the expected impact of the STLDI Rule into its rates for 2019.  Wu Decl. ¶ 15.  Thus, not only does CHC not face imminent, irreparable harm, it would gain a windfall at the expense of consumers

were this Court to enjoin the STLDI Rule and thereby change the assumptions on which CHC already set its premiums.

In any event, Plaintiffs misstate the law in asserting that an inability to recover damages is *per se* irreparable.  They rely upon this Court's observation in *Smoking Everywhere, Inc. v. FDA*, that even if a claimed economic injury did not threaten the plaintiffs' viability, it was still irreparable because the plaintiffs could not recover money damages against the agency due to sovereign immunity.  680 F. Supp. 2d 62, 76-77 (D.D.C. 2010), *aff'd sub nom. Sottera, Inc. v. FDA*, 627 F.3d 891 (D.C. Cir. 2010).  However, that suggestion in *Smoking Everywhere* was dicta because the Court had already concluded that "the potential for economic loss absent preliminary injunctive relief" *was* "sufficiently grave to threaten plaintiffs' very existence."  680 F. Supp. 2d at 76-77.  In particular, the plaintiffs in that case included a "fledgling company" with "only one product line" that "derive[d] all of its revenue from the sale of" the regulated product and which would "have no source of revenue" once its nearly-depleted inventory was exhausted.  *Id.* at 76. Plaintiffs here have shown nothing similar.  All they offer is CHC's bald conclusion that the company expects to lose "up to" roughly 2.5 percent of its business as a result of the STLDI Rule. Janda Decl. ¶¶ 6, 11.  Even if the 2.5 percent projection were supported by evidence, courts in this District have repeatedly found similar allegations of harm not to be irreparable.  *See, e.g.*, *ConverDyn v. Moniz*, 68 F. Supp. 3d 34, 46-49 (D.C. Cir. 2014) (holding projected damages of nearly $70 million in lost profits and foregone revenues over two years "failed to meet this Circuit's stringent standard for establishing irreparable harm" because they did not "threaten[] the very existence of [the plaintiff's] business"); *LG Electronics, U.S.A., Inc. v.* , 679 F. Supp. 2d 18, 35-36 (D.D.C. 2010) (noting that "[e]ven assuming [the plaintiff] will not be able to recover monetary damages from [the Department of Energy]" the losses were not irreparable because they represented "a minuscule portion of the company's worldwide revenues"); *Coal. for Common Sense in Gov't Procurement v. United States*, 576 F. Supp. 2d 162, 169-70 (D.D.C. 2008) (holding that the plaintiff's claims of lost income, even if irretrievable, did not rise to the level of irreparable harm because the losses amounted to a fraction of the plaintiff's overall business); *Sandoz, Inc.*,

439 F. Supp. 2d at 31-32 (holding that thirty one million dollars in irretrievably lost sales would be insufficiently severe in the context of the plaintiff's overall business operations to warrant a finding of irreparable harm); *Apotex, Inc. v. FDA*, Civ. No. 06-0627, 2006 WL 1030151, *16 (D.D.C. Apr. 19, 2006) (concluding that the plaintiff's lost sales during the pendency of the litigation, even if irretrievable, were insufficient to constitute irreparable harm), *aff'd and remanded*, 449 F.3d 1249 (D.C. Cir. 2006).

The same holds true for Plaintiffs' projections that certain ACAP members that sell ACA-compliant plans may lose market share to STLDI plans. "Loss of market share is simply economic harm by another name," and thus a litigant must still demonstrate the considerable magnitude of loss required in this Circuit to warrant preliminary injunctive relief. *LG Electronics*, 679 F. Supp. 2d at 36; *see also Mylan Pharms., Inc. v. Shalala*, 81 F. Supp.2d 30, 42-43 (D.D.C. 2000) ("Courts within [this] Circuit have generally been hesitant to award injunctive relief based on assertions about lost opportunities and market share." (collecting cases)).

Plaintiffs' failure to demonstrate irreparable harm is independently fatal to their motion.

### III.    Plaintiffs Are Not Likely to Succeed on the Merits of their Claims.

Plaintiffs likewise have not shown that they are likely to prevail on the merits of their claims under the deferential framework "set out in [*Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 845 (1984), which] applies to judicial review of claims that an agency has acted 'in excess of statutory jurisdiction, authority or limitations'" under the APA. *Cmty. Health Sys., Inc. v. Burwell*, 113 F. Supp. 3d 197, 211-12 (D.D.C. 2015) (citing *Am. Fed'n of Gov't Emps. AFL-CIO, Local 3669 v. Shinseki*, 709 F.3d 29, 33 (D.C. Cir. 2013)). The *Chevron* framework is based on the presumption "'that Congress, when it left ambiguity in a statute' administered by an agency, 'understood that the ambiguity would be resolved, first and foremost, by the agency, and desired the agency (rather than the courts) to possess whatever degree of discretion the ambiguity allows.'" *City of Arlington v. FCC*, 569 U.S. 290, 296 (2013) (citation omitted).

