## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ASSOCIATION FOR COMMUNITY AFFILIATED PLANS, *et al.*,<br><br>          *Plaintiffs*,<br><br>     v.<br><br>UNITED STATES DEPARTMENT OF TREASURY, *et al.*,<br><br>          *Defendants*. | **Civil Action No. 18-2133 (RJL)** |

**BRIEF OF AMICI CURIAE AARP AND AARP FOUNDATION**
**IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

Kelly Bagby (D.C. Bar # 462390)*
Dara S. Smith (D.C. Bar # 1027046)
Meryl D. Grenadier (D.C. Bar # 1024111)
AARP Foundation
601 E St., NW
Washington, DC 20049
Telephone: (202) 434-2137
Fax: (202) 434-6424
kbagby@aarp.org
dsmith@aarp.org
mgrenadier@aarp.org
*Counsel of Record*

March 1, 2019

*Counsel for Amici AARP and AARP Foundation*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to LOCAL CIV. R. 7(o)(5), amici curiae AARP and AARP Foundation submit the following corporate disclosure statement:

The Internal Revenue Service has determined that AARP is organized and operated exclusively for the promotion of social welfare pursuant to Section 501(c)(4) of the Internal Revenue Code and is exempt from income tax. The Internal Revenue Service has determined that AARP Foundation is organized and operated exclusively for charitable purposes pursuant to Section 501(c)(3) of the Internal Revenue Code and is exempt from income tax. AARP and AARP Foundation are also organized and operated as nonprofit corporations under the District of Columbia Nonprofit Corporation Act.

Other legal entities related to AARP and AARP Foundation include AARP Services, Inc., and Legal Counsel for the Elderly. Neither AARP nor AARP Foundation has a parent corporation, nor has either issued shares or securities.

## TABLE OF CONTENTS

Page

CORPORATE DISCLOSURE STATEMENT ............................................................. i

TABLE OF AUTHORITIES ............................................................... iv

STATEMENT OF INTEREST ............................................................. 1

SUMMARY OF THE ARGUMENT .......................................................... 1

ARGUMENT ....................................................................... 3

I.     THE STLDI RULE UNDERMINES THE ACA'S INDIVIDUAL HEALTH INSURANCE MARKET, SIGNIFICANTLY LIMITING HEALTHCARE CHOICES FOR MANY INDIVIDUALS AS THEY AGE. ............................. 3

     A.     Before the ACA, Individual Access to Healthcare was Limited and Prohibitively Expensive for Older Adults. ............................. 4

     B.     The ACA Increased Older Adults' Access to Affordable Healthcare. .................. 7

     C.     The Departments Know Younger Adults Will Enroll in STLDI Plans, Fragmenting the Risk Allocation for ACA-Compliant Plans and Undermining the ACA. ............................. 10

     D.     Risk Pool Fragmentation Will Increase Premiums For Pre-Medicare Older Adults Remaining On ACA-Compliant Plans. ........................... 12

II.    THE STLDI RULE VASTLY EXPANDS INSURANCE COVERAGE THAT LACKS ESSENTIAL CONSUMER PROTECTIONS DESIGNED TO ENSURE THAT ALL AMERICANS, AND OLDER ADULTS IN PARTICULAR, HAVE ACCESS TO QUALITY, AFFORDABLE HEALTHCARE. ....................................................... 13

     A.     The ACA Instituted Protections Designed to Remedy Ubiquitous Discrimination Based on Age and Health Status. ............................. 13

     B.     Under the Challenged Rule, Older Adults Will Be Left With Fewer and More Expensive Healthcare Coverage Options in The Individual Market. ............................. 15

     C.     Expansion of STLDI Will Create Confusion In The Individual Insurance Market. ............................. 17

III.    THE GOVERNMENT'S COMPARISONS TO COBRA ARE
        ARBITRARY, CAPRICIOUS AND DEMONSTRATE THE INTENT TO
        UNDERMINE THE ACA RATHER THAN TO COMPLEMENT IT............................ 20

        A.    Using One of COBRA's Maximum Coverage Periods as a Duration
              Limit for STLDI Plans is Arbitrary Because COBRA Coverage is Not
              Analogous to STLDI Coverage. ........................................................................ 21

        B.    The Rule's Instructions on How to Circumvent the 36-Month Duration
              Limit Without Threat of Federal Enforcement Demonstrates the
              Departments' Intent to Undermine the ACA. ..................................................... 23

CONCLUSION .................................................................................................................... 25

CERTIFICATE OF SERVICE ............................................................................................. 26

# TABLE OF AUTHORITIES

**Cases**

*AARP v. EEOC,*
    267 F. Supp. 3d 14 (2017) ............................................................................... 24

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co.,*
    463 U.S. 29 (1983) ........................................................................................... 25

*Northpoint Technology, Ltd. v. F.C.C.,*
    412 F.3d 145 (D.C. Cir. 2005) ........................................................................ 24

*Safari Club Int'l v. Zinke,*
    878 F.3d 316 (D.C. Cir. 2017) ........................................................................ 25

*Saltarelli v. Bob Baker Grp. Med. Trust,*
    35 F.3d 382 (9th Cir. 1994) ............................................................................. 22


**Statutes**

42 U.S.C. § 300gg(a)(1)(A)(iii) ................................................................... 7, 14
42 U.S.C. § 300gg-4 .................................................................................... 7, 13
42 U.S.C. § 300gg-300gg-9 ............................................................................. 21
42 U.S.C. § 18031 ............................................................................................. 7
42 U.S.C. § 18032(c) ........................................................................................ 8

**Regulations**

45 C.F.R. § 147.102(a)(1)(iii) .................................................................... 7, 14
45 C.F.R. § 156.80 ............................................................................................ 8
78 Fed. Reg. 13,406 (Feb. 27, 2013) ............................................................... 8
81 Fed. Reg. 75,316 (Oct. 31, 2016) ............................................................... 9
83 Fed. Reg. 28,912 (June 21, 2018) ............................................................. 13
83 Fed. Reg. 38,212 (Aug. 3, 2018) ............................ 2, 3, 4, 10, 12, 15, 17, 18, 21, 23, 24

**Legislative History**

H.R. Rep. No. 111-443 (2010) ........................................................................ 14
H.R. Rep. No. 241, 99th Cong., 2d Sess. 44, *reprinted in* 1986 U.S.C.C.A.N. 579 .................... 22
S. Rep. No. 146, 99th Cong. 1st Sess., *reprinted in* 1986 U.S.C.C.A.N. 42 ............................... 22

## Other Authorities

Reed Abelson, *Without Obamacare Mandate, 'You Open the Floodgates' for Skimpy Health Plans*, New York Times, (Nov. 30. 2017)............................................. 10, 19

Elizabeth Abbott, et al., *Implementing the Affordable Care Act's Insurance Reforms: Consumer Recommendations for Regulators and Lawmakers*, (Aug. 2012)..................... 5

Kent Allen, *Many Older Adults Can't Answer Basics on Medicare*, AARP, (Sept. 18, 2018) ....................................................................................................... 18

Ricardo Alonso-Zaldivar, *U.S. Clings to Health Coverage Gains Despite Turmoil*, AP News, (May 23, 2018) ............................................................................ 7

Julie Appleby, *People left holding the bag when policies revoked*, USA Today, (December 13, 2007) ................................................................................. 16