Accordingly, at the first step of the inquiry, the Court must "ask whether Congress has directly addressed the precise question at issue." *Mayo Found. for Med. Educ. & Research v. United States*, 562 U.S. 44 (2011) (internal citations omitted). If the Court concludes that the statute is silent or ambiguous with respect to the specific issue under consideration, the analysis shifts to *Chevron* step two, where "the question for the court is whether the agency's answer is based on a permissible construction of the statute." *City of Arlington*, 569 U.S. at 296 (quoting *Chevron*, 467 U.S. at 842-43). *Chevron* step two is coextensive with arbitrary or capricious review. *Judulang v. Holder*, 565 U.S. 42, 52 n.7 (2011).

**A.     The STLDI Rule Is Comfortably within the Departments' Authority.**

Plaintiffs first contend that the Departments exceeded their authority because the STLDI Rule is a "decision[] of vast 'economic and political significance'" that Congress did not clearly delegate to the Departments and that the Departments have "claim[ed] the power to create a new form of primary health insurance that is exempt from all of the ACA's central requirements[.]" Mot. at 13-14 (citing *King v. Burwell*, 135 S. Ct. 2480, 2489 (2015)). They are wrong.

First, it was Congress—not the Departments—that exempted STLDI plans from the individual market insurance reforms. Congress did so in HIPAA; it chose not to define STLDI but instead delegated to the Secretaries of HHS, Labor, and the Treasury the authority under the PHS Act, ERISA, and the Internal Revenue Code to "promulgate such regulations as may be necessary or appropriate to carry out the provisions of this title." HIPAA, Pub. L. No. 104-191 § 2792, 110 Stat 1936, *codified at, e.g.*, 42 U.S.C. § 300gg-92. And Congress chose to retain the STLDI exemption when it enacted the ACA without changing the definition of "individual health insurance coverage." Congress is presumed to have been aware, when it enacted the ACA, that the Departments' long-standing definition of STLDI under the 1997 Rule and the 2004 Rule encompassed plans of less than twelve months. *Lorillard v. Pons*, 434 U.S. 575, 581 (1978) ("[W]here, as here, Congress adopts a new law incorporating sections of a prior law, Congress normally can be presumed to have had knowledge of the interpretation given to the incorporated law, at least insofar as it affects the new statute."); *accord Gordon v. U.S. Capitol Police*, 778 F.3d

158, 165 (D.C. Cir. 2015).   The Court must therefore presume that Congress approved that definition.  *Cf. Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353, 381–82 & n.66  (1982) (holding that Congress's "re-enact[ing] a statute without change" or "incorporating sections of a prior law" demonstrates an intent to "le[ave] intact" an agency's interpretation); *see also Orton Motor, Inc. v. HHS*, 884 F.3d 1205, 1213 (D.C. Cir. 2018) (court may rely on regulations to interpret authorizing statute where Congress legislated with the restrictions in those regulations in mind).  That presumption should control this case with respect to the portion of the STLDI Rule that restores the maximum initial contract term of an STLDI policy to less than twelve months.

Second, even if Plaintiffs could overcome this clear indication of congressional intent, they have overstated the economic significance of the STLDI Rule.  While the STLDI Rule is expected to provide important relief for *individual consumers* seeking temporary coverage, its overall market effects are expected to be relatively modest.  That is because, among other things, approximately 87 percent of Exchange enrollees receive subsidies that insulate them from the effect of rate increases for ACA-compliant coverage.  Wu Decl. ¶ 6.  Those subsidies cannot be used to purchase an STLDI plan and the enrollees who receive them are generally unlikely to switch to STLDI plans.  For the remaining approximately 13 percent of the Exchange market enrollees who do not receive subsidies, at least some will remain in the Exchange market due to the more comprehensive coverage provided by ACA-compliant plans, particularly if they have pre-existing conditions that are not covered by any STLDI plans. 83 Fed. Reg. at 28,235-36.  Some others may choose to go uninsured rather than purchase ACA-compliant coverage because the tax penalty will be $0 starting in 2019.  *Id.* at 38,316-17.  The Departments' economic analysis therefore projected that the STLDI Rule would raise insurance rates of ACA-compliant coverage by only 1 percent in 2019.  83 Fed. Reg. at 38,236.

While the least conservative estimate performed by the Urban Institute (and cited by Plaintiffs) projected that the STLDI Rule could raise premiums by roughly 18 percent in 2019, that analysis examined the *combined* effect of the reduction of the tax penalty and the STLDI Rule, and therefore "it is difficult to know what just the policy impact of short-term changes would have

been to premiums in their analysis." 83 Fed. Reg. at 38,238.  Moreover, the rates for 2019 are now in and they undercut the Urban Institute's projections.  Premiums generally have *decreased* for 2019,[18] and even among insurers that did increase their rates in 2019, the increase is generally far less than projected by the Urban Institute and reflects a number of regulatory changes, including the reduction of the individual mandate penalty to $0.[19]  Moreover, the other analyses performed projected far more modest effects than the Urban Institute.  For example, the Congressional Budget Office and the Joint Committee on Taxation predicted a 2 to 3 percent increase in premiums as a result of the combined effect of STLDI Rule and another recent rule.  *Id.* at 38,237.  The Commonwealth Fund predicted that the combined effect of the STLDI Rule and the lifting of certain behavioral barriers would cause premiums to increase roughly 2.7 percent.  *Id.* at 38,238. And the Wakely Report commissioned by Plaintiffs projected that the combined effect of the STLDI Rule and the reduction of the tax penalty would cause premiums to increase in 2019 by only .7 percent to 1.7 percent.  Wakely Report at 1.  These analyses, and the preliminary available data regarding 2019, rates wholly undercut Plaintiffs' suggestion that the STLDI Rule will have a "vast" economic and political significance.