AARP Comment re re REG-133491-17, April 23, 2018 ............................................. 2

Linda J. Blumberg, et al., *Age Rating Under Comprehensive Healthcare Reform: Implications for Coverage, Costs, and Household Financial Burdens*, Urban Inst., (Oct. 2009) ............................................................................... 15

Linda J. Blumberg, et al., *The Potential Impact of Short-Term Limited-Duration Policies on Insurance Coverage, Premiums, and Federal Spending*, Urban Inst., (Feb. 2018).............................................................................. 3, 4, 11

Linda J. Blumberg, et al., Urban Inst., *Updated Estimates of the Potential Impact of Short-Term Limited-Duration Policies* (Aug. 2018) .............................. 11, 13

Dena Bunis, *How to Choose a Medicare Plan*, AARP Bulletin, (Oct. 2017) ............................. 19

Dena Bunis, *Short-Term Insurance Plans Are a Bad Idea*, AARP (March 21, 2018) ........... 11, 12

Gary Claxton, et al., *Pre-existing Conditions and Medical Underwriting in the Individual Insurance Market Prior to the ACA*, Kaiser Family Foundation, (Dec. 12, 2016) ......................................................................................... 14, 16

Sara Collins, et al., *Realizing Health Reform's Potential: Adults Ages 50-64 and the Affordable Care Act of 2010*, The Commonwealth Fund (Dec. 14, 2010)...................... 5

Congressional Budget Office, *How CBO and JCT Analyzed Coverage Effects of New Rules for Association Health Plans and Short-Term Plans*, (Jan. 2019)............ 12, 13

Sabrina Corlette, et al., *The Marketing of Short-Term Health Plans: An Assessment of Industry Practices and State Regulatory Responses*, Urban Institute (Jan. 2019) .............................................................................. 18, 19, 20

Lynda Flowers, et al., *Experience Has Taught Us That High-Risk Pools Do Not Serve Consumers Well*, AARP Pub. Policy Inst., (March 2017) ............................................. 5, 6

Peter Harbage M.P.P., *Primer on Post-Claims Underwriting*, Robert Wood Johnson Foundation ........................................................................................... 16

Kaiser Comm'n on Medicaid & the Uninsured, *Key Facts about the Uninsured Population* (Sept. 2013) ...................................................................................... 4

Kevin Lucia, et al., *State Regulation of Coverage Options Outside of the Affordable Care Act: Limiting the Risk to the Individual Market*, The Commonwealth Fund (March 2018) ................................................................................... 8, 9, 11

Anna Wilde Mathews, Wall Street Journal, *Sales of Short-Term Health Policies Surge* (April 10, 2016) ....................................................................................... 9

Nancy Metcalf, *Is 'Short-Term' Health Insurance a Good Deal?*, Consumer Reports, (Dec. 22, 2017) ...................................................................................... 19, 20

Claire Noel-Miller et al., *In Health Reform, Stakes are High for Older Americans with Preexisting Health Conditions*, AARP Pub. Policy Inst. (March 2017)................... 14

NAIC and CIPR Comment, April 23, 2018............................................................ 20

NAIC & the Ctr. for Ins. and Policy Research, *Health Insurance Rate Regulation*..................... 15

Lynn Nonnemaker, *Beyond Age Rating: Spreading Risk in Health Insurance Markets*, AARP Pub. Policy Inst., (Oct. 2009)................................................ 5

Karen Pollitz, et al., *How Accessible is Individual Health Insurance for Consumers in Less-Than-Perfect Health?*, Georgetown Univ. Inst. For Healthcare Research and Policy and Kaiser Family Foundation, (June 6, 2001) .............................. 15

Karen Pollitz, et al., *Medical Debt Among People With Health Insurance*, Kaiser Family Found., (Jan. 2014) .......................................................................... 7

Laura Skopec, et al., *Monitoring the Impact of Health Reform on Americans Ages 50-64: Uninsured Rate Dropped y Nearly Half between December 2013 and March 2015*, Urban Inst. and AARP Pub. Policy Inst. (Oct. 2015) ................... 8

Laura Skopec, et al., *Monitoring the Impact of Health Reform on Americans Ages 50-64: Fewer Americans Have Difficulty Paying Family Medical Bills after Early ACA Marketplace Implementation*, Urban Inst. and AARP Pub. Policy Inst. (Jan. 2016)............................................................................................ 7

Laura Skopec, et al., *Monitoring the Impact of Health Reform on Americans Ages 50-64: Access to Health Care Improved during Early ACA Marketplace Implementation*, Urban Inst. and AARP Pub. Policy Inst., (Jan. 2016)............................ 7

Thomas H. Somers, *COBRA: An Incremental Approach to National Health Insurance*, 5 J. Contemp. Health L. & Probs. 141 (1992) ................................. 22

Jane Sung, *Protecting Affordable Health Insurance for Older Adults: The Affordable Care Act's Limit on Age Rating*, AARP Pub. Policy Inst., (Jan. 2017).......................... 14

Jane Sung, et al., *Impact of Changing The Age Rating Limit for Health Insurance Premiums¸* AARP Pub. Policy Inst., (Feb. 2017) ............................................. 17

Jane Sung et al., *Warning: Short-Term Plans = Higher Premiums for Older Adults* AARP Pub. Policy Inst., (March 21, 2018) ...................................... 12

U.S. Dep't of Health & Human Servs., *At Risk: Pre-Existing Health Conditions Could Affect 1 in 2 Americans: 129 Million People Could Be Denied Affordable Coverage Without Health Reform*, (2011) ....................................... 14

Brian W. Ward, et al., *Prevalence of Multiple Chronic Conditions among US Adults: Estimates from the National Health Interview Survey (2010)*, Centers for Disease Control and Prevention, Vol. 10 (Apr. 25, 2013) .............................. 6

## STATEMENT OF INTEREST

AARP is the nation's largest nonprofit, nonpartisan organization dedicated to empowering Americans 50 and older to choose how they live as they age. With nearly 38 million members and offices in every state, the District of Columbia, Puerto Rico, and the U.S. Virgin Islands, AARP works to strengthen communities and advocate for what matters most to families, with a focus on health security, financial stability, and personal fulfillment. AARP's charitable affiliate, AARP Foundation, works to end senior poverty by helping vulnerable older adults build economic opportunity and social connectedness. Among other things, AARP and AARP Foundation fight for access to quality healthcare across the country and frequently appear as friends of the court on issues affecting older Americans, including challenges to the Patient Protection and Affordable Care Act ("ACA"). *See, e.g.,* Brief of AARP, et al., *King v. Burwell*, No. 14-114 (U.S. Jan. 28, 2015); Brief of AARP, et al., *NFIB v. Sebelius*, Nos. 11-393 & 11-400 (U.S. Jan. 27, 2012); Brief of AARP, et al., *Texas et al. v. United States of America, et al.*, No. 4:18-cv-00167-O (N.D. Tex. June 14, 2018); Brief of AARP, et al., *Stewart et al. v. Azar, et al.*, No. 18-152 (JEB) (D.D.C. April 6, 2018).[1]

## SUMMARY OF THE ARGUMENT

This court should grant the Plaintiffs' Motion for Summary Judgment and vacate and set aside the regulation on Short-Term, Limited-Duration Insurance ("STLDI") promulgated by the

---

[1]   AARP and AARP Foundation file this amici brief pursuant to Local Rule of the United States Court for the District of Columbia Civil Rule 7(o). Counsel for AARP and AARP Foundation authored this brief in whole. No party, party's counsel, or any other person other than the amici, its members, or counsel contributed money intended to fund preparing or submitting this brief.