Third, Plaintiffs' contention that the STLDI Rule exceeds the Departments' authority cannot be squared with their position that the 2016 Rule, which reduced the maximum term of STLDI coverage from 364 days to less than three months, was a permissible exercise of authority. The 2016 Rule not only changed the regulatory approach that existed when Congress enacted the

---

[18] *See* CMS Press Release, Premiums for the Federally-facilitated Exchanges drop in 2019 (Oct. 11, 2018), https://www.cms.gov/newsroom/press-releases/premiums-federally-facilitated-exchanges-drop-2019 (last visited Oct. 15, 2018); *see also* Average Monthly Premium for Second-Lowest Cost Silver Plan and Lowest Cost Plan for States Using the Healthcare.gov Platform, 2016-2019, https://www.cms.gov/sites/drupal/files/2018-10/10-11-18%20Average%20Monthly%20Premiums%20for%20SLCSP%20and%20LCP%202016-2019.pdf (last visited Oct. 15, 2018) (showing premium decreases in 39 states in 2019).

[19] For example, CHC requested an overall rate increase of 6.9%, but that increase accounts for a variety of regulatory changes, including reduction of the tax penalty to $0, as well as numerous other factors, such as higher provider costs, increased administrative expenses, new actuarial value requirements, and lower-projected risk adjustment charges.  Wu Decl. ¶ 15.

ACA, but also eliminated the ability of states to permit STLDI plans to have terms of three months or longer as they had done for two decades since establishment of the federal definition of STLD in the 1997 Rule.  If the Departments possessed authority in 2016 to *shorten* the definition from 364 days to less than three months—as Plaintiffs clearly believe—the decision to restore the Departments' 1997 definition (insofar as it permitted STLDI plans with a contract term of less than twelve months) must fall within the Departments' authority as well.[20]

In sum, contrary to Plaintiffs' assertion, the Departments have not claimed the unilateral authority to create a new form of primary insurance. The Departments have simply defined a statutorily undefined term—a function that falls comfortably within an implementing agency's authority and the Departments' specific grant of authority here—consistent with the definition that existed when Congress enacted the ACA.

### B.      The STLDI Rule Is Not Contrary to Law.

Plaintiffs next contend that the STLDI Rule is contrary to law under the first step of the *Chevron* analysis because the text and structure of the ACA "unambiguously preclude[]" the STLDI Rule.  Mot. at 16.  This theory is similarly defective.

### 1.      The STLDI Rule Is Consistent with the Statutory Text.

A contract term of up to 364 days is consistent with the plain meaning of the phrase "short-term."  As Plaintiffs acknowledge, "short-term" is a *relative* phrase, meaning "occurring over or involving a relatively short period of time."  Mot. at 22 (citing Merriam-Webster Dictionary, "short-term"); *see also Am. Safety Ins. Co. v. Page's Thieves Mkt., Inc.*, No. 2:15-CV-3266-PMD, 2016 WL 4430839, at *4 (D.S.C. Aug. 22, 2016) ("the 'term' in 'short-term' means 'a fixed or limited period for which something . . . lasts or is intended to last.'" (citation omitted)).  As Plaintiffs further acknowledge, "the relevant benchmark is the length of a standard health insurance plan: one year."  Mot. at 22 (citations omitted).  A plan of 364-days or less is thus "a fixed or

---

[20] The STLDI Rule also adopted a 36-month cap on renewals and extensions of STLDI policies, which is longer than the cap of less than twelve months that existed under the 1997 Rule.  However, the Departments projected that this provision would have only a negligible impact.

limited period" of coverage, and it also is shorter than the length of a standard plan.  It is, by any good-faith interpretation of the term, "relatively short."

Plaintiffs nevertheless claim that, even though a 364-day term is shorter than a standard plan, it is not short in a "meaningful sense." *Id*. at 22.  But definitions of contractual instruments necessarily entail stark dividing lines, and Plaintiffs fail to provide any non-arbitrary framework for assessing whether a contract period is sufficiently limited so as to be short in a "meaningful sense." *Id*.  Indeed, the phrase "short term" is frequently used in other contexts to describe periods of one year or less.  For example, a "short-term investment" is one that must be liquidated within one year.[21]  "Short-term gain" is profit from an asset that has been held for one year or less.[22]  And a "short-term loan" is "[a] loan with a due date of less than one year[.]"  Loan, Black's Law Dictionary (10th ed. 2014).  There is no merit to Plaintiffs' contention that the phrase "short-term" is not reasonably read to refer to a contract term of up to 364 days.  Rather, Plaintiffs simply ask the Court to supplant the judgment of the Departments with their own.