Counsel for both Parties have consented to Amici filing this brief.

defendant agencies (together, "Departments") on August 3, 2018 (83 Fed. Reg. 38,212 (Aug. 3, 2018)) ("STLDI Rule"). AARP was among the commenters that expressed concerns when the proposed rule was published. AARP Comment re REG-133491-17, April 23, 2018.[2] The Departments failed to meaningfully address any of these concerns in the final rule and the resulting harm to our healthcare system will be felt acutely by pre-Medicare older adults. Ultimately, the rule undermines the goals of the ACA. If not vacated and set aside, the STLDI Rule will return the nation to a pre-ACA health coverage landscape—an untenable situation for those who do not have access to coverage through their employer or public programs such as Medicare and Medicaid.

When passing the ACA, Congress recognized the importance of broadening participation in the individual health insurance market by including people with different healthcare needs. The STLDI Rule will allow issuers of these policies to siphon younger, healthier individuals away from the ACA individual markets. This will undermine the ACA risk pool and increase premiums for those who remain in the individual market, making healthcare unaffordable or unavailable.

The STLDI Rule will also expand the reach of coverage that discriminates against older adults. Because STLDI issuers are not required to comply with the consumer protection provisions contained in the ACA, STLDI plans can deny coverage or charge higher premiums based on a person's age, health, or preexisting conditions. These insurers are also allowed to charge an older person significantly higher premiums based purely upon their age.

Finally, the STLDI regulation is legally flawed because, in addition to the regulation's

---

[2]    https://www.aarp.org/content/dam/aarp/politics/advocacy/2018/04/aarp-comment-short-term-health-plans-042318.pdf.

other deficiencies, discussed at length in Plaintiffs' motion, the 36-month duration limit is

arbitrary. The Departments' analogy to the Consolidated Omnibus Budget Reconciliation Act's

("COBRA") insurance coverage, which they continue to advance in their summary judgment

briefing, is inapposite.  COBRA was intended to provide an extension of comprehensive

coverage, not to offer a competing form of more limited coverage for an extended period of time.

In addition, the duration limit is illusory and the Departments have demonstrated their intent to

undermine the ACA by providing instructions in the final rule that explain how STLDI coverage

may be extended indefinitely.

The STLDI Rule as promulgated, designed to circumvent the structure created by

Congress when it passed the ACA, has already and will continue to harm countless Americans,

but is especially threatening to older adults. It will have a damaging effect on the health and

financial stability of all who rely on the individual health insurance market or may need to turn

to the individual market in the future. This is especially true for pre-Medicare older adults who

will face far more expensive healthcare costs, or worse, lose access to the healthcare services

they need.

## ARGUMENT

## I.   THE STLDI RULE UNDERMINES THE ACA'S INDIVIDUAL HEALTH INSURANCE MARKET, SIGNIFICANTLY LIMITING HEALTHCARE CHOICES FOR MANY INDIVIDUALS AS THEY AGE.

As Plaintiffs' Memorandum of Law in Support of their Motion for Summary Judgment

describes, the new rule redefining "short-term, limited duration" insurance as insurance available

for 12 months or less, renewable for up to three years (83 Fed. Reg. at 38,214-15) will allow

STLDI plans to directly undermine the ACA's individual market and Congress' intent when it

enacted the ACA. Pl. Mem. 19 – 27; *see also* Linda J. Blumberg, et al., *The Potential Impact of*

*Short-Term Limited-Duration Policies on Insurance Coverage, Premiums, and Federal Spending*, Urban Inst., (Feb. 2018)[3] (hereinafter "Blumberg et al., *Impact of STLDI*"). The Departments acknowledge that STLDI plans will generally draw younger and healthier consumers who are currently enrolled in an ACA-compliant plan out of the individual markets. *See* 83 Fed. Reg. at 38,235. The STLDI Rule, combined with other changes, including the reduction of the individual mandate tax penalty to zero dollars and recent guidance expanding the scope of state waivers under section 1332 of the ACA,[4] will destabilize the ACA marketplaces. Blumberg et al., *Impact of STLDI*.[5] The STLDI Rule will reinstate the pre-ACA healthcare system—and in doing so, it will resurrect all the harms the ACA was intended to correct.

> **A.      Before the ACA, Individual Access to Healthcare was Limited and Prohibitively Expensive for Older Adults.**

Before the ACA was enacted, significant barriers prevented older Americans from obtaining affordable insurance coverage, resulting in poor health outcomes and financial instability. Most uninsured pre-Medicare adults (aged 50 – 64) who did not have access to affordable employer-sponsored insurance could not afford private insurance on the individual market, and did not qualify for publicly funded insurance programs. *See* Kaiser Comm'n on Medicaid & the Uninsured, *Key Facts about the Uninsured Population*, 2 (Sept. 2013).[6] This

---

[3]    https://www.urban.org/sites/default/files/stld_draft_0226_original_0.pdf.

[4]    State Relief and Empowerment Waivers, 83 Fed. Reg. 53575 (Oct. 24, 2018), https://go.usa.gov/xPz5Z.

[5]    https://www.urban.org/sites/default/files/stld_draft_0226_original_0.pdf.

[6]    https://kaiserfamilyfoundation.files.wordpress.com/2013/09/8488-key-facts-about-the-uninsured-population.pdf.

situation resulted in serious negative economic and health consequences for these individuals, their families, and the nation.

Many pre-Medicare adults without employer-sponsored coverage could not afford adequate insurance policies on the private individual market. In 2007, 61% of pre-Medicare adults who tried to purchase health insurance on the private market found it very difficult or impossible to afford. *See* Sara Collins, et al., *Realizing Health Reform's Potential: Adults Ages 50-64 and the Affordable Care Act of 2010*, The Commonwealth Fund, 5, Ex. 4 (Dec. 14, 2010).[7] Pre-Medicare adults paid high health insurance premiums and out-of-pocket medical expenses because insurers were allowed to deny coverage or offer sparse benefit packages to people with preexisting conditions, charged higher premiums based on age alone, or offered policies with very high cost sharing. Elizabeth Abbott et al., *Implementing the Affordable Care Act's Insurance Reforms: Consumer Recommendations for Regulators and Lawmakers*, at 10 (Aug. 2012);[8] Lynn Nonnemaker, *Beyond Age Rating: Spreading Risk in Health Insurance Markets*, AARP Pub. Policy Inst., 3, Tbl. 1 (Oct. 2009)[9].

Those who had preexisting conditions or were otherwise unable to purchase health insurance on the individual market often turned to state-run high risk pools to obtain coverage that if available were limited and very expensive. Lynda Flowers, et al., *Experience Has Taught Us That High-Risk Pools Do Not Serve Consumers Well*, AARP Pub. Policy Inst., (March

---

[7]   https://www.commonwealthfund.org/publications/issue-briefs/2010/dec/realizing-health-reforms-potential-adults-ages-50-64-and.

[8]   http://www.naic.org/documents/committees_conliaison_1208_consumer_recs_aca.pdf.