Plaintiffs' arguments on this point also run up against the fact that numerous states have chosen to define "short-term" in the same way as the Departments.  *See, e.g.*, S.D. Admin. R. 20:06:40:02 (defining "short-term, limited duration insurance" to mean "health insurance coverage provided under a contract . . . that has an expiration date specified in the contract that is within 12 months of the date the contract becomes effective[.]"); 28 Tex. Admin. Code § 3.3002(18) (same); *see also* NAIC 2016 Comment, at 1 (noting that "[s]hort term, limited duration insurance has long been defined as a policy of less than 12 months by both the states and the federal government").  The fact that many states—who have long been the primary regulators of insurance—agree with the Departments that short-term insurance can last for up to 364 days amply demonstrates that the Departments' interpretation is reasonable and consistent with the meaning of "short-term" as that term is understood in the industry.  *See, e.g.*, *Drummond Coal Co. v. Hodel*, 796 F.2d 503, 505

---

[21] *See* https://www.investopedia.com/terms/s/shorterminvestments.asp (last visited Oct. 12, 2018).

[22] *See* https://www.investopedia.com/terms/s/short-term-gain.asp (last visited Oct. 12, 2018).

(D.C. Cir. 1986) (rejecting "plain meaning argument" where agency's interpretation of phrase left undefined by Congress was supported by "industry practice").

The STLDI Rule's construction of the phrase "limited duration" to encompass renewals or extensions of up to 36 months is similarly consistent with the statutory text.  As Plaintiffs acknowledge, the word "[l]imited" means "[r]estricted in size, amount, or extent."  Mot. at 26 (citation omitted).  The word "duration" means "the time during which something exists or lasts." *See* https://www.merriam-webster.com/dictionary/duration (last visited Oct. 12, 2018).  A thirty-six-month cap on extensions and renewals quite literally "restrict[s]" the "time during which [an STLDI contract] exists or last."  It therefore gives reasonable meaning to the phrase "limited duration."

Plaintiffs focus on the fact that some states have capped the permissible period of renewability to a shorter term, such as twelve months, or even prohibited renewability altogether. Mot. at 26 n.33.  But the fact that some (but not all) states have chosen to limit renewability in a manner different from the Departments (which they can continue to do under the STLDI Rule) does not demonstrate that a maximum of 36 months is not also "limited-duration" in the plain sense meaning of the phrase.

## 2. Congress Did Not Clearly Preclude the STLDI Rule.

Plaintiffs also contend that it was improper for the Departments to use STLDI to "expand[] more affordable coverage options to consumers" and "reduc[e]  the number of uninsured individuals" because "Congress determined that the [only] way to" "expand[] affordable coverage options and reduce the number of uninsured individuals is through the" guaranteed issue and community rating reforms, which in turn would ensure that all health insurance consumers would be "members of a single risk pool."  Mot. at 16 (citing 42 U.S.C. § 18032(c)).[23]  But as noted

---

[23] A risk pool refers to "a group of individuals whose medical costs are combined to calculate premiums" with "the higher costs of the less healthy . . . offset by the relatively lower costs of the healthy."  Am. Academy of Actuaries, Risk Pooling: How Health Insurance in the Individual Market Works,  https://www.actuary.org/content/risk-pooling-how-health-insurance-individual-market-works-0 (last visited Oct. 15, 2018).

above, by choosing to exempt STLDI coverage from the individual market regulations under the ACA, Congress indicated that such coverage is not subject to the federal "single risk pool" requirements.[24]  It would be illogical to conclude that Congress expressly exempted STLDI plans from the individual market reforms of the ACA while also intending to prohibit STLDI plans as possible options for consumers.

In any event, to prevail on this point, Plaintiffs must show that Congress "directly addressed the precise question" of the maximum term and duration of STLDI coverage.  *Mayo Found. for Med. Educ. & Research v. United States*, 562 U.S. 44 (2011) (internal citations omitted).  They cannot do so.

In an effort to demonstrate that the STLDI Rule is contrary to HIPAA, which first established the STLDI exemption, Plaintiffs rely on broad language in the Senate and House Committee reports discussing HIPAA's overarching objective to "increase access to and portability of health insurance coverage for individuals and their families so that they could retain their health insurance when they changed or lost their jobs."  Mot. at 22-23 (citing S. Rep. No. 104-156; H.R. Rep. No. 104-496).  Notwithstanding this language, however, HIPAA did not purport to regulate the entirety of the insurance markets.  Indeed, the lion's share of its provisions—including guaranteed availability, protections against discrimination based on health status, and rules for crediting pre-existing condition exclusions—extend primarily to *group* plans; they had limited impact on the individual market.  Nothing about HIPAA's reforms to the group insurance market in any way suggests that Congress would have been troubled by a 364-day STLDI policy for those seeking gap coverage outside the group market.

HIPAA's reforms to the individual insurance market are likewise unhelpful to Plaintiffs. HIPAA imposed two requirements on issuers of individual market plans: (1) guaranteed availability of coverage for a subset of individuals transitioning out of an employee plan with at

---

[24] Congress made the same judgment with respect to several other health coverage options, including grandfathered plans, excepted benefits, student health plans, and large group health plans, *see supra* at 6-7, none of which are subject to the federal single risk pool requirements.

least 18 months of prior "creditable coverage," and (2) guaranteed renewability of individual coverage at the option of the individual.  42 U.S.C. §§ 300gg-41(a), 300gg-42(a).  There is no indication that the presence of STLDI coverage of up to 364 days created any regulatory incongruity with respect to these two protections.  Indeed, beyond these two constraints, individual health plans remained free under HIPAA to deny coverage, impose pre-existing condition exclusions, and discriminate based on health status, just as STLDI plans could.