[9]   https://assets.aarp.org/rgcenter/ppi/health-care/i35-age-rating.pdf.

2017).[10] For example, states charged people with preexisting conditions up to 200 percent of rates charged in the individual market. *Id.* The state-run high risk pools presented other barriers like waiting periods of up to 12 months for coverage related to preexisting conditions, high annual deductibles, low coverage limits, lifetime limits on services, and limits on prescription drug and behavioral health services. *Id.* These circumstances caused many pre-Medicare older adults to delay or forego care, resulting in, predictably, adverse health outcomes.[11] *Id.*

Older adults without health insurance suffer both physical and financial harm. As uninsured adults age, they are more likely to experience chronic health conditions, resulting in worse health outcomes and increased mortality. Between 2001 and 2010, the prevalence of multiple chronic conditions for adults ages 45 to 64 skyrocketed. Brian W. Ward et al., *Prevalence of Multiple Chronic Conditions among US Adults: Estimates from the National Health Interview Survey, 2010*, Centers for Disease Control and Prevention, Vol. 10, 5 (Apr. 25, 2013).[12] The lack of adequate, affordable health insurance also profoundly affected the financial stability of adults and, in turn, the national economy—causing individuals to incur medical care costs that depleted retirement savings, contributed to debt, and even led to bankruptcy. *See*, *e.g.*,

---

[10]   https://www.aarp.org/content/dam/aarp/ppi/2017-01/experience-has-taught-us-that-high-risk-pools-do-not-serve-consumers-well.pdf.

[11]   As the ACA health exchanges were ramping up and anti-discrimination protections were put in place, a similar, temporary federally-run high-risk pool was implemented to cover people with preexisting conditions. Lynda Flowers, et al*., Experience Has Taught Us That High-Risk Pools Do Not Serve Consumers Well*, AARP Pub. Policy Inst., (March 2017). This program, called the Preexisting Condition Insurance Program ("PCIP"), was also permitted to charge pre-Medicare older adults more in premiums, for example, amounting to as much as $12,264 for a 50-year-old person in 2011. *Id.*

[12]   https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3652717/pdf/PCD-10-E65.pdf.

Karen Pollitz et al., *Medical Debt Among People With Health Insurance*, Kaiser Family Found., 12 (Jan. 2014).[13]

### B.    The ACA Increased Older Adults' Access to Affordable Healthcare.

The ACA addressed many of the barriers described above. Among other things, the ACA prohibited discrimination based on preexisting conditions (42 U.S.C. § 300gg-4), instituted a limit on how much more insurers could charge people based solely on age, (42 U.S.C. § 300gg(a)(1)(A)(iii); 45 C.F.R. § 147.102(a)(1)(iii)), and established individual marketplaces in each state where consumers can purchase health insurance that meets ACA requirements (42 U.S.C. § 18031). Since the ACA was signed, roughly 19 million people have gained health insurance coverage. Ricardo Alonso-Zaldivar, *U.S. Clings to Health Coverage Gains Despite Turmoil*, AP News (May 23, 2018).[14] The impact that accessing affordable healthcare has had on pre-Medicare older adults, both in terms of health outcomes and financial stability, is tremendous. *See, e.g.,* Laura Skopec, et al., *Monitoring the Impact of Health Reform on Americans Ages 50-64: Access to Health Care Improved during Early ACA Marketplace Implementation*, Urban Inst. and AARP Pub. Policy Inst., 2 (Jan. 2016)[15]; Laura Skopec et al., *Monitoring the Impact of Health Reform on Americans Ages 50-64: Fewer Americans Have Difficulty Paying Family Medical Bills after Early ACA Marketplace Implementation*, Urban

---

[13]   https://kaiserfamilyfoundation.files.wordpress.com/2014/01/8537-medical-debt-among-people-with-health-insurance.pdf.

[14]   https://www.aarp.org/health/health-insurance/info-2018/health-insurance-coverage-steady.html.

[15]   https://www.aarp.org/content/dam/aarp/ppi/2015/access-to-health-care-improved-during-early-aca-%20marketplace-implementation.PDF.

Inst. and AARP Pub. Policy Inst. (Jan. 2016)[16] ("Between December 2013 and March 2015, the number of 50- to 64-year-olds reporting difficulty paying family medical bills or unmet health needs due to cost dropped."); Laura Skopec et al., *Monitoring the Impact of Health Reform on Americans Ages 50-64: Uninsured Rate Dropped by Nearly Half between December 2013 and March 2015*, Urban Inst. and AARP Pub. Policy Inst. (Oct. 2015)[17] (finding "the uninsured rate for people ages 50 to 64 fell by 47.4 percent…").

One key component of the ACA-regulated markets is that insurers in each state are required to consider all enrollees in all health plans as part of a single risk pool when setting premiums. 42 U.S.C. § 18032(c); 45 C.F.R. § 156.80. The purpose of the single risk pool is to "prevent issuers from segregating enrollees into separate rating pools based on health status[,]" thus spreading healthcare costs among all exchange enrollees. *See* 78 Fed. Reg. 13,406, 13,422 (Feb. 27, 2013). Under this structure, the costs of insuring those with great healthcare needs are offset by the profits from premiums paid by those who do not currently have high medical needs. *Id.* When the risk pool is diverse in terms of both age and anticipated medical needs, insurers can offer coverage with more predictable and stable premiums to everyone, including pre-Medicare older adults with preexisting conditions who would otherwise be unable to access coverage. *See* Kevin Lucia, et al., *State Regulation of Coverage Options Outside of the Affordable Care Act:*

---

[16]   https://www.aarp.org/content/dam/aarp/ppi/2015/fewer-americans-ages-50-64-have%20-difficulty-paying-family-medical-bills-after-early-aca-marketplace%20Implementation.PDF.

[17]   https://www.aarp.org/content/dam/aarp/ppi/2015/uninsured-rate-dropped-by-nearly-half-between-december-2013-march-2015.pdf.

*Limiting the Risk to the Individual Market*, The Commonwealth Fund, 2 (March 2018)[18]

(hereinafter "Lucia, et al., *Limiting the Risk*").

In the context of the ACA-regulated markets, the role of STLDI was expected to be far

more limited than in the past. 81 Fed. Reg. 75,316, 75,317 (Oct. 31, 2016) Nevertheless, prior to

2016 and despite the individual mandate and other provisions in place designed to encourage

individuals to participate in the ACA exchanges, insurers were marketing STLDI plans to

individuals as an alternative to primary health insurance coverage, often circumventing the 12-

month coverage limitation. *Id.*; *see also* Anna Wilde Mathews, Wall Street Journal, *Sales of*

*Short-Term Health Policies Surge* (April 10, 2016).[19] The number of people enrolled in STLDI

plans more than doubled from 2013 to 2014, and by the end of December 2016, the National

Association of Insurance Commissioners (NAIC) estimated that 160,000 people were covered by

STLDI policies, although some reports suggested this number was far greater. Lucia, et al.,

*Limiting the Risk* at 2 (citations omitted)[20].

At that time, the Departments expressed concern about this practice, particularly its

adverse impact on the risk pool for ACA-compliant coverage, making it more difficult to keep

premiums affordable and stable. 81 Fed. Reg. 75,317-18. To protect consumers, the Departments

issued new regulations in 2016 that redefined "short-term, limited-duration insurance" as

nonrenewable plans lasting no more than 3 months. *Id*. This change was consistent with both the

---

[18]   https://www.commonwealthfund.org/sites/default/files/documents/___media_files_
publications_fund_report_2018_mar_lucia_state_regulation_alternative_coverage_options_rev.
pdf.