In fact, HIPAA clearly indicates that Congress did not want to unduly restrict the availability of STLDI coverage.  In HIPAA, Congress provided that HIPAA's individual market guaranteed availability of coverage protections without a preexisting condition exclusion are contingent upon an individual maintaining eighteen months of "creditable coverage."  42 U.S.C. § 300gg-41(b)(1)(A).  A break in such coverage of sixty-three or more days rendered a person ineligible for these protections in the individual market.  *Id* § 300gg-41(b)(1)(B).  Yet Congress recognized STLDI coverage as a type of creditable coverage because it falls within the broader definition of "health insurance coverage" even though it is not "individual health insurance coverage."  *See* 42 U.S.C. §300gg-3(c)(1)(B); H.R. Rep. No. 104-736, at 180 (1996) ("The conferees intend that creditable coverage includes short-term, limited coverage."); *see also* 45 C.F.R. § 146.113(a)(1)(ii). (STLDI is a type of "health insurance coverage").  That decision to permit an individual to use STLDI coverage to satisfy the creditable coverage requirement suggests that Congress understood STLDI plans serve an important purpose for individuals undergoing life transitions and wanted to encourage such coverage as an alternative to not having insurance at all.  Restricting STLDI plans to periods of less than three months—as Plaintiffs advocate—would have made it more difficult for an individual to maintain the unbroken period of creditable coverage necessary to invoke HIPAA's protections.  That is because an individual attempting to bridge a gap in other types of coverage with an STLDI plan may have had to reapply for STLDI coverage more frequently and would be at risk of rejection if he or she had developed a pre-existing condition during that time.  There is no indication that Congress intended to create such obstacles to the protections it created under HIPAA.

34

Nor is there anything in the ACA that suggests Congress sought to restrict consumers' ability to obtain STLDI coverage; on the contrary, the ACA retained the existing exemption for STLDI plans from the federal individual market reforms.  Plaintiffs point to the ACA's "interdependent" provisions for guaranteed issue, community rating, essential health benefits, and rating based on a "single risk pool," but the fact that Congress sought, through these provisions, to foster a robust market for ACA-compliant coverage does not mean that Congress foreclosed any and all regulatory policies that might not achieve those same objectives but are designed to serve other purposes.

Indeed, as noted above, Congress itself recognized several health coverage options that are exempt, in varying degrees, from the ACA's market reforms.  For example, Congress exempted "grandfathered plans," 42 U.S.C. § 18011, which are plans that took effect prior to the ACA and therefore are more likely to have been sold to individuals without serious health conditions. Congress also included language supporting flexibility in applying the individual market reforms to student health insurance plans, *id*. § 18118, which are more likely to be issued to younger—and again healthier—enrollees.  The fact that Congress expressly recognized these various alternatives to ACA-compliant coverage, even though they might draw some younger, healthier people out of the risk pool for QHPs, refutes any notion that Congress's concerns about adverse selection and market segmentation were so strong as to wholly foreclose alternatives to ACA-compliant insurance in all circumstances.  *Cf. Rodriguez v. United States*, 480 U.S. 522, 525-26 (1987) ("Deciding what competing values will or will not be sacrificed to the achievement of a particular objective is the very essence of legislative choice—and it frustrates rather than effectuates legislative intent simplistically to assume that whatever furthers the statute's primary objective must be the law.").

Plaintiffs also argue that the Court must interpret "short-term, limited duration insurance" to align with the phrase "short coverage gaps" under section 5000A(c)(4) of the Internal Revenue Code.  The latter refers to a period of "less than three months" during which, under the ACA, a failure to have "minimum essential coverage" would not subject an individual to a tax penalty.  26

U.S.C. § 5000A(e)(4).  However, Congress has reduced that penalty to $0 beginning in 2019, so the concept of the "short coverage gap" no longer has much significance.  In any event, this argument cannot be squared with the surrounding text.  Plaintiffs contend that "[c]onstruing 'short-term limited duration coverage'" as "including plans that are . . . longer than three months is irreconcilable [with the] congressional judgment" that "individuals should not have coverage that falls outside the minimum essential coverage requirements for longer than three months."  Mot. at 25.  In fact, however, section 5000A establishes a mandate to obtain minimum essential coverage "for *each* month beginning after 2013[.]"  26 U.S.C. § 5000A(a) (emphasis added).  Congress thus expressed the "judgment that individuals should not have coverage that falls outside the minimum essential coverage requirements," Mot. at 25, in *any* month.[25]  Notwithstanding this judgment, in retaining HIPAA's exemption for STLDI plans from the definition of "individual health insurance coverage," 42 U.S.C. § 300gg-91(b)(5), Congress also understood that individuals would sometimes encounter coverage gaps, and if they did so, STLDI coverage was preferable to no insurance at all.  And, of course, Congress has reduced the tax penalty to $0 starting in 2019, suggesting that it does not presently believe it appropriate to penalize individuals for a coverage gap of any length.