[19]   https://www.wsj.com/articles/sales-of-short-term-health-policies-surge-1460328539.

[20]   https://www.commonwealthfund.org/sites/default/files/documents/___media_files_
publications_fund_report_2018_mar_lucia_state_regulation_alternative_coverage_options_rev.
pdf.

more limited role that STLDI plans historically played before the ACA and the ACA's goal of pooling individuals with varying levels of risk in the individual ACA-compliant market.

C.     **The Departments Know Younger Adults Will Enroll in STLDI Plans, Fragmenting the Risk Allocation for ACA-Compliant Plans and Undermining the ACA.**

STLDI plans are likely to siphon away people who are younger and have not yet experienced health conditions that require more comprehensive insurance from ACA-compliant health coverage. This is primarily because of the perception of immediate cost savings. STLDI plans have lower premiums than ACA-compliant plans, because they offer little protection if the insured suffers a serious illness. In 2016, a short-term policy averaged $109 per month for an individual, as compared to $378 for an ACA-compliant plan. Reed Abelson, *Without Obamacare Mandate, 'You Open the Floodgates' for Skimpy Health Plans*, New York Times, (Nov. 30, 2017) (hereinafter "Abelson, *Floodgates*") (citing study by online broker eHealth).[21] The Departments indicate that these individuals, as well as pre-Medicare older adults who do not have current health conditions, but do not qualify for subsidies or tax credits that would make the ACA-compliant individual market more affordable for them, may envision that these STLDI are better for them. 83 Fed. Reg. at 38,235.

The Departments expect up to 1.6 million people to buy short-term policies over the next four years, and they anticipate that in 2019 alone, between 100,000 and 200,000 people previously enrolled in individual market coverage will purchase STLDI policies instead. *See id.* at 38,236. The Urban Institute estimates that introduction of expanded short-term, limited-duration policies, combined with the removal of the tax penalty, will increase the number of

---

[21]   https://www.nytimes.com/2017/11/30/health/health-insurance-obamacare-mandate.html.

people without minimum essential health coverage by 2.6 million in 2019 – bringing that number up to 36.9 million people total. Linda J. Blumberg, et al., Urban Inst., *Updated Estimates of the Potential Impact of Short-Term Limited-Duration Policies* (Aug. 2018)[22] (hereinafter "Blumberg, et al., *Updated Impact of STLDI*"). Of those people, 32.5 million will be completely uninsured, and 4.3 million will enroll in expanded short-term, limited-duration plans—a far higher estimate than the Departments suggest. *Id.*

Pulling that many people from the ACA-compliant individual market jeopardizes the single-risk pool Congress created to protect the financial viability of ACA-compliant plans. *See* Lucia, et al., *Limiting the Risk* at 2[23]; *see also* Dena Bunis, *Short-Term Insurance Plans Are a Bad Idea*, AARP (March 21, 2018)[24] (hereinafter "Bunis, *Short-Term Insurance Plans*"). Adverse selection is inevitable because individuals with higher average healthcare needs will continue to enroll in ACA-complaint plans. Blumberg et al., *Impact of STLDI*.[25] The Departments acknowledge that they foresee this result in the supplementary information to the final rule, noting that the rule "could lead to further worsening of the risk pool by keeping healthy individuals out of the individual market for longer periods of time, increasing premiums for individual market plans and may cause an increase in the number of individuals who are

---

[22]  https://www.urban.org/sites/default/files/publication/98903/2001951_updated-estimates-of-the-potential-impact-of-stld-policies_0.pdf.

[23]  https://www.commonwealthfund.org/sites/default/files/documents/___media_files_publications_fund_report_2018_mar_lucia_state_regulation_alternative_coverage_options_rev.pdf.

[24]  https://www.aarp.org/politics-society/advocacy/info-2018/congress-reject-junk-health-insurance-plans-fd.html.

[25]  https://www.urban.org/sites/default/files/stld_draft_0226_original_0.pdf.

uninsured." 83 Fed. Reg. at 38,235. Moreover, these healthy individuals are likely to be those currently enrolled in comprehensive coverage, not those currently going without insurance altogether. The Congressional Budget Office (CBO) and Joint Committee on Taxation (JCT) expect that "lower premiums are more likely to attract people and employers who already purchase coverage than they are to convince a person or employer to purchase coverage for the first time." Congressional  Budget Office, *How CBO and JCT Analyzed Coverage Effects of New Rules for Association Health Plans and Short-Term Plans*, (Jan. 2019).[26] The resulting situation is reminiscent of the unsustainable pre-ACA high-risk pools. As younger and healthier adults are enticed to leave the individual market, the ACA marketplaces will become increasingly precarious, placing pre-Medicare older adults in harm's way.

     **D.**     **Risk Pool Fragmentation Will Increase Premiums For Pre-Medicare Older Adults Remaining On ACA-Compliant Plans.**

Implementation of the STLDI Rule will cause premiums to rise for those remaining in the ACA-regulated individual health insurance market who do not qualify for a subsidy or tax credit. AARP's Public Policy Institute anticipates that the short-term coverage rule combined with the zeroing out of the individual mandate penalty will lead to higher annual premiums than they otherwise would for 60-year-olds purchasing silver level coverage on an ACA marketplace. Jane Sung et al., *Warning: Short-Term Plans = Higher Premiums for Older Adults* AARP Pub. Policy Inst., (March 21, 2018)[27]; see *also* Dena Bunis, *Short-Term Insurance Plans*.[28]

---

[26]  https://www.cbo.gov/system/files?file=2019-01/54915-New_Rules_for_AHPs_STPs.pdf.

[27]  https://blog.aarp.org/2018/03/21/warning-short-term-health-plans-higher-premiums-for-older-adults/.

[28]  https://www.aarp.org/politics-society/advocacy/info-2018/congress-reject-junk-health-insurance-plans-fd.html.

The CBO and JCT estimate that premiums will rise by roughly 3 percent as a result of the STLDI rule and the final rule concerning association health plans (83 Fed. Reg. 28912 (June 21, 2018)). Congressional Budget Office, *How CBO and JCT Analyzed Coverage Effects of New Rules for Association Health Plans and Short-Term Plans*, (Jan. 2019).[29] Other estimates that take into consideration the zeroing out of the individual mandate tax penalty estimate far higher premium increases for individual ACA-complaint plans– 18.3 percent on average – in the 43 states (including the District of Columbia) that do not prohibit or limit short-term plans. Blumberg, et al., *Updated Impact of STLDI*.[30] Returning to circumstances where older people and others are priced out of the insurance market is a huge step backwards for the nation, and a dangerous proposition.

## II.   THE STLDI RULE VASTLY EXPANDS INSURANCE COVERAGE THAT LACKS ESSENTIAL CONSUMER PROTECTIONS DESIGNED TO ENSURE THAT ALL AMERICANS, AND OLDER ADULTS IN PARTICULAR, HAVE ACCESS TO QUALITY, AFFORDABLE HEALTHCARE.