Moreover, a "short coverage gap" is not the only scenario in which Congress originally exempted individuals from the tax penalty.  Congress also exempted individuals who, due to hardship or financial constraints, are unable to obtain minimum essential coverage, and it imposed no time limit on these waivers.  26 U.S.C. § 5000A(e).  Congress thus acknowledged that the circumstances in which a person might require short-term coverage are not necessarily limited to three-month increments.  Under Plaintiffs' construction, however, individuals encountering hardships that would exempt them from the tax penalty nevertheless should not be able to obtain STLDI coverage for the full duration of their hardship, but should be uninsured, simply because,

---

[25] The short coverage gap referred to in section 5000A of the Code merely refers to a safe harbor period in which an individual need not pay a tax penalty, not one where the MEC requirement does not apply.  *See* 26 U.S.C. § 5000A(e)(4).

according to Plaintiffs, Congress judged that individuals should not have coverage that falls outside the minimum essential coverage requirements[.]" Mot. at 25. Such a construction would make the perfect the enemy of the good. Plaintiffs cite nothing to suggest that Congress intended such an absurd outcome. *Cf. Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 575 (1982) ("[I]nterpretations of a statute which would produce absurd results are to be avoided if alternative interpretations consistent with the legislative purpose are available.").

Plaintiffs also say that their three-month interpretation is bolstered by the fact that Congress limited waiting periods for group health insurance coverage to ninety days when it enacted the ACA. Mot. at 25. However, if STLDI plans must be limited to *less* than ninety days, as Plaintiffs contend, individuals that switch to group coverage with a ninety-day waiting period will not be able to avoid a one-day loss of coverage, even if they acquire an STLDI plan in the interim. Moreover, a ninety-day STLDI policy to cover an initial waiting period would be of little help to an individual who faces a period of unemployment *before* obtaining a new job that offers group coverage. Plaintiffs' construction would therefore transform a provision intended to *facilitate* prompt coverage for individuals enrolling in group plans into one that severely *restricts* an individual's coverage options during any preceding period of unemployment. There is no indication that Congress intended such a harsh outcome.

Finally, Plaintiffs assert that Congress did not intend that the federal government should "help individuals avoid paying for benefits provided in individual health insurance coverage that they believe are not worth the cost[.]" Mot. at 16. This view of congressional intent cannot be squared with Congress's more recent decision in the TCJA to reduce the tax penalty to $0, which likely will result in some individuals choosing not to purchase ACA-compliant plans because they deem such plans to be over-priced. Nor it is consistent with the objectives of the ACA itself, which sought to, among other things, bring *down* the price of health insurance and facilitate continuity of coverage. The ACA does not preclude the Departments from allowing individuals to obtain affordable plans that meet their needs.

For all of these reasons, Plaintiffs have not shown that they are likely to succeed on their claims that the STLDI Rule is contrary to law.

### C.      The STLDI Rule Is Not Arbitrary and Capricious.

Plaintiffs also have not shown that they are likely to succeed in showing that the STLDI Rule is arbitrary and capricious, nor could they.   As noted, arbitrary and capricious review is coextensive with a court's deferential review under *Chevron* step two.  *Judulang*, 565 U.S. at 52 n.7.   Under this standard, agency action is not arbitrary and capricious unless "the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."  *Adirondack Med. Ctr. v. Sebelius*, 891 F. Supp. 2d 36, 44 (D.D.C. 2012) (citation omitted), *aff'd*, 740 F.3d 692 (D.C. Cir. 2014).  An agency's decision must be upheld so long as the agency considered the relevant data and articulated an explanation establishing a "rational connection between the facts found and the choice made."  *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962).  And judicial deference is at its apex where, as here, the regulation at issue "concerns a complex and highly technical regulatory program."  *Visiting Nurse Ass'n Gregoria Auffant, Inc. v. Thompson*, 447 F.3d 68, 76 (1st Cir. 2006) (citation omitted).

### 1.      The Departments Acted Reasonably in Promulgating the STLDI Rule.

Plaintiffs first assert that the STLDI Rule is unreasonable because the Departments relied on factors that Congress did not intend them to consider and failed to consider an important aspect of the problem.  Mot. at 19-21.  Specifically, Plaintiffs contend that the Departments were not permitted to base their decision on considerations of affordability and choice of insurance coverage options because, in Plaintiffs' view, affordability and choice can only be pursued through initiatives that facilitate the obtainment of *ACA-compliant* coverage.  As discussed, however, nothing in the ACA requires the Departments to promote affordability and choice through ACA-compliant insurance alone.  Indeed, the D.C. Circuit recently held that HHS exceeded its statutory authority

when it restricted non-ACA compliant coverage arrangements that Congress intended to exist.  *See Cent. United Life Ins. Co. v. Burwell*, 827 F.3d 70, 72-75 (D.C. Cir. 2016) (holding that HHS was not permitted to use its regulatory authority to restrict ACA-exempt fixed indemnity coverage notwithstanding the fact that individuals were finding it "cost-effective to forego minimum essential coverage . . . in favor of these . . . policies").