### A.   The ACA Instituted Protections Designed to Remedy Ubiquitous Discrimination Based on Age and Health Status.

The ACA changed the landscape of our national healthcare system and addressed many longstanding discrimination practices. The ACA provides protection for older Americans by preventing insurance providers from denying coverage or setting insurance premiums based on preexisting conditions. 42 U.S.C. § 300gg-4. In addition, under the ACA, issuers may not charge pre-Medicare older adults on the individual market more than three times the rate of an

---

[29]   https://www.cbo.gov/system/files?file=2019-01/54915-New_Rules_for_AHPs_STPs.pdf.

[30]   https://www.urban.org/sites/default/files/publication/98903/2001951_updated-estimates-of-the-potential-impact-of-stld-policies_0.pdf. Estimates are current as of this report's August 2018 publication. Additional states may have enacted legislation limiting STLDI plns since publication.

individual age 21 and older. 42 U.S.C. § 300gg(a)(1)(A)(iii); *see also* 45 C.F.R.

§ 147.102(a)(1)(iii). This limit ensures adults ages 50 to 64 have access to affordable health

insurance coverage, while fairly taking into consideration predictions of increased healthcare

consumption that often accompanies aging. *See* Jane Sung*, Protecting Affordable Health*

*Insurance for Older Adults: The Affordable Care Act's Limit on Age Rating*, AARP Pub. Policy

Inst., (Jan. 2017).

Prior to the ACA, medical underwriting policies disproportionately affected pre-Medicare

adults because 48 to 86% of people ages 55 to 64 had preexisting health conditions. U.S. Dep't

of Health & Human Servs., *At Risk: Pre-Existing Health Conditions Could Affect 1 in 2*

*Americans: 129 Million People Could Be Denied Affordable Coverage Without Health Reform*,

at 4, fig. 1 (2011).[31] Insurers routinely denied coverage to applicants with a wide variety of prior

health problems that pre-Medicare aged adults tend to experience more often, such as heart

disease, stroke, rheumatoid arthritis, chronic headaches, kidney stones, and angina. *See* Gary

Claxton, et al., *Preexisting Conditions and Medical Underwriting in the Individual Insurance*

*Market Prior to the ACA*, Kaiser Family Foundation, (Dec. 12, 2016).[32] (hereinafter "Claxton, et

al., *Preexisting Conditions and Medical Underwriting*"). Insurers who did not deny coverage

outright often limited benefits or charged excessive premiums. H.R. Rep. No. 111-443, pt. 2, at

981 (2010); *see also* Claire Noel-Miller et al., *In Health Reform, Stakes are High for Older*

*Americans with Preexisting Health Conditions*, AARP Pub. Policy Inst. (March 2017) (assessing

---

[31]   https://aspe.hhs.gov/system/files/pdf/76376/index.pdf.

[32]   https://www.kff.org/health-reform/issue-brief/pre-existing-conditions-and-medical-
underwriting-in-the-individual-insurance-market-prior-to-the-aca/.

the impact of eliminating or weakening the ACA protections for individuals with preexisting conditions).

Insurers frequently charged people ages 50 to 64 exorbitant rates – five or six times, or even as much as 11 times greater than their younger counterparts – solely based on their age. *See* Karen Pollitz, et al., *How Accessible is Individual Health Insurance for Consumers in Less-Than-Perfect Health?*, Georgetown Univ. Inst. For Healthcare Research and Policy and Kaiser Family Foundation, (June 6, 2001).[33] Insurers used the applicant's age, commonly referred to as "age rating," when setting the applicant's premium rates , because, they argued, health status declines with age, leading to more insurance claims. *See* NAIC & the Ctr. for Ins. and Policy Research, *Health Insurance Rate Regulation.*[34] This practice placed the cost of health insurance disproportionately on the oldest individuals in the market, and thus put insurance out of reach for many in the pre-Medicare age group. "For many older adults and older families, the higher out-of-pocket costs that come with greater medical use in older age, combined with high premiums due to steep age rating [], would lead to a high burden of total healthcare costs relative to income." Linda J. Blumberg et al., *Age Rating Under Comprehensive Healthcare Reform: Implications for Coverage, Costs, and Household Financial Burdens*, Urban Inst., at 8 (Oct. 2009).[35]

### B.  Under the Challenged Rule, Older Adults Will Be Left With Fewer and More Expensive Healthcare Coverage Options in The Individual Market.

Because STLDI is not subject to the ACA's consumer protection provisions, the Departments' promise of "increased consumer choice," (83 Fed. Reg. at 38,214) especially

---

[34]   http://www.naic.org/documents/topics_health_insurance_rate_regulation_brief.pdf.

[35]   https://www.urban.org/sites/default/files/publication/30701/411970-Age-Rating-Under-Comprehensive-Health-Care-Reform-.PDF.

disingenuous for pre-Medicare older adults with preexisting conditions. Due to preexisting conditions, many pre-Medicare older adults will be unable to obtain a STLDI policy at all. For those healthy pre-Medicare older adults who are able to obtain a STLDI policy, the coverage will likely be expensive because there will be no protections against or limits on age rating in how premiums are set. *See* Claxton, et al., *Pre-existing Conditions and Medical Underwriting*.[36] Coverage will also be inadequate, leaving people with many unmet medical needs because of the myriad of conditions STLDI policies often exclude. *Id.*

Moreover, individuals who buy into STLDI plans may not know what protections exist – or are lacking—in their plan. Even if these individuals initially secure a STLDI policy, they may be subject to post-claim underwriting or rescission – a practice prohibited under the ACA – that can result in abrupt cancellation of coverage. For example, before the ACA, one retiree, several months after purchasing a series of 6-month short-term insurance policies, went to the doctor regarding a lump that had been behind her ear for about a year. Peter Harbage M.P.P., *Primer on Post-Claims Underwriting*, Robert Wood Johnson Foundation, at 3-4 (citing Julie Appleby, *People left holding the bag when policies revoked*, USA Today, (December 13, 2007)).[37] The lump was diagnosed as cancer, and her insurer canceled her policy on the basis that the lump was preexisting. *Id.* The insurer said, "an ordinarily prudent person would seek diagnosis or treatment en a lump initially presents itself[,]" which, according to the insurer in this example, was prior to the purchase of her policy. *Id.* Without restrictions on such practices, pre-Medicare older adults

---

[36]   https://www.kff.org/health-reform/issue-brief/pre-existing-conditions-and-medical-underwriting-in-the-individual-insurance-market-prior-to-the-aca/.

[37]   https://harbageconsulting.com/wp-content/uploads/2016/08/Primer-on-Post-Claims-Underwriting.pdf.

are vulnerable to the discriminatory and even predatory practices of insurers, who are not required to make paying for medical care a priority.

Returning to pre-ACA age rating practices will also harm pre-Medicare older adults. An AARP research report conducted by Milliman estimated that changing the ACA age rating limit from 3:1 to 5:1 in the individual markets would significantly increase premiums for pre-Medicare older adults. Jane Sung, et al., *Impact of Changing The Age Rating Limit for Health Insurance Premiums*¸ AARP Pub. Policy Inst. (Feb. 2017).[38] Even while maintaining the other protections the ACA provides, increasing the age rating limits within the structure of the ACA would increase premiums by 22 percent for adults age 60 plus, and by 13 percent for adults ages 50 to 60. *Id.* at 1. Without any age rate limitation, and without any of the other consumer protections of the ACA, STLDI plans will not provide an affordable option for many pre-Medicare older adults who will be left paying out of pocket to secure medical treatment excluded from their STLDI plan.