Nor did Congress prevent the Departments from using their broad delegation of authority to increase affordability and choice for consumers given that the goals Congress hoped to achieve through the ACA-compliant marketplace have not materialized.  That is the very essence of administrative discretion.

### 2. The Departments Provided a Well-Reasoned Basis for Their Departure from the 2016 STLDI Rule.

Plaintiffs also assert that the Departments changed their prior, 2016 definition of STLDI without providing the required reasoned explanation.  Mot. at 28.  On the contrary, the Departments fully explained their decision.  The Departments first explained that although the October 2016 final rule "was intended to boost enrollment in individual health insurance coverage by reducing the maximum duration of coverage in short-term, limited-duration plans, it did not succeed in that regard."  83 Fed. Reg. at 38,214.  Instead, "average monthly enrollment in individual market plans decreased by 10 percent between 2016 and 2017, while premiums increased by 21 percent."  *Id.* Therefore, the Departments determined, "the expansion of additional coverage options such as short-term, limited-duration insurance is necessary, as premiums have escalated and affordable choices in the individual market have dwindled."  *Id.*

The Departments also addressed the contention, advanced by some commenters and reiterated in this case, that the 36-month renewability provision amounted to a change in policy. The Departments noted that "[t]he current rule (the October 2016 final rule) also allows renewals" and that "[t]he only difference between the two rules [in that respect] is that the current rule allows renewals to the extent the total duration of coverage . . . is less than 3 months, whereas this final

rule allows renewals to the extent the maximum duration of a policy . . . is up to 36 months." *Id.* at 38,220; *see also id.* at 38,220 n.34 (noting that the 1997 Rule similarly permitted extensions).

The Departments explained why they were interpreting the phrase "limited-duration" to have meaning independent of the phrase "short-term"; namely, that "the canon of statutory construction . . . disfavors rendering one or more statutory words or phrases redundant." *Id.* at 38,220. They elaborated that, "the term 'limited-duration' refers to a longer time period than 'short-term,' because, while an insurance policy's duration is (absent cancellation) never shorter than its term, a policy's term can be shorter than its duration (if the policy is renewed or extended)." *Id.*

Finally, the Departments reasoned that, in contrast to individual and group insurance policies, which, since the enactment of HIPAA, generally "must be guaranteed renewable indefinitely," *id*. at 38,221, STLDI coverage typically serves a transitory function, *id*. Thus, to determine the appropriate limits on the duration of such coverage, the Departments found it useful to look to the Consolidated Omnibus Budget Reconciliation Act of 1985 ("COBRA"), which establishes an analogous form of transitory coverage by "requir[ing] certain group health plans to extend group health coverage to certain individuals otherwise losing that coverage . . . for a minimum of 18, 29, or 36 months, depending on the nature of the qualifying event that triggers the temporary coverage period." *Id.*[26] The Departments explained that "[s]imilar to COBRA, short-term, limited-duration insurance also serves as temporary coverage for individuals transitioning between other types of coverage, and accordingly the Departments believe that it is reasonable to look to COBRA in giving meaning to 'limited-duration[.]'" *Id*. The Departments noted that "[b]y allowing COBRA coverage to last up to 36 months in some circumstances, Congress recognized that 36 months qualifies as a temporary period of transition, during which coverage of limited duration may be useful[.]" *Id*. The Departments then concluded that there were "strong policy

---

[26] The Departments also noted that the Federal Employees Health Benefits Program has similar provisions for temporary coverage of up to 36 months. 83 Fed. Reg. at 38,221 & n.36.

considerations . . . for adopting an interpretation . . . that provides a flexible period of insurance for individuals transitioning between other types of coverage[.]" *Id.*

In sum, the Departments (1) acknowledged that they were deviating from their 2016 Rule, (2) explained that such deviation was warranted because the 2016 Rule had not succeeded in serving its goal of stabilizing the markets, (3) explained that their interpretation of the phrase "short-term, limited duration" as generally permitting renewal of STLDI coverage up to a certain period was consistent with both the 1997 and the 2016 Rules, and (4) explained that they were extending the allowable duration beyond the initial contract term in a manner that aligned with COBRA's protections for those transitioning out of group coverage.  There is no merit to Plaintiffs' contention that the Departments failed to provide a reasoned explanation for the STLDI Rule.

### 3. The Purported Harms that Plaintiffs Claim Will Result from the STLDI Rule Do Not Render It Unlawful.

Plaintiffs also contend that the STLDI Rule is flawed because "an individual who enrolls in an STLDI plan will . . . run[] the risk of losing his or her eligibility to enroll in full coverage even if he or she later develops an illness or condition that requires costly treatment."  Mot. at 30. That fact, however, is precisely why STLDI coverage should *not* be artificially constrained to three months, as Plaintiffs propose.  Since the expiration of an STLDI policy does not trigger a special enrollment period ("SEP"), a person needing additional short-term coverage after the expiration of a less than three month STLDI plan could be left without any coverage options.  For example, if an enrollee misses the open enrollment period, purchasing an STLDI plan of less than three months would not put her anywhere close to the next annual open enrollment period.  Plaintiffs' proposed interpretation would thus force an individual facing a coverage gap of unknowable duration to immediately purchase an annual contract with a QHP, even if such an arrangement is ill-suited to her needs.  That proposed interpretation makes STLDI coverage all but meaningless other than as a bridge to purchasing a QHP.  There is no indication that Congress required or intended such an outcome.  In contrast, an STLDI plan of 364 days will cover the consumer through the next open enrollment period where she will have the option of obtaining ACA-

compliant coverage, if she has not yet obtained other primary coverage. That flexibility thus ensures that individuals can use STLDI policies to obtain seamless coverage during transitory periods in which they would otherwise encounter a coverage gap. There is every indication that Congress intended such an outcome.