This loss of essential consumer protections, will leave many pre-Medicare older adults in a dangerous position of being priced out of the health insurance market and having to forego medically necessary services.

**C.**     **Expansion of STLDI Will Create Confusion In The Individual Insurance Market.**

The STLDI rule makes clear that with the exception of the duration and required disclosure language, regulation of the marketing practices of STLDI issuers will be left to the states. 83 Fed. Reg. at 38,219. The disclosure language contained in the final rule states that each

---

[38]   https://www.aarp.org/content/dam/aarp/ppi/2017-01/Final_Spotlight_Age_Rating_Feb7.pdf.

individual consumer is responsible for reviewing their STLDI policy in detail to determine what

conditions are covered and what exclusions may apply. The language states, in relevant part:

> Be sure to check your policy carefully to make sure you are aware of any
> exclusions or limitations regarding coverage of preexisting conditions or health
> benefits (such as hospitalization, emergency services, maternity care, preventive
> care, prescription drugs, and mental health and substance use disorder services).
> Your policy might also have lifetime and/or annual dollar limits on health
> benefits.

*Id.* at 38,242. Leaving consumers to fend for themselves with only this limited information will

increase confusion and create an environment that is ripe for deceptive marketing of STLDI

plans and fraud against consumers, especially those who are older. Indeed, an Urban Institute

report indicates the regulators in several states "acknowledged that many consumers would likely

be confused about the differences between short-term plans and ACA-compliance coverage."

Sabrina Corlette, et al., *The Marketing of Short-Term Health Plans: An Assessment of Industry

Practices and State Regulatory Responses*, Urban Institute (Jan. 2019) (Corlette, et al., *The

Marketing of Short-Term Health Plans*).[39]

Many older adults have a difficult time navigating healthcare options, which become

increasingly complex. A recently published AARP survey reveals that almost two-thirds of pre-

Medicare older adults (ages 60 to 64) were unable to answer a majority of four basic questions

about the program. Kent Allen, *Many Older Adults Can't Answer Basics on Medicare*, AARP,

(Sept. 18, 2018).[40] Even in the Medicare context, where the government has worked diligently to

---

[39]   https://www.urban.org/sites/default/files/publication/99708/moni_stldi_final.pdf.

[40]   https://www.aarp.org/health/health-insurance/info-2018/most-adults-cant-answer-medicare-
questions.html?intcmp=HEA-HI-FEED.

simplify enrollment processes, making coverage choices involves complex decision-making.
Dena Bunis, *How to Choose a Medicare Plan*, AARP Bulletin, (Oct. 2017).[41]

Expanding the availability and duration of STLDI policies promises to complicate
matters further. The deputy commissioner of the California Department of Insurance has said
"[p]eople don't realize these products don't cover much of anything," and "[i]f they end up
needing significant care, they probably won't be able to afford the share of the costs they have to
pay." Nancy Metcalf, *Is 'Short-Term' Health Insurance a Good Deal?*, Consumer Reports, (Dec.
22, 2017)[42] (hereinafter Metcalf, *Is 'Short-Term' Health Insurance a Good Deal*?) Individuals
are even less likely to be able to make fully informed choices in light of the history of brokers
"using tactics rife with fraud" to induce consumers to purchase these plans. Abelson,
*Floodgates*.[43] Indeed, a marketing scan performed after implementation of the STLDI rule shows
that consumers are likely to have difficulty obtaining the information necessary to make
informed insurance purchases. Corlette, et al, *The Marketing of Short-Term Health Plans*.[44]

STLDI brokers are notorious for their aggressive and misleading marketing practices, and
both individual consumers and state regulators have begun to file lawsuits to curb unlawful
practices. *Id.* In the past two years, Pennsylvania regulators took legal action against seven
agents for misrepresenting STLDI plans. *Id.* In Montana, the state auditor recommended

---

[41]   https://www.aarp.org/health/medicare-insurance/info-2017/choosing-medicare-plan.html?
intcmp=AE-HEA-HI-COV-R1-C1-ART-CRGTHM2017.

[42]   https://www.consumerreports.org/health-insurance/is-short-term-health-insurance-a-good-
deal/.

[43] https://www.nytimes.com/2017/11/30/health/health-insurance-obamacare-mandate.html.

[44] https://www.urban.org/sites/default/files/publication/99708/moni_stldi_final.pdf.

disciplining a group of STLDI brokers who used "misinformation and deception" to market STLDI plans to consumers, when it was found that many buyers did not know their plans were not ACA-compliant and did not cover preexisting conditions. Metcalf, *Is 'Short-Term' Health Insurance a Good Deal*?.[45] In their comment to the STLDI proposed rule, NAIC and the Center for Insurance Policy Research ("CIPR") requested that implementation of the rule be delayed until 2020, so that states could "modify existing laws and regulations to protect consumers and state markets." NAIC and CIPR Comment, April 23, 2018.[46] Significantly, many states' regulators lack the authority to reject or require modifications to STLDI policies before they are sold. Corlette, et al, *The Marketing of Short-Term Health Plans*.[47] In addition, in many states, insurers who offer short term plans are not required to annually refile their plans or rates with the state unless there is a "material" change to the benefit design or formula by which rates are set (unlike ACA-compliant plans, which must be refiled annually). *Id.*

## III.   THE GOVERNMENT'S COMPARISONS TO COBRA ARE ARBITRARY, CAPRICIOUS AND DEMONSTRATE THE INTENT TO UNDERMINE THE ACA RATHER THAN TO COMPLEMENT IT.

The STLDI rule is arbitrary and capricious for the many reasons accurately explained in Plaintiffs' Memorandum of Law in Support of their Motion for Summary Judgment. Pl. Mem., 37 – 45. In particular, as the Motion explains, the rule's 36-month duration limit is premised on a flawed analogy to COBRA coverage. *Id.* at 40. Even more problematic, the Departments have

---

[45]   https://www.consumerreports.org/health-insurance/is-short-term-health-insurance-a-good-deal/.

[46]   https://www.naic.org/documents/index_health_reform_section_180423_comments_limited_duration_nprm.pdf.

[47]   https://www.urban.org/sites/default/files/publication/99708/moni_stldi_final.pdf.

ensured that even that limit is not meaningful, so "short-term" coverage can last indefinitely. Such an expansive reading of the term "short-term" is inconsistent with Congress' intent in using that term in the ACA and defies reason.

**A.    Using One of COBRA's Maximum Coverage Periods as a Duration Limit for STLDI Plans is Arbitrary Because COBRA Coverage is Not Analogous to STLDI Coverage.**

The rule's analogy to a 36-month maximum period during which employers must continue to offer group health insurance coverage under COBRA is so inapposite as to be arbitrary and capricious. The Departments' comparison to COBRA as a form of transitional insurance coverage unravels upon examination. 83 Fed. Reg. at 38,221. The rule is misleading in describing COBRA as similarly providing coverage for "individuals who are not currently eligible for or enrolled in comprehensive medical coverage," (*id.*), because as Plaintiffs' motion notes, unlike STLDI, COBRA coverage *is* comprehensive.