Plaintiffs next suggest that the SEP provisions of the ACA support their claims. According to Plaintiffs, "[u]nder HHS's regulations, the special enrollment period . . . lasts for 60 days, and new coverage will begin the month after enrollment." Mot. at 30. Thus, an individual who loses coverage due to an event that qualifies for an SEP might obtain seamless coverage if she purchases an STLDI policy to cover the period of the SEP and any waiting period before that. *Id.* at 29-30. But this hypothetical set of circumstances does not remotely cover the universe of circumstances in which persons might need short-term coverage. The SEP framework provides little comfort to individuals who do not qualify for an SEP, who do not know when they will be able to obtain new ACA-compliant coverage, or who cannot commit to a year of coverage under a new individual plan. Those are the very people the STLDI Rule seeks to help.[27]

In sum, the STLDI Rule both conforms to the statutory text and reasonably accounts for the needs of consumers seeking short-term coverage options. Plaintiffs have not demonstrated that they are substantially likely to succeed on the merits of their claims and, for that reason, the Court should deny their motion.

## IV. The Public Interest and Balance of Equities Weigh in Favor of the Government.

Finally, the balance of equities and public interest decidedly tip against granting preliminary relief. Plaintiffs assert that, because STLDI plans are not required to comply with all

---

[27] Plaintiffs also generally fault the Departments for not responding to comments, Mot. at 32, but they do not identify any particular point that the Departments failed to address or explain why the Departments' consideration of it was inadequate. To the extent Plaintiffs refer to Community Catalyst's comment that a consumer could face a coverage gap if her "short-term plan ends before marketplace open enrollment," Mot. at 31, the Departments explained that the Rule provides *greater* protection from such gaps than the 2016 Rule. *See* 83 Fed. Reg. at 38,218 (explaining that limiting the initial contract term to a shorter duration would subject consumers to re-underwriting, new deductibles, higher premiums, and possible rejection of coverage).

of the ACA's requirements, expanding the permissible duration of STLDI plans could lead to consumers inadvertently selecting a plan that does not meet their needs.  *Id.* at 40-41.  Plaintiffs' argument—beyond assuming that consumers are unable to make informed decisions regarding their health coverage—ignores the consumer notice that requires STLDI issuers to include along with any such plan.  83 Fed. Reg. at 38,223.  That notice warns consumers of precisely the types of coverage limitations that Plaintiffs point to in their motion, and undercuts Plaintiffs' claim of harm to individual consumers.  Moreover, there is no evidence that the STLDI Rule will have a significant effect on customer confusion, given state-specific enforcement schemes and the fact that individuals would be free to purchase STLDI policies even under Plaintiffs' preferred regulatory scheme.

Nor will allowing the STLDI Rule to go into effect injure the health care system as a whole, as Plaintiffs claim.  Mot. at 42-44.  On the contrary, enjoining the STLDI Rule—which issuers, including CHC, have already considered when setting rates for 2019—would upend planning for the coming plan year and create a windfall for issuers that increased their rates to account for the STLDI Rule.  *See* Wu Decl. ¶ 16.  For that reason, Plaintiffs are incorrect that an injunction would simply maintain the *status quo*.  *See* Mot. at 43-44.  Moreover, as discussed above, the vast majority of individual market consumers will be insulated from any price increases in 2019 due to their receipt of ACA subsidies.  As for premiums in 2020, litigation in the ordinary course would be sufficient to address any purported potential impact of the STLDI Rule on such premises.

Finally, the STLDI Rule provides flexibility and relief for states to adopt approaches to assist individuals facing coverage gaps—such as those who have lost their jobs, graduated from college, or been priced out of individual health insurance coverage under the ACA.  *See, e.g.*, 83 Fed. Reg. 38,218.  Because open enrollment begins in November 2018, Mot. at 43, an injunction could force these individuals to choose between purchasing ACA-compliant insurance that does not meet their needs or that they cannot afford, or going without insurance altogether.  An injunction would thereby harm the public by depriving individuals facing coverage gaps of short-term coverage options.

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Motion be denied.


Dated:  October 15, 2018

Respectfully Submitted,
JOSEPH H. HUNT
Assistant Attorney General

JEAN LIN
Acting Deputy Director

*/s/ Serena M. Orloff*
SERENA M. ORLOFF
California Bar No. 260888
BRADLEY P. HUMPHREYS
D.C. Bar No. 988057
Trial Attorneys U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street NW
Washington, D.C. 20005
(P) 202-305-0167; (F) 202-616-8470
Serena.M.Orloff@usdoj.gov
Bradley.Humphreys@usdoj.gov

*Attorneys for Defendants*