Under COBRA, individuals may temporarily continue to access employer-based group health coverage, which must comply with the ACA, as well as other statutory protections. *See* 42 U.S.C. §§ 300gg-300gg-9 (describing coverage, cost-sharing, and non-discrimination requirements for ACA-compliant plans, including group health insurance coverage like that provided by an employer). Thus, the period of time that is appropriate for offering access to more comprehensive, employer-based group health coverage under COBRA cannot be analogized to the period of time that is appropriate for allowing minimal, limited coverage that is not ACA-compliant to continue. COBRA coverage does not present the myriad concerns discussed above for two key reasons: (1) it is not substantively inadequate or discriminatory against pre-Medicare older adults and others with preexisting health conditions; and (2) it is not a vehicle for destabilizing the individual markets by siphoning off younger, healthier individuals.

Indeed, COBRA was a Reagan-era reform that was a precursor to the ACA. *See* Thomas H. Somers, *COBRA: An Incremental Approach to National Health Insurance*, 5 J. Contemp. Health L. & Probs. 141, 142-43 (1992) ("[I]t was during Ronald Reagan's watch that the government, through COBRA, engineered an incremental and complex regulatory approach to facilitate affordable access to healthcare."). Congress enacted COBRA to permit terminated employees and their families to maintain group health coverage at group rates, because, among other reasons, individual health insurance "may be impossible to obtain for people with pre-existing health problems." S. Rep. No. 146, 99th Cong. 1st Sess., *reprinted in* 1986 U.S.C.C.A.N. 42, 412. Thus, extending access to group health coverage aided, rather than undermined, the goal of promoting comprehensive coverage and reducing the systemic cost of uninsured individuals seeking emergency care. *See* H.R. Rep. No. 241, 99th Cong., 2d Sess. 44, *reprinted in* 1986 U.S.C.C.A.N. 579, 622 (referring to the increasing number of uninsured individuals and the "decreasing willingness of our Nation's hospitals to provide care to those who cannot afford to pay").

Consistent with that goal, Congress placed a duration limit on mandatory continuing COBRA coverage to avoid overburdening plans while ensuring that covered individuals still maintained access to comprehensive coverage. *See Saltarelli v. Bob Baker Grp. Med. Trust*, 35 F.3d 382, 387 (9th Cir. 1994) ("Congress recognized that continuation coverage may be a burden on group health plans and sought to minimize it by permitting quick termination when the insured obtains *full* protection from another plan.") (emphasis original). In selecting the duration of coverage available under COBRA, Congress was not concerned that it would compete with or become indistinguishable from primary coverage. In fact, COBRA coverage has coexisted with STLDI plans for many years, and its duration limit has *always* been far longer—for good reason.

The two forms of coverage have always had separate purposes and, thus, separate durations. The Departments' analogy between the two durations makes no sense and is not supported by fact or the legislative history of COBRA.

**B.      The Rule's Instructions on How to Circumvent the 36-Month Duration Limit Without Threat of Federal Enforcement Demonstrates the Departments' Intent to Undermine the ACA.**

The rule makes clear that even the 36-month duration limit is illusory—and intentionally so. The rule explains how individuals can extend STLDI coverage indefinitely, and the Departments actively encourage doing so. The rule dedicates considerable effort to explain exactly how individuals and insurance providers may circumvent the 36-month limit without risk of federal agency intervention. 83 Fed. Reg. at 38,222. The rule describes multiple "mechanisms" to extend STLDI coverage. *Id.* First, individuals may purchase separate option contracts "or other instrument[s] under which the individual can, in advance, lock in a premium rate in the future." *Id.* Individuals may also "purchase a new, separate short-term, limited-duration insurance policy at a specified premium rate at a future date without re-underwriting[.]" *Id.* Under these circumstances, the Department suggests, "it may be possible for a consumer to maintain coverage under short-term, limited-duration insurance policies for extended periods of time." *Id.*

However, the rule does not stop there. Instead, it goes on to explain that the rule does not prohibit issuers from "offering a new short-term, limited-duration insurance policy to consumers who have previously purchased this type of coverage, or otherwise prevent consumers from stringing together coverage under separate policies offered by the same or different issuers, for total coverage periods that would exceed 36 months." *Id.* Finally, the rule explains that "[t]he Departments are also significantly limited in their ability to take an enforcement action under

23

[the relevant statutory provisions] with respect to such transactions involving products or instruments that are not health insurance coverage." *Id.*

This government guidebook on how to extend STLDI plans for beyond any reasonable sense of what short-term means is remarkable. Not only have the Departments declined to even attempt to place any limits whatsoever on individuals' or issuers' ability to extend STLDI coverage indefinitely, but they have also set forth detailed instructions on how to craft such extensions with impunity. More than that, the Departments have essentially disclaimed any authority to prevent individuals or issuers from taking advantage of loopholes. In short, the rule that purportedly sets limits on the term and duration of non-ACA-compliant individual insurance goes far out of its way to make any such limits meaningless.

This loophole-instruction-manual evinces the Departments' intent to undermine the ACA-compliant market rather than supplementing or complementing it. It is not difficult to discern that allowing STLDI plans to become permanent fixtures undermines the ACA-compliant market by creating a parallel STLDI market that will be in direct competition. The fact that the Departments instructed individuals and insurance providers on how to create that market means that undermining the individuals ACA market is not only the effect, but also the intent, of this rule. A regulation that undercuts the purpose of the statute it purports to interpret is invalid because it is unreasonable, arbitrary, and capricious. *Northpoint Technology, Ltd. v. F.C.C.*, 412 F.3d 145, 151 (D.C. Cir. 2005) ("A 'reasonable' explanation of how an agency's interpretation serves the statute's objectives is the stuff of which a 'permissible' construction is made"); *AARP v. EEOC*, 267 F. Supp. 3d 14, 30 (2017) ("The purpose of a statute, and the way in which a proposed rule furthers the purposes of a statute, is critical to the *Chevron* step two analysis"). A regulation that *deliberately* subverts the statutory purpose also relies on impermissible factors—

24

an independent reason for invalidating the rule. *Safari Club Int'l v. Zinke*, 878 F.3d 316, 325

(D.C. Cir. 2017) (citing *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co.*, 463 U.S.

29, 43 (1983)). Because this rule demonstrably sets out to undermine the statute it interprets it is

arbitrary and capricious and should be vacated and set aside.

## CONCLUSION

For these reasons, plaintiffs' Motion for Summary Judgment should be granted.

Dated: March 1, 2019                    Respectfully Submitted,

                                        */s/Kelly Bagby*
                                        Kelly Bagby (D.C. Bar # 462390)*
                                        Dara S. Smith (D.C. Bar # 1027046)
                                        Meryl D. Grenadier (D.C. Bar # 1024111)
                                        AARP Foundation
                                        601 E Street NW
                                        Washington, DC 20049
                                        T: (202) 434-2060
                                        kbagby@aarp.org
                                        dsmith@aarp.org
                                        mgrenadier@aarp.org
                                        *Counsel of Record*

                                        *Counsel for Amici AARP and*
                                        *AARP Foundation*

**CERTIFICATE OF SERVICE**

I hereby certify that on March 1, 2019 I electronically filed the foregoing Brief of Amici Curiae AARP and AARP Foundation in Support of Plaintiffs' Motion for Summary Judgment with the Clerk of the Court for the United States District Court for the District of Columbia by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

Date: March 1, 2019                         */s/Kelly Bagby*
                                            Kelly Bagby